PUBLIC VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **AMERICAN ACTIVE ANODE MATERIAL PRODUCERS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and,**<br><br>**LG ENERGY SOLUTION MICHIGAN, INC., PANASONIC COPORATION OF NORTH AMERICA, PANASONIC ENERGY CORPORATION OF NORTH AMERICA, TESLA, INC., HUZHOU KAIJIN NEW ENERGY TECHNOLOGY CO., LTD. and CONTEMPORARY AMPEREX TECHNOLOGY CO., LIMITED,**<br><br>**Defendant-Intervenors.** | **Before: Hon. Jennifer Choe-Groves, Judge**<br><br>**Court No. 26-02905** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Daniel B. Pickard, Esq.
Claire M. Webster, Esq.
Carson Easterling, Esq.

BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW
Washington, D.C. 20006
(202) 452-7900

*Counsel to American Active Anode Material Producers*

Dated: September 11, 2026

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT PURSUANT TO RULE 56.2 ........ 2

A. Administrative Determination Under Review ........ 2

B. Reasons for Contesting the Administrative Decision ........ 3

C. Issues Presented for Review and Summary of Argument ........ 3

III. STATEMENT OF FACTS ........ 5

IV. STANDARD OF REVIEW ........ 10

V. ARGUMENT ........ 11

A. The Commission's Determination that There Was No Significant Price Effects by Reason of the Significant Volume of Unfairly Priced Imports Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law ........ 12

1. The Commission's Determination and Failure to Address Material Arguments and Material Evidence Regarding Price Depression and Suppression is Unsupported by Substantial Evidence and is Otherwise Contrary to Law ........ 14

2. The Commission's Determination to Disregard the Questionnaire Import Purchase Cost Data Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law ........ 20

3. The Views Did Not Provide a Reasoned Analysis of the Evidence That Chinese Imports Were Sold at Prices Below Domestic Producers' Cost of Production ........ 22

4. The Commission's Determination that U.S. Purchasers Used a "Cost-Plus" Methodology in Negotiating Offtake Agreement Prices with Domestic Producers is not Supported by Substantial Evidence and Otherwise Not in Accordance with Law ........ 25

B. The Commission's Determination That There is No Causal Relationship Between the Subject Imports and The Lack of an Established Domestic Industry is Not Supported by Substantial Evidence and is Otherwise Contrary to Law ........ 37

C. The Commission's Determination that There Was No Adverse Impact by Reason of the Significant Volume of Unfairly Priced Imports Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law ........ 47

1. The Commission Failed to Examine Material Arguments and Evidence that Chinese Dominance had Adverse Impacts on the Domestic Industry ........ 48

2. The Commission's Determination that Subject Imports Have Not Caused Purchasers to Delay the Qualification of Domestic Producers is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law ........ 48

3. The Commission's Determination that the Domestic Industry's Performance and Ability to Obtain Financing Is Indicative of Normal Start-Up Conditions Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law ........ 52

**4. The Commission's Determination That Subject Imports Have Not Discouraged Investors and Hinder the Domestic Industry's Ability to Obtain Financing Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law ...................... 55**

**VI. CONCLUSION ........................................................................................................ 63**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....33, 45, 60

*Diamond Sawblades Manufacturers Coalition v. United States*,
612 F.3d 1348 (Fed. Cir. 2010)....1

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)....25, 54, 60

*Altx, Inc. v. United States*,
25 CIT 1100, 167 F. Supp.2d 1353 (2001)....11, 33, 37, 40, 48

*AWP Indus., Inc. v. United States*,
35 CIT 774, 783 F. Supp. 2d 1266 (Ct. Int'l Trade 2011)....61, 62

*Usinor Industeel, S.A. v. United States*,
26 CIT 467 (2002)....33

*Usinor v. United States*,
26 CIT 767 (2002)....10, 11, 40

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)....10

19 U.S.C. § 1677(7)(B)....11

19 U.S.C. § 1677(7)(C)(ii)....12, 14, 20

19 U.S.C. §1677(11)(C)....21, 38

19 U.S.C § 1677f....61

19 U.S.C. § 1677f(i)....14, 15

Tariff Act of 1930 Section 771(7)(C)(ii)....12, 14, 17, 20

**Other Authorities**

*Active Anode Material from China; Determinations*, 91 Fed. Reg. 16,968....3

*Active Anode Material From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 91 Fed. Reg. 7,247 (Feb. 17, 2026) ....................5

*Active Anode Material From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 91 Fed. Reg. 7,261 (Feb. 17, 2026) at 52 ....................6

*Certain Dried Salted Codfish from Canada*, Inv. No. 731-TA-199, USITC Pub. 1711 (July 1985) ....................12

*Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092-1093 (July 2006) ....................1

*Refillable Stainless Steel Kegs from Mexico*, Inv. No. 731-TA-1427, USITC Pub. 4976 (Oct. 2019) ....................11

*Tungsten Shot from China*, Inv. Nos. 701-TA-732, USITC Pub. 5655 (Aug. 2025) ....................12, 14

H.R. Doc. No. 103-316, vol. 1, *reprinted in* 1994 U.S.C.C.A.N. 4040 ....................14, 15

H.R. Rep. 100-40, 100th Cong. 1st Sess. (1987) ....................11

# I. INTRODUCTION

The negative determination underlying this appeal was the worst decision in twenty years by the U.S. International Trade Commission (the "Commission").[1] Before the Commission was a case in which China held more than 99 percent of market share in every full year of the period of investigation ("POI") and made sales of active anode material below U.S. companies' costs of production. Yet the Commission found that these overwhelming indicators of material retardation had no effect on the U.S. industry, a conclusion that defies both common sense and record evidence. The Commission's determination was based on circular reasoning, an impermissible disregard for material evidence, and factually incorrect statements that reflect a clear ignorance of the record. A staggering amount of critical evidence and key arguments was improperly ignored or overlooked in the Views, despite being repeatedly cited in both American Active Anode Material Producers' ("Plaintiff" or Petitioner") prehearing and post-hearing briefs.

Moreover, a troubling pattern of unreliability in evaluating supporting evidence such as contemporaneous business information underlies the Commission's analysis. Despite Petitioner's submission of over one thousand pages of objective evidence appended to its prehearing brief, Chair Karpel admitted during the final phase hearing that she had not reviewed all of the evidence submitted in support of the domestic industry. PR198 at 75 ("{T}here's voluminous exhibits in this investigation, so I can't say we've looked at all of them."). Moreover, Chair Karpel requested that Petitioner provide additional contemporaneous business documentation. *Id.* at 75-76. Petitioner complied with the request, submitting, among other documents, email correspondence from purchasers using Chinese prices in negotiations with the U.S. producers. Chair Karpel and

[1] *Compare Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092-1093 (Final) (July 2006). The Commission reversed its negative determination subsequent to judicial review. *See Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092-1093 (Final) (Remand) (May 2008); *Diamond Sawblades Manufacturers Coalition v. United States*, 612 F.3d 1348 (Fed. Cir. 2010).

Commissioner Johanson then disregarded this requested evidence, based in part on the timing of its submission and other parties' factually incorrect statements.[2]

Domestic industry witnesses testified to the causal connection between the harm to their business and subject imports including the extensive evidence of the influence of China's impact on the U.S. active anode material ("AAM") market. Despite this evidence, the Commission found <u>no</u> causal connection between the large volume of subject imports and the demonstrated price effects and adverse impacts of those imports.

Adding insult to injury, the Commission's determination contains objective factual errors, fails to address material evidence and arguments, is inconsistent with basic notions of economics, impermissibly ignores conflicting evidence, and misapplies relevant legal standards. The Commission denied relief to the domestic industry and its workers, and it did not even provide a reasonable explanation why. This is both unjust and contrary to law. For the reasons set forth in this brief, the Commission's determination that the undisputed market dominance of unfairly priced Chinese imports had no significant price effects, no adverse impact, and was not a causally related to the health of the domestic industry, must be remanded.

On behalf of American Active Anode Material Producers, we respectfully submit the following brief in support of Plaintiff's motion for judgment on the agency record.

## II. <u>STATEMENT PURSUANT TO RULE 56.2</u>

### A. <u>Administrative Determination Under Review</u>

The administrative determination under review is the U.S. International Trade Commission's Final Determination in the investigation of *Active Anode Material from China*. The

[2] At the time of the negative determination at issue, the Commission only had three Commissioners. Chair Karpel and Commissioner Johanson voted in the negative. Commissioner Kearns voted in the affirmative. Following the negative determination, the individuals nominated to replace Chair Karpel and Commissioner Johanson were confirmed by the U.S. Senate on July 16, 2026, and sworn in as U.S. International Trade Commissioners on August 17, 2026.

Final Determination was issued and published in the Federal Register on April 3, 2026. *See Active Anode Material from China; Determinations*, 91 Fed. Reg. 16,968 (Int'l Trade Comm'n Apr. 3, 2026).

**B. Reasons for Contesting the Administrative Decision**

Plaintiff's reasons for contesting the administrative decision are set forth in the Summary of Argument below, and in more detail in the Argument section of this memorandum.

**C. Issues Presented for Review and Summary of Argument**

1. Was the Commission's determination that the domestic industry did not experience negative price effects due to subject imports supported by substantial evidence and in accordance with law?

No. The Commission's determination is flawed because it failed to properly consider and analyze critical record evidence demonstrating that subject imports exerted negative price effects, including price suppression, depression, and underselling. Despite a record showing Chinese dominance in the market, Chinese imports selling below U.S. producers' costs of production, and U.S. purchasers using Chinese prices to lower domestic prices during negotiations, the Commission inexplicably concluded there were no negative price effects. This decision disregards material evidence, relies on factually incorrect statements, and fails to provide a reasoned analysis, warranting a remand.

2. Was the Commission's determination that the domestic industry was not adversely impacted by subject imports supported by substantial evidence and in accordance with law?

No. The Commission's determination that subject imports did not have a significant adverse impact on the domestic industry is not supported by substantial evidence and is contrary to law. The Commission's findings are flawed because it failed to properly analyze and address critical record evidence demonstrating the effects of Chinese dominance. Specifically, the Commission erroneously concluded that the domestic industry was experiencing normal startup

conditions, ignoring extensive evidence that China's monopolistic practices, subsidization, and price suppression have distorted market conditions and materially retarded the industry's growth. Further, the Commission improperly dismissed evidence without adequate explanation showing that low-priced Chinese imports delayed qualification processes and discouraged investment – evidence that directly contradicts its conclusion. The record demonstrates that the Commission's analysis is unsupported by substantial evidence, relies on erroneous factual statements, and fails to consider material arguments and evidence. These errors warrant a remand.

3. Was the Commission's determination that there is no causal relationship between the subject imports and the lack of an established domestic industry supported by substantial evidence and in accordance with law?

No. The Commission's causation analysis was illogical and lacked explanation required by law. The Commission improperly ignored extensive record evidence demonstrating that low-priced Chinese imports have materially retarded the establishment of the U.S. industry, including extensive, objective third-party evidence demonstrating China's dominance in the U.S. AAM market and its role in materially retarding the development of the U.S. industry. Plaintiff submitted over one thousand pages of credible government reports, academic studies, media reports, publications by think tanks and global organizations, financial sector reports and articles published by the law firms representing some of the key respondents. The Commission failed to address this evidence in a reasoned analysis, instead disregarding it and mischaracterizing it as mere news reports. The failure to address the considerable evidence of Chinese market domination and its adverse effects on the U.S. industry renders the Commission's determinations unsupported by substantial evidence and otherwise not in accordance with law.

Although the Views acknowledged the domestic industry's worsening financial condition, the two Commissioners concluded that this was expected for a startup operation and that the

industry's ability to secure funding indicated no material retardation. This analysis is flawed because it disregards critical evidence showing that Chinese market dominance and artificially low prices delayed U.S. producers' qualification processes, discouraged investment, and prevented industry growth. The Commission failed to address evidence linking Chinese pricing to investment delays, qualification setbacks, the overall deterioration of the domestic industry's viability and the decline in the start-up domestic industry's performance, rather than gradual improvement. Further, the Commission improperly determined that the domestic industry was in a normal startup phase, without providing a reasoned analysis of Chinese market manipulation and its impact on the industry's ability to establish itself.

The Commission's failure to provide the reasoned analysis, as required by law, as to the causal connection between the monopoly maintained by China and the failure for to establish a domestic industry warrants a remand for proper reconsideration.

## III. STATEMENT OF FACTS

On December 18, 2024, Plaintiff filed a petition with the Department of Commerce and the Commission alleging the establishment of the domestic active anode material industry was materially retarded by reason of dumped and subsidized imports from the People's Republic of China ("China"). PR1, CR1. On December 26, 2024, the Commission instituted antidumping and countervailing duty investigations on AAM from China. PR2.

The Department of Commerce made preliminary and final determinations of dumping and that the Chinese industry received large subsidies, including policy loans, tax reductions, and provision of land, utilities, and raw materials for less than adequate remuneration. *See Active Anode Material From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 91 Fed. Reg. 7,247 (Feb. 17, 2026); Issues and Decision Memorandum

accompanying *Active Anode Material From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 91 Fed. Reg. 7,261 (Feb. 17, 2026) at 52.

The record in the Commission's preliminary phase investigation demonstrated a reasonable indication that the establishment of an industry in the United States is materially retarded by reason of subject imports. PR89, CR85 at 3. This preliminary determination was consistent with several underlying determinations the Commission made based on the record.

The Commission further preliminarily found that "China dominates the global supply of AAM, accounting for 79 percent of the global supply of natural AAM and 97 percent of the global supply of synthetic AAM in 2023, the most recent full year for which data are available." *Id*. at 36. The Commission preliminarily found that the "the domestic industry has demonstrated the ability to produce AAM that is substitutable with subject merchandise." *Id*. at 37. However, evidence on the record indicated that it is extremely difficult for domestic producers to compete with subject imports on the basis of price and it is undisputed that prices for AAM imported from China are low. *Id*. at 45. As a result, the Commission preliminarily found it likely that [

]. *Id*. at 46. Plaintiff argued and the Commission accepted that the volume of imports was significant both on an absolute basis and relative to consumption. *See id.* at 42.

Notably, the Commission explained that one would normally expect a start-up industry to be able to improve its performance by increasing its production and sales, thereby realizing economies of scale. However, the record demonstrated that many of the domestic industry's performance indicators did not reflect such expected improvement. *Id*. at 52. The Commission specifically noted that "we are not persuaded by respondents' argument that domestic producers'

inability to complete purchasers' qualification processes is wholly unrelated to subject imports." *Id*. at 53

Based on the foregoing, including evidence that the size of the Chinese industry and its current domination of the U.S. market for AAM presents a significant obstacle to domestic producers' ability to compete with subject imports on the basis of price, the Commission found a reasonable indication that the low prices of subject imports combined with their dominant presence in the U.S. market had a retarding effect on the establishment of the domestic industry. *Id*. at 48.

In advance of the final phase hearing, Plaintiff submitted a prehearing brief on February 2, 2026. PR168, CR201/209. In support of its arguments, Plaintiff submitted over one thousand pages of objective evidence demonstrating China's dominance over the supply of AAM, including government reports, academic studies, media reports, publications by think tanks and global organizations, reports from the financial sector, and articles published by the law firms representing mandatory respondent BTR and U.S. purchaser Tesla. *See id*. at 14-54, Exhibits 3-42. The Views do not meaningfully discuss this evidence in its analysis.

Petitioner's Prehearing Brief likewise contained evidence demonstrating price effects on the domestic industry including price suppression, depression, and underselling. *Id*. at 97-101. Plaintiff submitted additional evidence of subject imports' price effects under the material retardation standard including China's control of the price of AAM in the market and prices being established below U.S. producers' costs of production. *Id*. at 101-115. Moreover, Plaintiff submitted significant and material evidence of the negative impacts of subject impacts on the domestic industry including causing purchasers to delay the qualification of domestic producers, discouraging investors, and hindering the domestic industry's ability to obtain financing. *Id*. at 115.

Plaintiff submitted its post-hearing brief following the Commission's hearing. At Chair Karpel's express request, this brief included additional evidence including contemporary business documentation and sworn affidavits demonstrating, *inter alia*, that subject imports directly hindered the domestic industry's ability to secure sufficient private investment and impacted offtake agreement price negotiations as a result of the prevalence of low-priced imports, thereby materially retarding the establishment of the domestic industry. PR202, CR240/248 at 10-14, Exhibits 2-6, 9-10. Among this evidence, the domestic industry submitted [ ] contrary to sworn evidence [ ]. *See id*. at Exhibit 2-6. Although Plaintiff included multiple affidavits and contemporaneous business documents in accordance with the Commission's request, Chair Karpel and Commissioner Johanson's majority opinion ultimately discarded this evidence. PR228, CR268 at 44, n.177.

The Commission's determination to disregard Plaintiff's evidence was based on inadequate analysis and objectively incorrect factual findings. Notably, the Commission disregarded contemporaneous business documentation demonstrating U.S. purchaser [ ] utilized a comparison to the price of Chinese AAM during price negotiations with U.S. producer [ ]. *Id*. at 45, n.177. The Commission disregarded this evidence on the grounds that it did not depict discussions with a U.S. purchaser but instead contains conversations "between [ ] and a [ ], not a U.S. purchaser." *Id*. This is directly contradicted by the Commission's collected questionnaire responses and Staff Report. *See* CR114 at I-3; PR158, CR199 at 3.13. The Commission relied on similar inaccurate statements in

disregarding Plaintiff's documentation from [ ] negotiations with [ ] for an offtake agreement which demonstrate that [ ] used Chinese price comparisons during commercial negotiations to leverage down the potential offtake agreement price. *See* PR202, CR240/248 at Exhibit 6, Tab A. The Commission found that this evidence shows a comparison of [ ]. However, the data collected by the Commission staff demonstrates that [ ]. *See* CR97 at I-2a. Thus, objectively, this was not, and could not have been, [ ].

The Commission also disregarded the sworn affidavits submitted by Plaintiff supporting the argument that the domestic industry's efforts to obtain financing were hindered by low-priced subject imports. *See, e.g.*, PR202, CR240/248 at Exhibits 7, 9, 10. The decision to disregard these affidavits was not in accordance with law, as discussed more fully below.

Plaintiff submitted government reports, academic studies, media articles, think tank and global organization publications, financial sector reports, and articles by law firms representing BTR and Tesla, which underscored how China's dominance impacts the U.S. AAM market. *See* PR168, CR201/209 at 14-54, Exhibits 3-42. Although this extensive evidence regarding China's monopolistic hold of the AAM industry contradicts several of the Commission's underlying findings, the Views do not meaningfully address this argument or any of the evidence offered in support.

The Commission determined that the large volume of imports, which were found to be "significant" on both an absolute and relative basis, had no significant price effects or adverse impact on the domestic industry. PR228, CR268 at 32. Specifically, the Commission noted that the domestic industry's performance and ability to obtain financing is indicative of normal start-up conditions and not significant adverse impacts. *Id.* at 47, 49-51. In making this determination, the

Commission did not address, in whole or in part, material evidence and arguments of the domestic industry.

Petitioner and other parties submitted their Final Comments on March 9, 2026. *See generally* PR219, CR262/266. On March 12, 2026, the Commission reached a two-to-one vote, finding that the establishment of an industry in the United States is not materially retarded by reason of imports. PR223. The Commission issued its opinion on April 1, 2026, CR268, and the public version was issued on March 31, 2026, PR228. The determination was published in the *Federal Register* on April 3, 2026. PR229. This action followed.

## IV. **STANDARD OF REVIEW**

The Court of International Trade reviews the actions of the Commission in antidumping and countervailing duty proceedings to determine whether they are supported "by substantial evidence on the record or otherwise not in accordance with law." *See* 19 U.S.C. § 1516a(b)(1)(B). Under well-established case law, "substantial evidence is 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Usinor v. United States*, 26 CIT 767, 770 (2002). "Every party before an agency of the United States has a right to expect a fair and logical determination containing as much analysis as is necessary to adequately demonstrate the basis for its conclusions." *Id.* at 785.

The Commission has an affirmative obligation to respond to the parties' material evidence and arguments. "{T}he Court of International Trade and {the U.S. Court of Appeals for the Federal Circuit} cannot evaluate the substantiality of evidence supporting an ITC determination 'merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (internal citations omitted).

Relevant to numerous issues in this appeal, while the Commission is presumed to have considered all the evidence in the record, it is also well established that the Commission must explain or counter salient evidence militating against its conclusions. The Commission must address material evidence and arguments, and it cannot invoke the presumption of consideration of evidence "as a shield against examination of the Commission's failure to present required analysis of the record evidence." *Usinor*, 26 CIT at 783. It cannot use the presumption of consideration of the evidence as a "talismanic justification" for the absence of specific discussion regarding key evidence or arguments of the parties. *Id.*

Mere citation to record evidence does not constitute, by itself, a consideration of a party's argument, and the Commission cannot fail to analyze evidence contradicting the agency's own conclusion where an interested party has specifically brought the possibility of conflicting evidence to the agency's attention. *Altx, Inc. v. United States*, 25 CIT 1100, 167 F. Supp.2d 1353, 1359-60 (2001). Relevant to this case, it is axiomatic that objectively factually incorrect findings cannot be supported by substantial evidence and merely stating a conclusion, without more, is not a reasoned analysis that can withstand judicial review.

## V. ARGUMENT

Section 1677(7)(B) specifies that the requirement to address volume, price, and impact of subject imports applies to all final determinations under sections 1671d(b) and 1673d(b), which include determinations of material retardation. *See* 19 U.S.C. § 1677(7)(B). The legislative history of this provision further confirms that it applies to "every investigation," including material retardation. H.R. Rep. 100-40, 100th Cong. 1st Sess. at 127 (1987). The Commission has framed its inquiry as to whether the industry's performance "reflects merely the normal start-up condition of a company entering an admittedly difficult market or, is the performance worse than what could reasonably be expected . . . " *See, e.g.*, *Refillable Stainless Steel Kegs from Mexico*, Inv. No. 731-

TA-1427, USITC Pub. 4976 (Oct. 2019) (Final) at 27; *Certain Dried Salted Codfish from Canada*, Inv. No. 731-TA-199, USITC Pub. 1711 (July 1985) (Final) at 5.

For the numerous reasons detailed herein, the Commission's determinations that the significant volume of imports, both by absolute volume and relative to consumption in the United States, did not have significant price effects or a significant adverse impact on the domestic industry, is not supported by substantial evidence and is otherwise contrary to law. We respectfully request the Court remand these determinations to the Commission for reconsideration.

### A. <u>The Commission's Determination that There Were No Significant Price Effects by Reason of the Significant Volume of Unfairly Priced Imports Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law</u>

The Commission's finding that the significant volume of imports, both by absolute volume and relative to consumption in the United States, did not have significant price effects on the domestic industry, is not supported by substantial evidence and is otherwise contrary to law.

Section 771(7)(C)(ii) of the Tariff Act of 1930, as Amended ("the Act") provides that, in evaluating the price effects of the subject imports, the Commission shall consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
>
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii). The Commission has previously noted that section 771(7)(C)(ii) applies to material retardation cases. *Tungsten Shot from China*, Inv. Nos. 701-TA-732 and 731-TA-1701, USITC Pub. 5655 (Aug. 2025) (Final) at 32. This required analysis may be viewed in a different light due to the different circumstances of a material retardation analysis, where an industry is experiencing unfair negative impacts while attempting to enter a market. *Id*.

Accordingly, under the applicable legal standard, the Commission must assess whether subject imports have had adverse price effects on the domestic industry, including price suppression, depression, or underselling. The record in the underlying investigation clearly demonstrated these "traditional" price effects were experienced by the domestic industry. The evidence also established that Chinese imports exerted significant price effects in the context of a material retardation analysis due to China's market dominance, which allowed China to set prices below U.S. producers' cost of production and allowed U.S. purchasers to exert downward pressure on U.S. producers' prices during contract negotiations.

Despite this substantial record evidence, the Commission inexplicably concluded, without adequate explanation, that there were no negative price effects on the U.S. industry due to subject imports. There are numerous errors underlying the Commission's price effects determination, including that the Commission failed to fully address material evidence and arguments that (1) statutorily required price effects factors such as price suppression, depression, and underselling demonstrate the negative price effects on the domestic industry; (2) subject imports were sold below U.S. producers' costs of production; (3) U.S. purchasers used low prices of subject imports to lower the domestic industry's prices during offtake agreement negotiations; and (4) evidence detracted from the two Commissioners' finding that a "cost-plus" analysis–without any consideration whatsoever of Chinese/market pricing–was used during contract negotiation. The Commission committed further error by using objectively factually incorrect statements in its analysis and disregarding evidence on the improper basis of a U.S. purchaser's nonparticipation. *See* PR228, CR268 at 30, 45. Accordingly, the Commission's determination is not supported by substantial evidence and is not otherwise in accordance with law because it disregards material evidence, reaches an unreasonable conclusion, and was based on factually incorrect statements.

### 1. The Commission's Determination and Failure to Address Material Arguments and Material Evidence Regarding Price Depression and Suppression Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law

The Views failed to fully address the record evidence and material arguments of price suppression and depression. Instead, the Views offer a conclusion without a reasoned analysis.

Section 771(7)(C)(ii) of the Act provides that, in evaluating the price effects of the subject imports, the Commission shall consider whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would not have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii). Section 771(7)(C)(ii) applies to material retardation cases despite the fact that this analysis might be approached differently than in a material injury case, given the distinct circumstances involved in a material retardation determination. *See* Petitioner's Prehearing Brief at 97, PR168, CR201/209. Nevertheless, the Commission is statutorily obligated to consider whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would not have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii). The Commission is also obligated to specifically reference in its determinations factors and arguments that are material and relevant, or it must provide a discussion or explanation in the determination that renders evident the agency's treatment of a factor or argument. H.R. Doc. No. 103-316, vol. 1 at 892, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4216; *see also* 19 U.S.C. § 1677f(i).

Evidence of the traditional price factors including price suppression and depression are present on the underlying record.[3] It is uncontested that U.S. producers' total cost of goods sold

[3] Chair Karpel and Commissioner Johannson appear to oddly fault Petitioner for making arguments as to the statutorily required factors and also making arguments that the material retardation analysis requires additional analysis. *See* Views at 28, n.156. For example, while the Commission is required by statute to analyze underselling, which was present in the current investigation, it has also examined whether a selling price was set at injuriously low levels for new market participants. *See Tungsten Shot from China*, Inv. Nos. 701-TA-732 and 731-TA-1701, USITC Pub. 5655 (Aug. 2025) (Final) ("Tungsten Shot"). Both were present in the current case, and Petitioner made both arguments.

("COGS") as a percentage of net sales increased throughout the POI [ ], resulting in price suppression. PR187, CR253 at 6.3 (Table 6.1); PR228, CR268 at 35 n.150. Strikingly, the domestic industry's COGS-to-net-sales ratio was [ ] percentage points higher in interim 2025, at [ ] percent, than in interim 2024, at [ ] percent. *Id*. This demonstrates the significant degree to which domestic prices were suppressed due to subject imports.

Rather than grapple with the evidence of price suppression on the record, the Commission rests its analysis on the conclusion that because "the industry is in a start-up phase, such trends are not particularly probative." Views at 37, PR228, CR268. However, this conclusion itself lacks reasoned analysis. The Commission's Preliminary Views noted that one "would expect a nascent industry in a start-up phase to be able to improve its performance by increasing its production and sales, while realizing efficiencies of scale and thereby lowering its average unit costs." PR89, CR85 at 48. The Preliminary Views further acknowledge that the domestic industry did not improve as expected over the POI, noting "many of the domestic industry's performance indicators do not reflect such expected improvement." *Id*. at 52.

The Commission's Views report that data collected in the final phase confirms that the performance of the domestic industry was indeed worsening. Views at 48, PR228, CR268. Indeed, Plaintiff argued that the domestic industry cannot make such expected improvements because the U.S. producers are startups attempting to enter a very abnormal, near monopolistic market, essentially competing against the government of the People's Republic of China and its strategy of bringing excess capacity online and crashing global prices. PR202, CR240/248 at 14 Exhibit 1, Question VII. Despite this, the Views ignore Plaintiff's evidence that China's dominance of the entire global AAM market has affected the U.S. industry's ability to compete with Chinese AAM

producers, making this far from a "normal" start-up. The Commission's Views do not provide a reasoned analysis to address these contrary facts but instead provide a conclusion, *i.e.*, the domestic industry is in a start-up phase, rather than a discussion of the evidence. Moreover, this stated conclusion is contradicted by the fact that the industry's performance was actually worsening. For this reason, too, the Commission's price effects determination should be remanded for further consideration.

The record additionally contained clear evidence of price depression. Specifically, the data contained in the Final Staff Report shows that domestic average unit values ("AUVs") decreased over the three-year period. *See* PR216, CR253 at 6.4 (Table 6.1) (unchanged from prehearing report); PR168, CR201/209 at 99-100. In 2022, domestic AUVs were [ ] per pound and declined to [ ] per pound in 2024, a decrease of [ ] percent over the POI. PR216, CR253 at 6.4 (Table 6.1). Of the six U.S. producers, half reported reducing prices since January 1, 2022, to avoid losing sales to Chinese competitors. *Id*. at 5.23. Accordingly, the record evidence demonstrates that U.S. prices were depressed on an absolute basis.

This price depression occurred at a time of increasing demand, underscoring the severity of subject imports' price effects. PR228, CR268 at 16-18. Indeed, the Views confirm that demand for AAM increased during the POI. *Id*. Rather than engage in a reasoned analysis, the Commission avoids addressing the data by disregarding it as being of little probative value because the domestic industry's U.S. shipments were comprised almost entirely of trial/test shipments. *Id*. at 35-36. However, categorization of the domestic industry's shipments as trial/test shipments does not explain why the domestic industry's prices decreased throughout the POI, especially during a corresponding period of increasing demand. According to basic economics, it is illogical for an industry to continue lowering prices when demand is growing, absent external pressure. And there

was mostly certainly external pressure, as China had the vast majority of the market and its prices, too, were decreasing during a period of growing demand.

While the Commission recognized that section 771(7)(c)(ii) applies to material retardation cases, its Views failed to adequately grapple with the evidence demonstrating price suppression and depression, instead dismissing the traditional price effects analyses as being of limited probative value in determining whether the domestic industry has been materially retarded by subject imports. *Id*. at 32. While both the Plaintiff and the Commission have recognized that evidence of price suppression and/or depression may require analysis in a different light than it would in a material injury case, the Commission failed to provide the reasoned analysis required by law as to the record evidence that demonstrated negative price effects on the domestic industry under the Commission's traditional price factors. *Id*. at 32-33, 35 (citing PR168, CR201/209 at 114). Nor does the Commission discuss any legal authority that allows it to decline to conduct a statutorily required analysis.

This is especially perplexing in light of the Commission's analysis of the statutory factors in the preliminary phase, when it ultimately concluded that, "the size of the Chinese industry and its current domination of the U.S. market for AAM presents a significant obstacle to domestic producers' ability to compete with subject imports on the basis of price." PR89, CR85 at 46-48. The Commission preliminarily found "a reasonable indication that the low prices of subject imports combined with their dominant presence in the U.S. market had a retarding effect on the establishment of the domestic industry." *Id*. Indeed, Commissioner Kearns separately concluded that the domestic industry experienced significant price effects based on the low, declining prices of large volumes of subject imports, which remained below U.S. producers' raw material costs

throughout the POI, and evidence of Chinese prices influencing negotiations for offtake agreements. PR228, CR269 at 10.

Petitioner offered supporting evidence that Chinese imports have had significant price effects on the domestic industry. For example, Plaintiff's prehearing brief presented a report authored by the Foundation for Defense of Democracies, a research institute focusing on national security and foreign policy, which analyzed the particularly difficult condition created by China's domination. PR168, CR201/209 at Exhibit 19. The report demonstrates that China controls the upstream, midstream, and downstream segments of the battery supply chain through monopolization, price manipulation, subsidies, and export dumping. As a result, China's control of the supply chain enables it to limit foreign competition by creating excess supply and dumping into markets at heavily discounted prices, damaging international competitors or pushing them out of the market altogether. *Id*. The Commission's Views are completely silent as to this evidence.

Another report authored by the International Energy Agency confirmed that the downward pressure on graphite/AAM prices is a byproduct of China's domination and oversupply. *Id*. at Exhibit 22. The two Commissioners do not address this evidence. The Atlantic Council, a U.S. think tank, similarly highlighted China's market dominance and its resultant ability to manipulate supply, undercut potential competitors, and discourage new entrants by creating high price volatility. *Id*. at Exhibit 20. The Views are silent as to this evidence. The Federation of American Scientists, a nonpartisan, nonprofit policy research and advocacy organization, concurred regarding the effects of Chinese dominance on the U.S. AAM market. Its report illustrated how China deliberately drove down market prices for graphite to maintain its market share, noting, "while other companies pulled back their production volume significantly, Chinese-owned companies pulled back much less and, in some cases, continued to expand their production,

generating an oversupply of . . . natural and synthetic graphite. Government policies enabled these decisions by making it financially viable for Chinese companies to sell materials at low prices that would otherwise be unsustainable." *Id*. at Exhibit 21. This evidence also is not addressed.

A policy brief published by the Center for International Private Enterprise was entered into the record and that demonstrated that China engages in non-market and anti-competitive practices that distort the global playing field, often forcing competitors out of the market. *Id*. at Exhibit 23. Chinese firms' massive overproduction has driven prices to unsustainably low levels for many companies, but Chinese producers can withstand these price drops due to their government's financial support and a willingness to disregard international standards. *Id*. Chair Karpel and Commissioner Johanson do not engage with this evidence either.

As further documented in the *Alpha Equity Report*, because China makes virtually all anode parts for batteries, it controls nearly the entire market and has power over the entire supply chain and sets the price of graphite low, creating a significant barrier to new players entering or competing in the market. *Id*. at Exhibit 29. In fact, graphite prices are experiencing "multi-year lows," creating a "sustained period of depressed prices that discourages much-needed investment in diversifying the supply chain away from China." *Id*. The Views likewise do not provide any analysis of this evidence.

Instead, in the final phase Views, the Commission concludes without adequate analysis or explanation that the traditional price depression/suppression factors and the supporting data are of limited probative value under the facts of this investigation. The Commission's analysis offers no meaningful response to Plaintiff's evidence demonstrating the widespread agreement that non-Chinese AAM producers are experiencing negative price effects as a result of China's dominance. The Commission will no doubt respond that it is presumed to have considered all evidence.

However, the Commission has an affirmative obligation to respond to the parties' material evidence and arguments. "{T}he Court of International Trade and this court {the U.S. Court of Appeals for the Federal Circuit} cannot evaluate the substantiality of evidence supporting an ITC determination 'merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Suramerica*, 44 F.3d at 985 (internal citations omitted).

The Commission utterly failed to address material evidence and material arguments, rendering its determination unreasonable, unsupported by the statute, and contrary to law.

#### 2. The Commission's Determination to Disregard the Questionnaire Import Purchase Cost Data Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law

Section 771(7)(C)(ii) of the Act provides that, in evaluating subject imports' price effects, the Commission shall consider whether "(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States." 19 U.S.C. § 1677(7)(C)(ii).

In its Preliminary Views, the Commission noted its difficultly in calculating underselling due to the limited number of quarterly comparisons and low volumes of commercial sales, emphasizing "this relative lack of pricing data suggests that the domestic industry is having difficulty entering a market currently dominated by subject imports." PR89, CR85 at 45. Subsequently, the Commission requested that importers report purchase cost data for AAM imported from China, based on the landed, duty-paid ("LDP") value. This data demonstrated: "landed duty-paid costs for AAM imported from China were below the sales price for U.S.-produced product in 11 of 14 instances {(} more than 70 million pounds), with differentials ranging from [ ] to [ ] percent." PR216, CR253 at 5.22. Indeed, the Commission noted in its Views that the purchase costs of subject imports for Products 1, 3, and 4 declined irregularly by

[ ] percent, [ ] percent, and [ ] percent, respectively, over the POI. *See* PR228, CR268 at 35 n.150. This occurred at a time of increasing demand, further emphasizing the degree of underselling. *Id*. at 17-18. Accordingly, the import purchase cost data demonstrated significant underselling by Chinese products.

The Commission does not provide a logical analysis or discussion as to why these data do not amount to negative price effects contributing to the "material retardation of the establishment of an industry in the United States." 19 U.S.C. §1677(11)(C). In particular, the Commission does not explain why underselling in the amount of over 70 million pounds, with differentials ranging from [ ] to [ ] percent does not meet this threshold. *See* PR216, CR253 at 5.22. The Commission instead disregards this evidence on the basis that the domestic industry's data reflects prices of test/trial shipments while Chinese imports are commercial shipments. PR228, CR268 at 36. This reasoning contradicts the veracity of the Commission's own conclusions. Indeed, its own analysis acknowledges that China's finished, qualified commercial products <u>are lower priced than the domestic industry's test sample prices</u>. Yet the Commission does not conclude that this demonstrates any price effect on the domestic industry. Without a reasoned explanation of the contradictions in this analysis, the Commission's conclusion is illogical and not in accordance with law. This bears repeating: China sold more than 70 million pounds of AAM of finished product at continuously falling prices during a period of growing demand, such finished products were even lower-priced than the domestic industry's test samples to enter the market, and Chair Karpel and Commissioner Johanson found that this had no effect on the U.S. industry.

This is more confusing in light of the Commission's preliminary determination that "the domestic industry has demonstrated the ability to produce AAM that is substitutable with subject merchandise." *Id*. at 37. As such, the Commission's determination to disregard the import purchase

cost data collected by questionnaires is also not supported by substantial evidence and is otherwise contrary to law.

### 3. The Views Did Not Provide a Reasoned Analysis of the Evidence That Chinese Imports Were Sold at Prices Below Domestic Producers' Cost of Production

The Commission's determination that Chinese imports that were sold below the U.S. producers' cost of production had no adverse price effects is not supported by substantial evidence and is otherwise contrary to law.

The record demonstrates that China has set the "market price" in the United States below U.S. producers' cost of production. The domestic industry's per unit COGS was [ ] in 2022, [ ] in 2023, and [ ] in 2024. PR216, CR253 at 6.4 (Table 6.1). Chinese imports' U.S. shipment AUVs were [ ] in 2022, [ ] in 2023, and [ ] in 2024. *Id*. at 4.3 (Table 4.2). The Commission's own data demonstrates that subject imports' U.S. shipment AUVs were below even the domestic industry's raw material costs. The domestic industry's per unit raw material costs were [ ] in 2022, [ ] in 2023, and [ ] in 2024. *Id*. at 6.4 (Table 6.1). As Commissioner Kearns's Separate Views acknowledged, Petitioner also provided supporting analysis using global raw material and average energy costs demonstrating that Chinese AAM is sold in the United States below the costs of inputs for AAM, and this is not due to inflated or skewed production costs of a nascent industry. PR228, CR269 at 2 n.3; *see also* Post-Hearing Brief at Exhibit 1 at 49, PR202, CR240/248. In other words, the analysis demonstrating Chinese prices are established below the costs of raw materials is unaffected by the nascent status of the domestic industry. As a result, the price of subject imports in the U.S. market clearly and effectively established a price at which the domestic industry could not make a profit, yet bafflingly, Chair Karpel and Commissioner Johanson indicate that this had no negative effect on the domestic industry.

Further supporting Plaintiff's argument, in the underlying investigation, Commission Staff audited the data reported by the largest U.S. producer. [

]. Syrah Verification Report at 7, CR200. Importantly, unchanged in the Final Staff Report is that the average unit values of loose AAM in dollars per pounds was [ ] in 2024 and [ ] in interim 2025. Staff Report at 4.8 (Table 4.5), PR216, CR253. Therefore, the data collected by Commission Staff demonstrated that Chinese prices are lower than both raw material prices and the cost of production for Syrah's verified and confirmed data. [ ] U.S. Producers' Questionnaire at II-9a, CR97. This evidence was also not addressed in the Views.

The evidence of Chinese prices below U.S. producers' AUVs and raw material costs becomes even more salient when considered in the context of demand conditions in the market. Indeed, the Views confirm that demand for AAM increased during the POI. Views at 16-18, PR228, CR268. Yet, during this period of increasing demand the Chinese shipment price fell from an AUV of [ ] in 2022 to [ ] in 2024. PR216, CR253 at 4.3 (Table 4.2).

It defies the logic of basic economics for an industry to continue dropping their goods' prices during a period of increasing demand, unless it is an attempt to prevent the establishment of competitors. Yet the Commission fails to explain how this behavior is not an indication that China

is wielding its low prices as a weapon to prevent the U.S. industry from establishing itself in the market, especially in light of record evidence directly supporting that China was engaged in predatory pricing to prevent the establishment of competitors. PR168, CR201/209 at 56-59, Exhibits 9, 14, 16, 18, 31-33.

The Commission notes that it "also examined the extent to which the price of subject imports has affected the domestic industry's ability to price its products in relation to its costs." PR228, CR268 at 16. Despite this, confusingly, the Commission disregards this extensive evidence in a footnote stating, "given the start-up nature of the domestic industry and the lack of commercial sales, it is not to be expected that the very limited commercial sales and the test/trial shipments during the POI would cover production costs." *Id.* at 40, n.166. This explanation does nothing to grapple with the evidence of subject imports being sold at below U.S. producers' production and raw material costs. Plaintiff emphasizes that whether the domestic industry is nascent or not is not relevant in the context of raw material costs.

Moreover, Plaintiff submitted third-party evidence that China's monopolistic market control by a nonmarket economy government allows subject imports to crash global prices to "multi-year lows" creating a "sustained period of depressed prices." PR168, CR201/209 at Exhibit 29. Chinese companies are able to withstand periods of selling at these uneconomic prices due to government support, while U.S. producers deteriorate financially as China prevents their entrance into the market. *Id.* at Exhibit 14. The Commission's analysis does not address China's monopolization of the U.S. and global AAM markets. Indeed, despite China representing nearly 100 percent of market share, which was never contested, the two Commissioners not only fail to provide any reasoned analysis regarding the evidence of monopolization but also do not even use the word "monopoly" in their Views.

The Commission's determination that subject imports' prices decreasing to well below the domestic industry's cost of production and raw material costs during a period of increasing demand is illogical without a reasoned explanation. It ignores this evidence, without reasoned analysis, and as such is contrary to law and necessitates a remand. *See, e.g.*, *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

### 4. The Commission's Determination that U.S. Purchasers Do Not Consider Chinese Pricing in Negotiating Offtake Agreement Prices with Domestic Producers Is Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law

Underlying the Commission's erroneous determination that subject imports did not have significant price effects is its finding that U.S. purchasers use a "cost-plus" analysis during offtake agreements negotiations with domestic producers (that allowed U.S. producers to cover their cost plus generate a profit) without any consideration of market prices. PR228, CR268 at 40-48. The Commission's determination that a "cost-plus" methodology – divorced from any effect of Chinese pricing - was used is flawed for numerous reasons, including that the analysis: (1) fails to address material evidence including contemporaneous business documentation detracting from the Commission's conclusion; (2) includes factually incorrect statements regarding [ ]; (3) includes factually incorrect statements regarding a U.S. producer's operations; (4) impermissibly disregards Petitioner's evidence on the basis of nonparticipation of a U.S. purchaser; and (5) fails to consider negotiations in the context of China controlling prices in the United States.

#### a. <u>The Commission Failed to Examine Material Evidence that Detracts from Its Conclusion</u>

Regarding the Commission's finding that U.S. purchasers use a "cost-plus" analysis, the Commission concluded that, "U.S. AAM purchasers including Tesla, LG, and Panasonic use a 'cost-plus' methodology in negotiating offtake agreements with domestic producers, which

ensures that domestic producers are reimbursed for all production costs (e.g., direct materials, labor, overhead) plus a predetermined profit margin (the 'plus')." PR228, CR268 at 40. Further, the Views concluded that "negotiated offtake prices were the result of arms-length transactions between sophisticated U.S. producers and purchasers and that the results of these negotiations were offtake prices that allowed producers to cover their cost plus generate a profit." *Id*. at 41.

The Commission essentially turned a blind eye to the evidence demonstrating that U.S. purchasers used comparisons to Chinese prices to lower U.S. producers' prices, including important financial metrics, questionnaire responses, testimony, and contemporaneous business documents. Further, the Commission's analysis was, in part, based on factually incorrect statements that were contradicted by evidence on the record, including its own Staff Report.

First, as detailed in Section V.A.1, it is well-established on the record that Chinese AAM, and thus Chinese AAM prices, dominate the U.S. market. The Commission itself describes subject imports from China as a "dominant source of AAM in the U.S. market during the POI." *Id*. at 31. As the dominant market force, it is only logical that consideration would be given to the price of Chinese AAM during commercial offtake agreement negotiations. The Views fail to address how evidence that China dominates the market at unfairly low prices would not affect the price negotiations of the domestic industry.

This is consistent with testimony from the Staff Conference, where the domestic industry testified that customers want to buy the lowest-priced AAM, so China's abundance of very low-priced product creates a non-starter during negotiations as the domestic industry is unable to move past pricing discussions. PR224 at 57, 60. Specifically, the domestic industry testified that, "{W}e do have a concern that if one country is dominating this market and continues to supply material

at a -- or continue to cut the prices or continue to underprice the market, then the local industry will never get established." *Id*. at 88.

Further confirmation was provided at the Commission hearing, with testimony from Plaintiff explaining that "because of the low prices established by China, consumers have been somewhat reluctant to enter into off-take agreements, locking in prices during a period where prices are continuously dropping." PR198 at 10. The domestic industry further testified that "Simply put, not agreeing to meet that Chinese price leads to further delays in contract negotiations." *Id*. at 35. Indeed, Commissioner Kearns acknowledged that, "{T}he market price, which, of course, is the China price, and that is part of the price negotiations. . . China price and market price in this market that's a hundred percent China sounds like the same thing to me." *Id*. at 235.

The Commission does not address this evidence in its analysis of U.S. purchasers' use of cost-plus pricing and instead seemingly operates under the assumption that offtake agreement negotiations between sophisticated U.S. producers and purchasers are occurring in a vacuum separate from the market. PR228, CR268 at 40-42. The Commission's failure to conduct its analysis in the context of material evidence of China's domination of the U.S. AAM market renders its determination unsupported by substantial evidence and otherwise contrary to law.

Further, the Views failed to meaningfully address material arguments and evidence, including contemporaneous business documents and testimony, that U.S. purchasers utilize cost breakdown comparisons with the prices of subject imports during commercial negotiations to lower U.S. producers' prices. The Commission's determination that such information did not detract from the other record evidence is not supported by substantial evidence and is otherwise contrary to law.

The domestic industry witnesses explained that the process of entering into an offtake agreement with a U.S. purchaser includes undergoing a cost breakdown comparison analysis. PR198 at 43-44. Plaintiff's counsel further argued that this cost comparison is requested for the purposes of using Chinese prices to exert downward pressure on U.S. prices during negotiations:

> {T}the idea of OEMs collecting kind of a cost spreadsheet, and then being able to beat you down on individual items as a price negotiation tactic, you see that in numerous industries, where they ask you to itemize and they'll say, all right for COGS, we think you should be at least equal to the Chinese price. So we're going to lower your price and we're going to set that even. And then they can tick down. And that's a way of continuing to force the price down.

*Id.* at 75. Plaintiff's testimony and argument demonstrate that the large volumes of unfairly low-priced subject imports are the reason that offtake agreement price negotiations with U.S. purchasers use side-by-side cost comparisons to exert downward pressure on U.S. producer prices. Specifically, industry witnesses explained:

> Price has been, in negotiations and qualification processes for establishment of additional contracts, the single most important item on the minds of potential customers, and that's been evidenced by a couple of times we have seen negotiations cease and qualification processes for potential contracts cease pending our assessment and agreement to a new target price which is lower than what we originally started out discussing.

*Id*. at 70. Following the hearing testimony and accompanying its Post-Hearing Brief – and as explicitly requested by Chair Karpel – Petitioner submitted [ ] contemporaneous business documentation from [ ] U.S. producers demonstrating that comparative cost breakdowns were used to lower domestic prices relative to Chinese prices. This record evidence included:

- Business documents from [ ] identifying [ ] using side-by-side comparisons during offtake agreement negotiations. For example, a presentation by [ ] providing [ ] with a side-by-side comparison of [ ]. *See* PR202, CR240/248 at Exhibit 4, Tab A. [ ], as evidenced by [ ] Importer Questionnaire, are [

]. *See* CR175 at II-5a. This evidence demonstrates that [ ], directly impeaching their sworn testimony. PR198 at 229-35.

- Business documents from [ ] depicting comparisons to Chinese prices during price negotiations by [ ]. For example, a spreadsheet prepared by [ ]. *See* PR202, CR240/248 at Exhibit 6, Tab A.

- Business documents from [ ] depicting comparisons to Chinese prices during price negotiations by [ ]. [ ], in essence the market price established by China. *Id.* at Exhibit 5, Tab C.

- Contemporaneous business documents from [ ] referencing lower Chinese prices during offtake agreement negotiations with [ ]. For example, [ ]. That is, a purchaser's own [ ]. *Id.* at Exhibit 3.

- Contemporaneous business documents from [ ] demonstrating [ ], use of cost comparisons to Chinese prices during offtake agreement negotiations. For example, [ ]. *Id.* at Exhibit 2.

The contemporaneous business documentation was extensive and a significant part of Plaintiff's Post-Hearing Brief. *Id.* at 4-9, Exhibits 2-6. It was explicitly requested, and then rejected, by Chair Karpel. The domestic industry argued this was an important consideration in examining the price effects negatively impacting the domestic industry.

Indeed, [ ]. At the hearing, when Chair Karpel asked respondents' panel, "Have any of you ever in these price negotiations

for an offtake contract used Chinese pricing as a relevant factor in setting those prices?," Mr. Swamynathan from Tesla, Mr. Seals from LG, and Mr. Zhang from Panasonic all responded, under oath, "No." PR198 at 235. Plaintiff's [

].

The Views fail to address virtually all of this evidence in any meaningful way and include a footnote that, at best, rings hollow in response to Plaintiff's argument, nominally addressing and disregarding select evidence but not refuting the core record evidence and argument. PR228, CR268 at 44, n.177. Specifically, the Commission apparently disregards evidence on the basis that it [

]. *Id*. However, as detailed further in Section V.A.4.c, the determination that this evidence shows a comparison to [ ] is factually incorrect, [

]. *See* CR97 at I-2a, I-7.

The Commission disregarded an additional contemporaneous business document submitted in Petitioner's post-hearing brief by inaccurately describing it as depicting a [

]. *Id*. This appears to be implying that the Commission does not know if the Asian supplier was Chinese. But this is not correct. [

]. CR175 at II-5a. The Commission further states, "the communications do not indicate that [ ] to lower its prices because of this comparison." PR228, CR268 at 44 n.177. The Commission provides a

similar conclusion regarding emails from [ ]. *Id.*

The two Commissioners state that these "communications do not indicate that [ ] to lower its prices because of this comparison." *Id.* Chair Karpel and Commissioner Johanson's suggestion that a purchaser claims it is comparing your price to a lower price but does not genuinely expect you to lower your price is absurd. To state the obvious, if a purchaser is actively comparing prices, it indicates an intention to negotiate or seek better terms. Claiming a purchaser is simply notifying a potential supplier of a competitor's lower price without expecting any reaction contradicts common sense behavior associated with price comparison, which is aimed at negotiating a better deal.

Chair Karpel and Commission Johanson provide no reasoned explanation, and indeed arguably cannot provide a reasoned explanation, as to why a profit-driven company would request and share pricing comparisons from other suppliers during a pricing negotiation if not to use them as a tool to persuade the domestic industry to lower their prices. The Commission similarly disregards documents submitted by Petitioner showing [ ]. *Id.* at 45, n.177. As detailed further in Section V.A.4.b, Chair Karpel and Commissioner Johanson are factually incorrect in disregarding this evidence on the basis that it depicts a conversation between [ ] and a [ ]. The Commission's own Staff Report confirms that [ ]. *See* PR216, CR253 at 3.13.

The Views also compare [ ] and between [ ], and within the range of the

[ ]. *Id*. This conclusion again fails to grapple with the evidence that [ ] have been either [ ]. PR202, CR240/248 at Exhibit 1, Question II.

Chair Karpel explicitly requested contemporaneous business documents showing that Chinese prices were used in price negotiations, but when it was provided the Chair rejected the very information that was requested. Instead, the Commission apparently focuses solely on the evidence of respondents, PR228, CR268 at 42 n.170, despite their own testimony that unintentionally supports Petitioner's testimony and evidence that a comparative cost breakdown using Chinese prices was used during commercial offtake negotiations. PR198 at 229-35.

The Views, incredibly, partially disregard Plaintiff's evidence based on the timing of the submission of that evidence. During the hearing, Chair Karpel specifically requested that Plaintiff submit any contemporaneous documentation demonstrating that customers referenced low-priced subject imports and/or directly compared Chinese prices with U.S. prices for AAM as a negotiating tool. *Id*. at 75-76. However, following Plaintiff's compliance, Chair Karpel and Commissioner Johanson cast aside the extensive contemporaneous business documentation by stating "The timing of these submissions . . . deprived both the Commission and respondent parties of an opportunity to address these materials at the hearing." PR228, CR268 at 39 n.162. This is particularly troubling as the Commission explicitly requested that this information be submitted with Petitioner's Post-Hearing Brief. [4]

[4] It was noted at the hearing that the Commission's treatment of contemporaneous business documents has been inconsistent, and accordingly, objective evidence demonstrating negative price effects was submitted from think tanks, universities, financial reporting services, and the like. When contemporaneous business documents (*i.e.*, emails) were requested, Plaintiff confirmed that this evidence too could be added to the record. *See* PR198 at 77 ("{W}e can provide additional documents, emails that demonstrate the pricing pressure and communications with the Commission. I will say that the Commission's practice in regard to contemporaneous business documents, there have certainly been cases where they've been afforded great probative value. And there have been some recent cases where there have been

Plaintiff emphasizes that this contemporaneous business documentation fundamentally detracts from the Commission's conclusion. The Commission has an obligation to address all material arguments and material evidence submitted by the parties. *See, e.g.*, *Usinor Industeel, S.A. v. United States*, 26 CIT 467, 478 (2002); *Altx,* 25 CIT at 1105-08, 167 F. Supp. 2d at 1359-60. The Commission also has an obligation to discuss evidence detracting from or contradicting its findings. *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-89 (1951). However, the Commission's determination essentially ignores this evidence, without reasoned analysis, and as so is contrary to law and necessitates a remand. This alone under *Altx* should require a remand, but the Commission creates additional error by including factually incorrect statements and illogical conclusions in its analysis as detailed below.

b. The Commission Relies on Factually Incorrect Statements Regarding a U.S. Purchaser in its Price Effects Analysis

In denying relief to the domestic industry, the Commission's analysis of the evidence regarding offtake contract price negotiations, and therefore its price effects determination, contains materially and objectively factually incorrect statements. As the first example, Plaintiff submitted contemporaneous business documentation demonstrating U.S. purchaser [ ] utilized a comparison to the price of Chinese AAM during price negotiations with U.S. producer [ ]. *See* PR202, CR240/248 at Exhibit 3. The Commission acknowledges that this evidence is compelling in supporting Petitioner's argument before disregarding the evidence on the grounds that it did not depict discussions with a U.S. purchaser. Specifically, the Commission notes:

explicit documents introduced saying people didn't get the business as a result of low Chinese prices, and they were afforded minimum probative value. What we've attempted to do in this investigation is provide 100 pieces or more of objective evidence from third parties, all documenting the effects of Chinese pricing. To the extent that the Commission would like to see more contemporaneous business documents, we're happy to provide them."). Indeed, it was the type of behavior exemplified by Chair Karpel and Commissioner Johanson's discounting of emails that explicitly referenced Chinese prices that led Petitioner to supplement the record with extensive third-party evidence that corroborated such evidence.

> We also note documents submitted by Petitioner involving [ ]. Of all the documents submitted by Petitioner in its posthearing brief, this makes the most explicit reference to the price of Chinese AAM. Even here, however, the discussions are between [ ] and a [ ], not a U.S. purchaser.

*See* PR228, CR268 at 45, n. 177 (emphasis added, internal citations omitted). This is factually incorrect.

First, it is well documented on the record that [ ] is indeed a U.S. purchaser. [ ], as [ ]. *See* CR114 at I-3 (reporting [ ]). The Commission's Staff Report further reports that [ ] has purchasing operations in the United States. Specifically, the Staff Report notes [ ]. *See* PR216, CR253 at 3.13 (emphasis added).

Accordingly, the Commission made a factually incorrect statement that it relied on in disregarding evidence. An objectively incorrect finding cannot be deemed to be supported by substantial evidence.

c. The Commission Further Relies on Erroneous Statements Regarding a U.S. Producer in Its Price Effects Analysis

As another example, Plaintiff provided documentation from [ ] negotiations with [ ] for an offtake agreement, demonstrating that [ ] used Chinese price comparisons during commercial negotiations to leverage down the potential offtake agreement price. *See* PR202, CR240/248 at Exhibit 6, Tab A. The evidence, which was directly responsive to Chair Karpel's request, depicts [ ]. *Id.* It [

]. *Id.*

The Commission incorrectly states that the evidence "[ ]." PR228, CR268 at 44 n.177. It further bases this incorrect observation on a heading on one column on the table that references tariffs and ocean freight. In this column, [ ] apparently provided its transportation costs. *Id.* (citing PR202, CR240/248 at Exhibit 1 at 8). The Commission states that because [ ] included costs in this column then it must show a comparison of [ ]. *Id.* This is factually incorrect and further exhibits the Commission's misunderstanding of the underlying record. The record before the Commission demonstrates that [ ]. *See* CR97 at I-2a. Thus, objectively, this was not, and could not have been, [ ]. Although the chart is admittedly confusing, the Views entirely overlook this evidence due to an unclear column title, rather than grappling with the evidence submitted.

It is factually incorrect to state the evidence introduced [ ]. An objectively incorrect finding cannot be deemed to be supported by substantial evidence. For this reason, too, the determination should be remanded to the Commission for further consideration.

d. <u>The Commission Impermissibly Disregarded Petitioner's Evidence Regarding a U.S. Purchaser of Chinese Imports</u>

The Commission impermissibly disregarded evidence on the basis that the purchaser of Chinese imports did not participate in the Commission's investigation. The determination to disregard Plaintiff's evidence, and thus Plaintiff's overarching argument, because of non-

cooperation of a purchaser of Chinese product, is not supported by substantial evidence and is otherwise contrary to law.

In its post-hearing brief, Plaintiff submitted contemporaneous business documents demonstrating that the practice of using Chinese prices during price negotiations to lower U.S. producers' prices was not limited to the U.S. purchasers that appeared at the final phase hearing. Specifically, Plaintiff provided evidence including meeting notes between [ ] depicting Chinese prices being utilized during potential commercial negotiations. PR202, CR240/248 at Exhibit 4, Tab D. This evidence directly detracts from the Commission's conclusion that Chinese prices were not used as an anchor price to lower the domestic industry's prices during commercial price negotiations.

The Commission outright disregarded this evidence partly because [ ] did not participate in the investigation. PR228, CR268 at 44 n.176. There is no evidence that the Commission ever contacted the company or otherwise requested information or participation from the company or that the company refused to cooperate as to any information request. It is especially troubling that the Commission apparently used the non-participation of a purchaser of subject imports to benefit the position of subject imports; the non-participation by those using Chinese product was used in favor of China. In the absence of reasoned explanation, this too calls for a remand, particularly because the evidence provided directly undermines the Commission's findings.

e. <u>The Commission Did Not Provide a Reasoned Analysis of How the Evidence that the Domestic Industry Was Deteriorating Did Not Contradict its Opposite Conclusion</u>

Adding insult to injury, the Commission's determination is inconsistent with basic notions of economics and impermissibly ignores conflicting evidence. Chair Karpel and Commissioner Johanson determined that U.S. AAM purchasers were using an alleged cost-plus approach during

contract negotiations to ensure U.S. producers could cover their costs and make a profit. However, the domestic industry was unprofitable, and record evidence showed that the domestic industry financially deteriorated each year of the POI. Indeed, important financial metrics establish that the industry's performance decreased every year of the POI. Specifically, the Commission's Prehearing Staff Report included aggregated data on the domestic industry's operations which demonstrates that the U.S. domestic industry incurred [ ] over the entire POI. PR216, CR253 at 6.3 (Table 6.1).

The Commission cannot fail to analyze evidence contradicting its conclusion. *Altx*, 25 CIT 1100, 1107-08, 167 F. Supp.2d 1353, 1359-60. Yet, it does exactly this: fails to provide a reasoned analysis of material evidence both submitted by Petitioner and collected by Commission Staff that directly undermines the Commission's price effects determination. Accordingly, the determination must be remanded to the Commission for reconsideration.

### B. <u>The Commission's Determination That There Is No Causal Relationship Between the Subject Imports and Lack of an Established Domestic Industry Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law</u>

The Commission may be the only agency in the United States Government to find that Chinese critical mineral imports are having no negative effects in America. This is all the more amazing in light of the market domination and low and falling prices of Chinese AAM imports while the health of the domestic industry deteriorated. In determining that there was no causal nexus between subject imports, which had already been found to be significant on both an absolute basis and relative to consumption, and declines in the domestic industry's performance, the Commission ignored substantial record evidence that the injury was causally connected to subject imports. Views, PR228, CR268 at 31, 48.

Under the material retardation standard, the Commission determines whether the establishment of a domestic industry in the United States is materially retarded by reason of the

subject imports. 19 U.S.C. § 1677(11)(C). For an affirmative determination, imports do not need to be the most important cause of injury, as long as the imports are more than an incidental, tangential, or trivial cause. *Nippon Steel Corp.*, 345 F.3d at 1381.

If the record or its analysis is unclear as to a not immaterial factor's impact on material injury, or if its consideration has been omitted altogether, then the legality of the causation analysis is thrown into doubt. *Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334, 1343–44 (Ct. Int'l Trade 2014), *aff'd*, 793 F.3d 1355 (Fed. Cir. 2015).

Underlying the Commission's unlawful analyses and determinations regarding price effects, adverse impact, and causation is the Commission's failure to consider Plaintiff's material evidence and argument regarding the conditions of competition specific to the U.S. AAM market created by the domination of Chinese imports – though the Commission made other errors in those analyses as well. In Petitioner's Prehearing Brief, Plaintiff submitted over one thousand pages of objective evidence demonstrating China's dominance over the U.S. AAM market and resulting impacts, as discussed in Sections V.A.1, V.B, and V.C.1. *See* PR168, CR201/209 at 14-54, Exhibits 3-42. To be clear, Plaintiff is not asserting that such evidence compelled an affirmative determination, but rather that the failure to engage with such evidence amounts to agency error that cannot withstand judicial review.

The evidence included in the record and which the Commission does not address included:

- Articles from numerous media sources underscoring the depth of China's control over both the supply and price of AAM. Petitioner's Prehearing Brief at Exhibits 3-13. Media articles confirm that China dominates the global capacity for AAM production, controlling the entire AAM supply chain end-to-end, allowing China to push down prices below any matchable level. *Id.* at Exhibit 9-10.

- Consistent with media reporting, scholarly and academic reports demonstrating that there is wide consensus among scholars and academic institutions that China uses predatory tactics including cost control, government subsidies, and "problematic

overcapacity" to dominate the AAM market and control the global price of AAM. *Id*. at Exhibit 14-18.

- Reports by think tanks, and organizations around the globe confirming both China's dominance in the AAM market and China's efforts to suppress competition including "us{ing} economic tools as a means of coercion and signaling to shape trade and market circumstances to be more favorable to China." *Id*. at Exhibit 19-26.

- Articles from the financial sector detailing China's utilization of tactics such as oversupply to crash global AAM prices in order to create an untenable environment for new market entrants. *Id*. at Exhibit 27-30.

- Congressional reports by the Select Committee on the Strategic Competition between the United States and the Chinese Communist Party which identified China's control of graphite as a threat to U.S. national security and economy due to its high volatility, low U.S. domestic production volume, and China import dependence. *Id*. at Exhibit 31. A subsequent Select Committee report describing Chinese dominance in the critical minerals sector as "'a loaded gun' pointing it directly at U.S. industry." *Id*. at Exhibit 32.

- A working paper by the Commission's Office of Industries emphasizing the condensed nature of the global graphite industry with China having a predominant role among most stages of the global value from extraction, through processing, of battery components assembly. *Id*. at Exhibit 33. Notably, at the time of the report, the top five producers of synthetic graphite controlled well over a majority of global production, including BTR New Energy Materials Inc. The report noted, "{T}here's the potential of {China} stepping up supplies and bringing down prices to drive foreign rivals into a corner, just like they're doing with rare earths." *Id.*

- Articles published by law firms representing BTR, Panasonic, and Tesla underscoring that China's dominance in critical minerals is universally recognized. *Id*. at Exhibit 34-39.

- Articles directly linking China's global dominance in the AAM industry to the domestic industry's ability to secure the necessary investments to establish commercial operations. *Id*. at Exhibit 40-42.

In fact, hearing testimony from both Petitioner and U.S. purchasers confirmed that Chinese domination impacts the U.S. AAM market. *See, e.g.*, PR198 at 32-33, 36, 245.

The Commission only briefly refers to this evidence, stating "Petitioner devoted a considerable portion of its prehearing brief to reviewing news and analyst reports about Chinese graphite production and pricing and its role as a dominant supplier of graphite in the U.S. market."

PR228, CR268 at 37. The Commission concludes that "Petitioner's theory and those of the news and analyst reports are not borne out by the facts on the record of these investigations." *Id*. at 38. The Commission failed to provide a reasoned analysis as to how over one thousand pages of objective documentation did not detract from the Commission's determination that there is no negative price effect, adverse impact, or causal relationship between China's undeniable global dominance and the material retardation of the domestic industry.

The Commission not only fails to meaningfully address this evidence, but its determination to disregard Plaintiff's evidence relies on multiple factually incorrect mischaracterizations. First, the Commission mischaracterizes Plaintiff's submission of supporting information as an attempt "to supplant information provided by market participants on actual price negotiations between domestic producers and purchasers."[5] *Id*. This is objectively a clear mischaracterization of Plaintiff's evidence. Evidence in the Prehearing Brief regarding Chinese import volumes, overcapacity and pricing practices, were corroborated by the contemporaneous business

[5] The Commission's footnote, without any attribution or citation to the record or any other form of support, states: "Petitioner appears to believe the sheer volume of news and analyst reports it cites should render unnecessary or outweigh actual evidence of how contracts and prices are negotiated. The Commission's determinations however are fact-based inquiries supported by the collection of detailed industry and market data submitted by market participants typically through lengthy questionnaire responses. While the Commission may rely on other sources, e.g., the types of news and analyst reports submitted by Petitioner, Petitioner's theory of the case would have the Commission use such reporting to supplant information provided by market participants on actual price negotiations between domestic producers and purchasers. The Commission declines to do so. The Commission, however, has considered news and analysts reports cited by Petitioner and does not find they outweigh substantial record evidence supporting the Commission's finding that subject imports have not materially retarded the establishment of a domestic industry." Two points are worth noting: (1) these unsupported and mischaracterized assertions are flatly contradicted by the fact that Petitioner clearly submitted contemporaneous business documents regarding how contracts and prices are negotiated and provided industry and market data showing Chinese pricing levels and their impact on the domestic industry; and (2) it is also well established that the Commission must explain or counter salient evidence militating against its conclusions. The Commission must address material evidence and arguments, and it cannot invoke the presumption of consideration of evidence "as a shield against examination of the Commission's failure to present required analysis of the record evidence." *Usinor*, 26 CIT at 783. It cannot use the presumption of consideration of the evidence as a "talismanic justification" for the absence of specific discussion regarding key evidence or arguments of the parties. *Id.* Indeed, mere citation to record evidence does not constitute, by itself, a consideration of a party's argument, and the Commission cannot fail to analyze evidence contradicting its conclusion where an interested party has specifically brought the possibility of conflicting evidence to the agency's attention. *Altx,* 25 CIT at 1107-08, 167 F. Supp. 2d at 1359-60. This is exactly what the Commission has done in this case.

documents submitted in the post-hearing brief (and that were explicitly requested Chair Karpel). Indeed, all of this evidence was also consistent with the actual data collected by the Commission that demonstrated low and falling prices of Chinese imports (during a period of increasing demand), that were below raw material costs, and that correlated with decreasing performance of the domestic industry. Plaintiff never requested that this evidence be used in lieu of evidence regarding contract negotiations but rather provided this evidence as supporting evidence regarding the market conditions in which these offtake agreements are negotiated. Indeed, in its Prehearing Brief, Petitioner states,

> The most important condition of competition in this investigation involves China's dominance in the U.S. and global markets. Indeed, China's dominance allows it to set prices in both the United States and globally, and it is this dumped and subsidized price that has prevented the establishment of a domestic industry.

PR168, CR201/209 at 14.

The Commission commits further error by its clear attempt to disingenuously diminish the evidence provided by Petitioner to "news and reports." In the hope that it may be of value to the Court, Plaintiff provides below a partial list of the information that the Commission dismissed without any discussion:

- *Securing the Supply of Graphite for Batteries*, Precourt Institute for Energy, Stanford University (2025). PR168, CR201/209 at Exhibit 16.

- *A US Framework for Assessing Risk in Critical Mineral Supply Chains*, Atlantic Council. *Id*. at Exhibit 20.

- *Critical Thinking on Critical Minerals*, Federation of American Scientists (July 9, 2025). *Id*. at Exhibit 21.

- *Global Critical Minerals Outlook 2025*, International Energy Agency. *Id*. at Exhibit 22.

- *Policy Brief: Examining Chinese Practices in the Global Critical Minerals Market*, Ctr. for Int'l Private Enterprise. *Id*. at Exhibit 23.

- *Securing America's Critical Minerals Supply*, Carnegie Endowment for Int'l Peace (2025). *Id*. at Exhibit 24.

- *Critical Minerals and the Future of the U.S. Economy*, Ctr. for Strategic & Int'l Stud. *Id*. at Exhibit 25.

- *Unplugging Beijing: A Playbook to Reclaim America's Advanced Battery Supply Chain*, Foundation for Defense of Democracies (July 2025). *Id*. at Exhibit 19.

- *Western Battery Graphite Markets: Is There Hope Ahead?*, Oxford Institute for Energy Studies (Feb. 2025) *Id*. at Exhibit 14.

- *Can the West Loosen China's Grip on the Global Graphite Market?*, MiningTechnology (July 25, 2025). *Id*. at Exhibit 8.

- *Reset, Prevent, Build: A Strategy to Win America's Economic Competition with the Chinese Communist Party*, The House Select Committee on Chinese Communist Party (Dec. 12, 2023). *Id*. at Exhibit 31.

- *Predatory Pricing Report: How the Chinese Communist Party Manipulates Global Mineral Prices to Maintain Its Dominance*, The House Select Committee on Chinese Communist Party (Nov. 12, 2025). *Id*. at Exhibit 32.

- *A Deep Dive into China's Role as "Critical Mineral Monolith"*, MiningTechnology, (Sep. 10, 2024). *Id*. at Exhibit 9.

- *Towards a Sustainable Supply of Graphite: A Geological Way Forward*, 5 Earth Sci., Sys. & Soc'y (2025). *Id*. at Exhibit 17.

- *Overview of Graphite Supply Chain and Its Challenges*, 29 Geosciences J. at 329–341 (2025). *Id*. at Exhibit 18.

While the Commission may attempt to just waive their hand at "news reports", in reality the evidence that they failed to address included Congressional reports, studies from Stanford University, Atlantic Council publications, findings of the Federation of American Scientists, information from the International Energy Agency, papers from the Carnegie Endowment for International Peace, CSIS reports, findings from the Foundation for Defense of Democracies, Oxford Institute for Energy Studies reports, and many more. As such, the Commission relies on an objectively false characterization of Plaintiff's evidence in its determination to disregard the same. An objectively incorrect finding cannot be deemed to be supported by substantial evidence.

At a bare minimum, a party before the Commission is entitled to a written opinion that actually addresses the major evidence that was submitted in the investigation. The Commission did not do this.

Further, the Views acknowledged that the domestic industry's financial condition worsened over the POI. PR228, CR268 at 49. Despite this, the Views state that the observed declines in the domestic industry's financial performance were "not unexpected given that the domestic industry remains in a startup phase." *Id.* A straightforward reading of the "Impact of Subject Imports" section of the Views suggests that the Commission attributes the domestic industry's inability to become established on its current lack of qualification to supply AAM in the U.S. *Id*. at 58-59. The Views also conclude that the domestic producers' ability to secure funding during the POI demonstrates that subject imports are not the cause of any material retardation of the U.S. industry. *Id*. at 56.

However, these conclusions ignored material evidence and argument submitted by Plaintiff demonstrating that low Chinese pricing in the market caused the delayed qualifications of U.S. producers and disincentivized investment, which directly contributes to the material retardation of the establishment of the domestic industry. PR219, CR262/266 at 9. As detailed in Section V.C.2, contemporaneous business documents submitted by Plaintiff demonstrate that qualification was delayed as a direct result of U.S. producers not agreeing to lower prices to be more competitive with Chinese prices. *See* PR202, CR240/248 at Exhibits 2-6. Essentially, Plaintiff argued that it would be illogical for U.S. purchasers to prioritize the qualification of a more expensive supply when there is currently access to a cheap, accessible alternative. *See* PR168, CR201/209 at 77-80. Indeed, Plaintiff submitted evidence demonstrating the domestic industry's experience that a U.S. producer's inability to match Chinese prices resulted in radio silence for long periods of time in

the midst of the qualification process. *Id.* at Exhibit 91. As such, China's artificially low pricing of AAM directly correlated to delays in the U.S. industry's qualification.

Moreover, the domestic industry testified that investments in its industry are necessary to obtain capital for testing equipment, building production to scale, and everyday operations. PR198 at 22, 79-80, 115-16. Specifically, additional capital is necessary for, *inter alia*, [

]. *See* PR216, CR253 at 6.23. However, investors are understandably unwilling to commit capital in a market where China has demonstrated its ability to manipulate prices to prevent competition. PR219, CR262/266 at 9. Clearly, the large presence of subject imports caused a delay in investments, which led to delays in qualification. *See, e.g.*, PR198 at 22, 79-80, 115-16. The Commission can discount this evidence, but it cannot fail to address or discuss it.

Market participants provided lengthy questionnaire responses, documenting that U.S. producers reported a host of negative effects on investment due to imports. PR216, CR253 at 3.26 (Table 3.6) (directly connecting Chinese pricing to lack of investment and production constraints). The negative effects on investment due to Chinese imports include cancellation, postponement, or rejection of expansion projects; denial of investment proposals; reduction in the size of capital investments; negative impact on returns on investment; problems related to the issue of stocks or bonds; and difficulties servicing debt. *Id*. at 6.22 (Table 6.12). Additionally, the Staff Report contains numerous references to firms reporting that artificially low pricing from China lowers incentives to capital investment, which prevents them from building out their facilities to meet customer demand. *Id*. at 5.8. As such, not only does Chinese pricing decrease investments in the U.S. industry, but in turn the inability to obtain investment hinders its ability to proceed with qualification. *See id*. at 6.23–6.24 (Table 6.13). Remarkably, the Commission's analysis does not

include any of the data included in its Staff Report at Table 6.13, despite it being directly relevant to the Commission's conclusion that subject imports prices have not prevented the domestic industry from attracting investments. *See, e.g.*, PR228, CR268 at 46. As noted above, in discounting the third-party evidence, the Commission emphasized that it relies heavily on information provided by "market participants typically through lengthy questionnaire responses" but then ignores the evidence from these lengthy questionnaire responses when that evidence undercuts its conclusion. *Id.* at 38, n.159. Without confronting this evidence, the Commission's determination is contrary to law and requires a remand. *See, e.g.*, *Universal*, 340 U.S. at 488-89.

It is important to note that the third-party evidence was not submitted to supplant existing record evidence but rather to corroborate the questionnaire responses, sworn testimony and documentary business documents showing material retardation of the industry due to Chinese imports. The Commission cannot simply disregard evidence that it does not like by concluding that Petitioner is trying to replace other evidence of record. This is especially true when the third-party evidence is not intended to stand on its own but rather is consistent with and supports the wealth of evidence on the record. The Commission says that it relies on lengthy questionnaire responses but then disregards all evidence contained in those questionnaire responses and which is corroborated by numerous and highly credible sources.

Another significant error in the Commission's analysis is that it concludes that the domestic industry is operating in normal start up conditions. A conclusion without analysis cannot withstand judicial review. No party has refuted that China has monopolistic control of the market that allows it to set low prices globally. PR219, CR262/266 at 12. Moreover, Chinese prices were declining during a period of increasing demand, a function of their massive subsidization, oversupply, and a Chinese government policy of eliminating competition. The Commission failed to meaningfully

grapple with the role of Chinese domination in the market, specifically the evidence that massive volumes of low-priced imports were used to deter new market entrants. This cannot be explained away be merely concluding that these conditions were a part of the "reasonable expectation of an industry's startup phase," especially when considering the magnitude of Chinese domination. It is unbelievable that the Commission concludes, in light of uncontested facts, that entering a market where Chinese state-controlled entities maintain more than [ ] percent of U.S. market share and sell at prices below raw materials costs is part of "normal start-up operations." PR216, CR253 at 4.3 (Table 4.2).

Plaintiff emphasizes that the Commission framed its inquiry as whether the industry's performance "reflects merely the normal start-up condition of a company entering an admittedly difficult market or, is the performance worse than what could reasonably be expected." PR228, CR268 at 15-16. Despite this framing and the Commission's acknowledgment that the domestic industry was deteriorating financially, there is no meaningful analysis of the evidence that the domestic industry is attempting to enter a very abnormal market that is controlled by a nonmarket economy government that maintains over [ ] percent of domestic market share, provides massive subsidies to Chinese companies, and uses anticompetitive and predatory practices. PR168, CR201/209 at 56-59, Exhibits 7, 9, 16, 18; PR202, CR240/248 at 14-15, Exhibit 1 at Question VII.

Merely stating that the "domestic AAM producers are startups, and their financial condition is no worse than expected given their phase of development" is not an analysis. PR228, CR268 at 60. Unlike what one would expect from a startup, the domestic industry's performance worsened as Chinese entities kept lowering prices during a period of increasing demand, and the Commission viewed this as just a normal start up environment. The lack of meaningful analysis warrants a remand.

### C. **<u>The Commission's Determination that There Was No Adverse Impact by Reason of the Significant Volume of Unfairly Priced Imports Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law</u>**

The Commission's finding that the significant volume of imports in the United States, both by absolute volume and relative to consumption, did not have an adverse impact on the domestic industry, is not supported by substantial evidence and is otherwise contrary to law.

In considering whether the establishment of an industry is materially retarded by reason of subject imports, the Commission considers the size of the domestic industry and the market in which it is competing to determine whether subject imports are adversely affecting its performance. PR228, CR268 at 47. Here, the Views stated the Commission examined the industry's performance to determine if it "reflects merely the normal start-up condition of a company entering an admittedly difficult market or, is the performance worse than what could reasonably be expected … ." *Id*. (citing *Laminated Woven Sacks*, USITC Pub. 3942 at 32; *Codfish*, USITC Pub. 1711 at 5; *BMT Commodity Corp. v. United States*, 11 C.I.T. 524 (1987) (affirming material retardation determination that applied standard of whether industry's performance reflected merely the normal start-up condition of a company entering an admittedly difficult market or, is the performance worse than what could reasonably be expected), *aff'd,* 852 F.2d 1285 (Fed. Cir. 1988)).

In reaching its erroneous determination, the Commission found that the domestic industry was not experiencing adverse impacts but rather simply experiencing normal startup conditions, did not experience delays in the qualification process due to subject imports, and was able to secure funding for its development. The Commission's analysis is flawed for numerous reasons, including the failure to meaningfully address Plaintiff's material evidence and arguments.

**1. The Commission Failed to Examine Material Arguments and Evidence That Chinese Dominance Had Adverse Impacts on the Domestic Industry**

As detailed in Section V.B, the Commission's failure to meaningfully address evidence submitted by Plaintiff in Petitioner's Pre-Hearing and Post-Hearing Briefs regarding adverse impacts due to China's domination in the market including government reports, academic studies, media reports, publications by think tank and global organizations, reports from the financial section and articles published by the law firms representing some of the key respondents is not supported by substantial evidence and is otherwise contrary to law.

The Commission claims to "consider the size of the domestic industry and the market in which it is competing to determine whether subject imports are adversely affecting its performance." Views at 47, PR228, CR268 (emphasis added). However, the Views did not engage with any of this evidence in reaching its adverse impacts determination. The remainder of the impact analysis flowed from these errors, including a staggering misunderstanding of basic AAM market conditions. This alone under *Altx* should require a remand, 25 CIT 1107-08, 167 F. Supp.2d at 1360.

**2. The Commission's Determination That Subject Imports Have Not Caused Purchasers to Delay the Qualification of Domestic Producers is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law**

In reaching its determination that the domestic industry did not experience any adverse impacts, the Commission relies in part on the conclusion that no domestic producer is qualified to supply AAM in the U.S. PR228, CR268 at 59. The Commission further determines that subject imports did not cause delays in U.S. producers' qualification, despite no domestic producer being able to successfully complete the qualification process during the POI. *Id*. The Commission's analysis is flawed, as it failed to consider material evidence and arguments that "but for" subject imports, the qualification of U.S. producers would be further along.

a. <u>The Commission Failed to Provide a Reasoned Analysis as to How Significant Volumes of Low-Priced Imports Did Not Delay Qualification and Relies on Factually Incorrect Statements in Support of This Conclusion</u>

The Commission's determination that subject imports have not caused purchasers to delay the qualification of domestic producers, thereby materially retarding the establishment of the domestic industry, is not supported by substantial evidence and is otherwise contrary to law. Specifically, the Views provide, "We note further that supplier qualification by technical experts is conducted separately from commercial negotiations over pricing in offtake agreements." PR228, CR268 at 51, n.192. The Views conclude that the domestic industry is injured due to a failure to complete qualification, rather than because of subject imports, is based on the underlying findings that qualification and commercial negotiations are conducted independently of each other. *Id.*

The Final Staff Report confirms that importers/purchasers "typically reported that the time required to certify or qualify their last three suppliers from China ranged from one to two years." PR216, CR253 at 2.16. However, evidence before the Commission confirmed that purchasers didn not qualify any of the higher priced U.S. producers in that time frame. Plaintiff submitted argument and evidence that purchasers delayed qualifying the domestic industry because of their unfettered access to low-priced subject imports. As Plaintiff emphasized throughout the investigation, and as common sense would dictate, technical qualification does not occur in a vacuum, but rather, price negotiations and technical qualifications occur simultaneously. And frequently by the same personnel and at the same time as documented in the email correspondence that is part of the record. Thus, qualification delays present as a result of disagreements in price negotiations occurring simultaneously with technical qualifications. *See, e.g.*, PR202, CR240/248 at 9-10, Exhibits 1-3; PR198 at 27, 63. As such, when price negotiations stall, the U.S. producers' technical

qualification stalls as well. “Simply put, not agreeing to meet that Chinese price leads to further delays in contract negotiations and qualification.” PR198 at 35-36.

Additionally, contemporaneous business documents demonstrate that U.S. purchasers, including those who testified at the hearing in opposition to relief for the domestic industry, have both delayed qualifying U.S. producers and refused to proceed with qualification due to lower priced Chinese imports. PR219, CR262/266 at 6-9; PR202, CR240/248 at Exhibits 1-6. Price negotiations and the qualification process are intertwined such that any stalling in price negotiations creates delays in the qualification process. Plaintiff submitted evidence demonstrating this relationship. For example, Plaintiff provided contemporaneous business documents depicting discussions that [

]. PR202, PR240/248 at Exhibit 3, Tab D. Contrary to the Commission’s conclusion, email correspondence from purchasers were discussion qualification intertwined with price considerations.

The Commission did “not find that Petitioner has presented substantial evidence that purchasers have slowed qualification for U.S. producers because of their continuing access to subject imports.” *Id*. at 50-51. The Commission further concluded that Plaintiff provided only theory, and no evidence that purchasers slowed qualification as a result of their continued access to subject imports. *Id*. at 39. Instead, the Commission’s analysis centers on the disingenuous claim that: “Petitioner’s case rests on theory rather than concrete evidence – that it would be economically rational for purchasers of AAM to delay or interfere with qualification given access to low-priced AAM from China, thereby hindering investment.” *Id*. at 74-75. But this is not so.

To begin with, there was sworn testimony, not just theory. Testimony from Petitioner and other witnesses directly contradicts the Commission’s characterization, establishing that

qualification and pricing are closely linked in practice. During the final phase hearing, a representative from Anovion testified regarding the interconnection of testing for qualification and commercial negotiation:

> Despite our efforts and repeated guidance from many customers that cycle testing would be the stage gate for commercial discussions, we have not been able to reach a definitive resolution with customers around any type of commercial contracts other than letters of intent from small volume potential customers. In reality, price discussions occurring simultaneously with this process have impeded us from securing commercial contracts of scale. Major customers have repeatedly stated that if we could match pricing from Chinese suppliers that there would be plenty of contract and volume available, especially if we could be a swap-in for the Chinese product.

PR198 at 18. Therefore, the Commission's statement that Petitioner's case relied on just "theory" is contradicted by the record and undermines the validity of its conclusion.

There was also documentary evidence submitted as well. Plaintiff provided specific and concrete evidence demonstrating that [

]. *See* PR202, CR240/248 at Exhibit 1, Question II. [

]. *See id*.

Accordingly, there were emails, contemporary business records, and third-party reports and findings – all "concrete evidence." Instead of engaging with the evidence, the Commission relied on mischaracterizations of Plaintiff's argument and evidence which clearly contradicted the Commission's conclusion regarding the industry's qualification. By stating the Petitioner "rests on theory rather than evidence," the Views essentially deny the existence of contradictory evidence from which conflicting inferences could be drawn. This is impermissible. *Suramerica*, 44 F.3d at

985. At a minimum, the Commission's analysis failed to address this evidence. Plaintiff emphasizes that it is axiomatic that objectively factually incorrect findings cannot be supported by substantial evidence and therefore necessitate a remand.

### 3. The Commission's Determination That the Domestic Industry's Performance and Ability to Obtain Financing Is Indicative of Normal Start-Up Conditions Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law

The Commission analyzed the impact of subject imports under the pretext that the domestic industry's poor performance is because it remained in a "normal" start-up phase. PR228, CR268 at 49, 58-59. It found that, "{T}here is no indication that the domestic industry's performance is worse than what could reasonably be expected since reaching break-even can take years for start-up companies in this particular industry," *id*. at 58-59, ultimately finding, "Domestic AAM producers are startups, and their financial condition is no worse than expected given their phase of development. We accordingly reach the determinations in these investigations that subject imports are not materially retarding the establishment of a domestic industry," *id*. at 60.

However, the Commission's findings fail to address Plaintiff's extensive evidence that the domestic industry was not attempting to enter an industry with normal startup conditions, but a very abnormal, near monopolistic market. As an industry witness testified, "Normal traditional startups are not facing off against state-sponsored monopolists operating outside of market constraints." PR198 at 46.

As discussed in Section V.B, Plaintiff submitted evidence of China's dominance of the entire global AAM market and its effect on the U.S. industry's ability to compete with Chinese AAM producers, making this far from a "normal" start-up industry, and that the U.S. AAM market is under monopolistic market control by a communist government, which has stated its intentions to prevent competition and has done so by bringing excess capacity online and crashing global

prices. PR202, CR240/248 at Exhibit 1. The Commission does not address this evidence whatsoever. The Chinese AAM industry is not profit-oriented but instead is driven by geopolitical objectives. PR198 at 50. These are hardly "normal" start-up conditions.

Petitioner argued that obstacles startup businesses face include insufficient market research, inadequate business planning, poor marketing and customer acquisition, inadequate team and leadership, ignoring legal and regulatory requirements, and neglecting customer feedback and market changes. PR202, CR240/248 at Exhibit 1. These are not the challenges that the domestic industry faced and that were documented in the record.

As witnesses testified to extensively at the Hearing, competing against the Chinese government is not part of a company's normal startup operations. For example, Ms. de La Bruyère, co-founder of Horizon Advisory, a research firm focused on the implications of Chinese industrial policy, testified, "State-supported Chinese producers have a near monopoly of the AAM industry. This allows China to depress prices so that they are artificially low. That in turn means that non-Chinese producers must either sell at uneconomic prices and therefore lose money or try to convince consumers to buy at above market prices, which no customer is keen to do." at 45-46; PR202, CR240/248 at Exhibit 1.

The Horizon Advisory Report, *The China Hazard – How Beijing Strategically Controls the Global Battery Supply Chain*, further demonstrates that, "China purposely overproduces anode material, creating more supply than global demand. This oversupply allows China to manipulate the global graphite market by flooding it with cheap, highly subsidized product, <u>driving down prices in a concerted effort to smother foreign competitors</u>." PR1, CR1 at Exhibit I-21 (emphasis added). Moreover, "China presents an enormous spectrum of challenges to U.S. investments in the battery industry. First, Beijing's control of the industry means that it can disrupt business models

and supply lines overnight and therefore threaten the sustainability of U.S. investments." *Id.* at 24. This market volatility driven by China's dominance and its willingness to suppress AAM prices discourages investment in critical minerals production. *See, e.g.*, PR168, CR201/209 at Exhibit 21. Chair Karpel and Commissioner Johanson utterly fail to address the evidence of the Chinese government's monopoly. A reasoned explanation is required under the law and merely baldly stating that these are "normal" startup conditions is insufficient.

Sworn testimony at the hearing indicated that China heavily subsidizes its AAM industry: "Setting aside labor cost differences between the U.S. and China, 60 to 65 percent of our Chinese competitors' capital costs are paid by the central, provincial, and municipal government. This includes civil works, building, utility infrastructure, and land. Power is the highest input cost to make synthetic graphite. It is subsidized in China, and Chinese competitors' electricity costs are about 50 percent lower than ours in the U.S." PR198 at 45-46. Again, the majority Views are silent as to this evidence and argument.

Undoubtedly the Commission will respond in its brief that Plaintiff is allegedly asking the Court "to impermissibly reweigh evidence." This is not true. Rather, Plaintiff argues that this material argument and evidence detract from the Commission's determination that these are normal startup challenges. Despite the numerous sources of evidence that were introduced to demonstrate that the domestic AAM industry was forced to compete with a government-run Chinese monopoly, Chair Karpel and Commissioner Johanson did not address this evidence or argument. Plaintiff emphasizes that the contemporaneous business documentation and testimony it submitted fundamentally undermine the Commission's conclusion. Because the Commission's determination ignores this evidence without providing a reasoned analysis, its decision is contrary to law and warrants a remand. *See, e.g.*, *Gerald*, 132 F.3d at 720.

**4. The Commission's Determination That Subject Imports Have Not Discouraged Investors and Hindered the Domestic Industry's Ability to Obtain Financing Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law**

The Views also failed to fully address the record evidence that contradicts the conclusion that subject imports have not discouraged investors and hindered the domestic industry's ability to obtain financing.

a. The Commission Failed to Address Material Arguments and Evidence That Subject Imports Have Discouraged Investors and Hindered the Domestic Industry's Ability to Maintain Financing

In the underlying investigation, Plaintiff provided evidence demonstrating that the low prices established by Chinese imports in the U.S. market further retard the domestic industry's establishment by disincentivizing investments. Petitioner's Prehearing and Post-Hearing Briefs provided material evidence and arguments demonstrating that investors are unwilling to invest in an uncertain market with a market price that is set below costs of production that continued to fall throughout the POI, especially during a time of increasing demand. Plaintiff additionally provided affidavits from current or potential investors that the Commission impermissibly disregarded, as detailed in Section V.C.4.c. This market volatility driven by China's dominance and its willingness to suppress AAM prices discourages investment necessary for the establishment of a domestic industry. PR168, CR201/209 at Exhibit 16; PR202, CR240/248 at Exhibit 1, Question III.

Petitioner's Post-Hearing Brief provided the Commission with an explicit list of evidence detailing the relationship between low market prices set by China and the lack of investment in the United States. PR202, CR240/248 at 13. This included affidavits supporting the argument that the domestic industry's efforts to obtain financing were hindered by low-priced subject imports. *See e.g., id.* at Exhibits 7, 9, 10. One such affidavit was from [

]. *See id*. at Exhibit 7.

Witnesses likewise testified regarding the adverse impacts subject imports had on investments in the domestic industry. *See* PR198 at 100-02. One U.S. producer testified: "the process of attracting investment has been especially difficult in a monopolistic market." *Id*. at 28. The artificial market price created by Chinese imports is a direct cause for hesitation on the part of investors. By way of summarizing these direct impacts on investment decisions, Syrah explained:

> As investors evaluate the potential to provide us with capital. . . they look at today's prevailing market price that's published in a number of indices. There's obviously differences in prices amongst different customers and suppliers, but there is a general understanding of what the market price and export prices are today from China. . . And today, as investors do that, if I look across a number of these parties and ourselves included of publicly listed companies, our cost estimates in many cases are publicly available, the price does not stack up for an investment against the cost base, and that price is driven by China.

PR198 at 100-01. The Commission Staff Report contained numerous responses from U.S. producers detailing the actual and anticipated negative effects of imports on investment, growth, and development, since January 1, 2022. *See* PR216, CR253 at 6.23 (Table 6.13). For example, "[

].” *Id.*

In the face of myriad evidence to the contrary, the Commission found that subject imports did not prevent domestic producers from attracting investments. This determination, without explanation, is unsupported by substantial evidence and cannot withstand judicial review.

b. The Commission’s Determination That U.S. Producers Secured Significant Funding Is Unsupported by Substantial Evidence and Is Otherwise Not in Accordance with Law

The Commission found that the domestic AAM producers have secured significant funding during the POI in the form of Syrah and Novonix’s offtake agreements, thus subject imports have not impeded them from securing greater levels than might reasonably be expected.[6] *Id.* at 56. As an initial note, the majority of U.S. companies had not obtained offtake agreements. A fact that the two Commissioners conveniently ignore.

As Plaintiff explained in its Post-Hearing Brief, the domestic industry enters, or attempts to enter, into bankable offtake agreements to continue attracting necessary investment. *See* PR202, CR240/248 at Exhibit 1, Question II. Plaintiff explicitly addressed the offtake agreements referenced by the Commission in explaining that these offtake agreements [

]. *Id.* As such, the Commission improperly relies on the fact that two domestic producers (in effect a minority of the domestic industry) have reached offtake agreements to support its conclusion that reaching an

[6] The Commission found that the domestic industry had obtained sufficient funding despite the fact it also determined that no U.S. producer had made any commercial shipments of AAM. In other words, the Commission apparently found there was adequate financing even though there was not, and is not, any commercial production in the United States.

agreement is equivalent to providing the domestic industry with sufficient tools to become established.

This conclusion is particularly absurd, since Plaintiff provided evidence that "developing . . . AAM production facilities requires billions in capital investment." *See id*. at Exhibit 18. While the Commission concludes that the domestic AAM producers have "secured significant funding" it did not address any contradictory evidence that this funding was inadequate for the establishment of the domestic industry. *Id*.

Perhaps even more concerning is the Commission's failure to recognize that Petitioner submitted evidence that neither Syrah nor Novonix received the full funding of these offtake agreements. In its post-hearing brief, Plaintiff detailed that [

]. PR202, CR240/248 at Exhibit 1, Question II.

The Views further note as a ground for the Commission's determination that the U.S. Department of Energy made the following awards: (1) "Anovion reported that in October 2022 it was awarded a grant of $117 million," PR228, CR268 at 29 n.126; (2) Novonix "was awarded a $103 million dollar tax credit" and "a conditional commitment for a $754.8 million loan," *id*.; (3) "SKI US was awarded a $150 million grant in September 2024," *id*.; and "Syrah reported '[

]'." *id*.; *see also id*. at 56.

These acknowledgements do not consider contradictory evidence Plaintiff submitted. Plaintiff provided substantial evidence that government grants are not an appropriate substitute for necessary private investment. Plaintiff specifically provided evidence demonstrating that [

], federal grants are not a substitute for necessary private investment. PR168, CR201/209 at 77. The domestic industry explicitly testified that while "some of the Petitioners have been receiving some government funding, not clearly to the level that Chinese producers have been receiving. But it's not yet enough to build out a full-scale facility. What you really need is you need a bankable contract." PR198 at 80.

The record clearly demonstrates that, although the industry was eligible to receive government funds, these amounts were insufficient to address the industry's capital needs. In fact, Plaintiff submitted evidence that the industry remains significantly under-capitalized and under-invested. For example, while a $100 million grant may seem substantial on its face, it is inadequate when compared to the approximately $1 billion required to establish a new, fully operational facility. *See* PR202, CR240/248 at Exhibit 18.

Moreover, multiple domestic producers [ ]. PR168, CR202/209 at 119. In reality, Petitioner's Prehearing Brief specifically noted that [ ], representing only [ ] percent of the total [ ] originally promised to the domestic industry. *Id.*

Further, some of the government grants [ ]. *See, e.g.*, PR216, CR253 at 3.14 (Table 3.3). [ ].

Again, the Views fail to grapple with this contradictory material evidence. The Commission also has an obligation to discuss evidence detracting from or contradicting its

findings. *See, e.g.*, *Universal*, 340 U.S. at 488-89. Plaintiff is not asking the Court to impermissibly reweigh evidence but instead is noting that the material evidence Plaintiff provided fundamentally detracts from the Commission's conclusion. The Commission's determination ignores this evidence, without reasoned analysis, and so is contrary to law and necessitates a remand. *See, e.g.*, *Gerald*, 132 F.3d at 720.

c. <u>The Commission's Determination That Affidavits Petitioner Submitted Did Not Detract From Other Record Evidence is Not in Accordance With Law</u>

As stated above, Plaintiff submitted affidavits supporting the argument that the domestic industry's efforts to obtain financing were hindered by low-priced subject imports. *See, e.g.*, CR202, PR240/248 at Exhibits 7, 9, 10. The Views nominally referenced that Plaintiff submitted this evidence but did not meaningfully address it before determining to disregard each affidavit in turn. PR228, CR268 at 57. By only nominally addressing select evidence, the Views did not refute the core record evidence and argument contained therein.

In determining to disregard this evidence, the Commission's analysis notes for each affidavit its lack of "supporting documentation." *Id*. Plaintiff's sworn affidavits regarding the domestic industry's difficulties securing investment, which were further corroborated by sworn testimony, PR198 at 28, 100-02, and questionnaire responses, PR216, CR253 at 6.12–6.13, and other sworn affidavits were disregarded for want of supporting documentation. However, the Commission cites no legal authority requiring Petitioner to include supporting documentation with its affidavits. In fact, this determination is especially perplexing as the Views favorably cite an affidavit from Tesla, which did not include supporting documentation, in support of the Commission's analysis that purchasers used a cost-plus analysis during price negotiations. *See id*. at 43, n.176. This is arbitrary and capricious decision-making: Plaintiff's affidavits must include supporting documentation to have probative value, but a respondent's affidavit does not.

Further compounding this error was the Commission's decision to disregard an affidavit Plaintiff submitted because it "was prepared on behalf of Novonix during the course of these trade remedy proceedings." PR228, CR268 at 57, n.210. The Commission states,

> We do not find [ ]'s affidavit to be persuasive for several reasons. First, Petitioner has not provided any supporting documentation from [ ]. Second, the attachment [ ] is outside the POI and approximately eleven months after the petitions were filed in these investigations thereby indicating that the document was prepared on behalf of Novonix during the course of these trade remedy proceedings.

*Id.* While the Commission does not substantively grapple with the multiple affidavits Plaintiff submitted, this affidavit is specifically disregarded.

Again, the Commission cites no legal authority supporting its ability to disregard Plaintiff's evidence and avoid addressing material argument because such evidence was prepared during the course of the investigation. To the contrary, the Commission is statutorily required to include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments concerning impact on the industry of the subject imports. 19 U.S.C § 1677f. In *AWP Indus., Inc. v. United States*, this Court affirmed that, when faced with potentially credible evidence on both sides of a disputed issue, the Commission has discretion in assigning weight, <u>but only</u> "as long as its reading of the record is reasonable." 35 CIT 774, 796, 783 F. Supp. 2d 1266, 1287 (Ct. Int'l Trade 2011).

The Commission's disregard of Plaintiff's evidence on this basis is especially unreasonable in light of the practical reality that most of the evidence it considers during a trade remedy investigation is prepared for the purpose of that investigation. For example, the Commission issues blank questionnaires to be completed by interested parties during trade remedy investigations, which ultimately are compiled into the Staff Report. The Commission did not disregard the

affidavits submitted by other parties that are dated during and appear to have been prepared during the course of the investigation. *See, e.g.*, PR228, CR268 at 23 nn.95, 97, 43 n.176.

It is arbitrary and capricious decision making that U.S. producer's sworn affidavits can be disregarded if not accompanied by supporting documents but there is no requirement for the affidavits of those opposing relief for the domestic industry. Similarly, sworn affidavits on behalf of the U.S. industry can be invalidated if they are dated during the pendency of the investigation, but – in the complete absence of any justification – this prohibition does not apply to the affidavits of those importing Chinese AAM.

While a pre-litigation report may have substantial probative value due to its independence, this is an oversimplification and not an absolute rule. The probative value of any evidence depends on multiple factors, including its accuracy, relevance, and the context in which it was created. Dismissing a report solely because it was produced during the investigation fails to provide a reasoned analysis and disregards these critical considerations.

An affidavit is a sworn statement of facts made under oath, and its credibility may be based on its consistency, the affiant's personal knowledge, and corroboration, rather than solely on the timing of its creation. *See AWP Indus., Inc.*, 783 F. Supp. 2d 1266, 1287. That an affidavit was prepared during litigation does not inherently diminish its probative value; rather, its weight depends on its substantive content and corroboration with other evidence. Here, the affidavit was relevant and supported by corroborating evidence, further enhancing its probative value.

The Commission failed to provide a reasoned explanation as to why substantial record evidence demonstrating that subject imports discouraged investors and hindered the domestic industry's ability to obtain financing did not detract from its determination regarding adverse impacts on the domestic industry. Because it disregards this evidence without providing a reasoned

analysis, this determination is not based on substantial evidence, is contrary to law and warrants a remand.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court remand the Commission's price, impact, and causation determinations to the agency for further consideration.

Respectfully submitted,

*/s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Claire M. Webster, Esq.
Carson Easterling, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
(202) 452-7900

*Counsel to American Active Anode Material Producers*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to the Court's July 10, 2026, Scheduling Order, ECF No. 61, that this brief contains 19,771 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Carson Easterling