*NONCONFIDENTIAL VERSION*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

Court No. 26-02905

AMERICAN ACTIVE ANODE MATERIAL PRODUCERS,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

LG ENERGY SOLUTION MICHIGAN, INC., PANASONIC CORPORATION OF NORTH AMERICA, PANASONIC ENERFY CORPORATION OF NORTH AMERICA, TESLA, INC., HUZHOU KAIJIN NEW ENERGY TECHNOLOGY CO., LTD., and CONTEMPORARY AMPEREX TECHNOLOGY CO., LIMITED,

*Defendant-Intervenors*.

# DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

DAVID A.J. GOLDFINE
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708-5452
Facsimile: (202) 205-3111
david.goldfine@usitc.gov

MARGARET D. MACDONALD
General Counsel
Telephone: (202) 205-2561
margaret.macdonald@usitc.gov

KARL S. VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone: (202) 205-3096
karl.von-schriltz@usitc.gov

**DATED: November 13, 2026**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iv

**I. INTRODUCTION ........ 1**

**II. STATEMENT PURSUANT TO RULE 56.2 ........ 1**

A. Administrative Determinations Under Review ........ 1

B. Questions Presented and Summary of Argument ........ 1

1. Was the Commission's Finding that Subject Imports Did Not Have Significant Adverse Price Effects Supported by Substantial Evidence and in Accordance with Law? ........ 1

2. Was the Commission's Determination that Subject Imports Did Not Have a Significant Adverse Impact on the Domestic Industry Supported by Substantial Evidence and in Accordance with Law? ........ 3

**III. STATEMENT OF FACTS ........ 4**

A. Legal Framework and Conditions of Competition ........ 4

B. Volume ........ 7

C. Price ........ 7

D. Impact ........ 11

**IV. STANDARD OF REVIEW ........ 15**

**V. ARGUMENT ........ 18**

A. The Commission's Finding That Subject Imports Did Not Have Significant Adverse Price Effects Is Supported by Substantial Evidence and in Accordance with Law ........ 18

1. The Commission Reasonably Found That Subject Imports Did Not Have Significant Adverse Price Effects ........ 18

2. Plaintiff's Arguments Regarding Traditional Price Effects Are Unavailing ........ 27

3. Plaintiff's Other Price Effects Arguments Are Unavailing ........ 35

**TABLE OF CONTENTS (cont'd)**

B. The Commission's Finding That Subject Imports Did Not Materially Retard the Establishment of the Domestic Industry Is Supported by Substantial Evidence and in Accordance with Law .......................46

1. The Commission Reasonably Found that Subject Imports Did Not Delay the Qualification of Domestic Producers .........................46

2. The Commission Reasonably Found That Subject Imports Did Not Discourage Investors or Hinder the Domestic Industry's Ability to Obtain Financing ....................................................54

3. The Commission Reasonably Found that the Domestic Industry's Startup Costs Reflected Normal Startup Conditions ..........................................................................................63

**VI. CONCLUSION ..........................................................................................................65**

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004)....................19, 60

*Am. Lamb Co. v. United States*,
785 F.2d 994 (Fed. Cir. 1986)....................33

*AWP Indus., Inc. v. United States*,
35 CIT 774, 783 F. Supp. 2d 1266 (2011)....................62

*Comm. for Fair Coke Trade v. United States*,
28 CIT 1140, 293 F. Supp. 2d 1297 (2003)....................29

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)....................15, 18, 33

*Grupo Industrial Camesa v. United States*,
85 F.3d 1577 (Fed. Cir. 1996)....................33

*Hitachi Metals, Ltd. v. United States*,
949 F.3d 710 (Fed. Cir. 2020)....................16

*JMC Steel Grp. v. United States*,
70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015)....................17

*Matsushita Elec. Indus., Ltd. v. United States*,
750 F.2d 927 (Fed. Cir. 1984)....................17

*Maverick Tube Corp. v. United States*,
No. 14-229, 2016 WL 703575 (Ct. Int'l Trade Feb. 22, 2016), *aff'd*, 857 F.3d 1353 (Fed. Cir. 2017)....................33

*Metallverken Nederland B.V. v. United States*,
13 CIT 1013, 728 F. Supp. 730 (1989)....................18, 33

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)....................15, 16, 62

*Nucor Corp. v. United States*,
28 CIT 188, 318 F. Supp. 2d 1207 (2004)....................17, 30

*Nucor Corp. v. United States*,
414 F.3d 1331 (Fed. Cir. 2005)....................19, 31

**TABLE OF AUTHORITIES (cont'd)**

**Cases (cont'd)** **Page(s)**

*PAO TMK v. United States*,
No. 21-532, Slip Op. 23-150, 2023 WL 6939242 (Ct. Int'l Trade Oct. 12, 2023) ....16

*Siemens Energy, Inc. v. United States*,
806 F.3d 1367 (Fed. Cir. 2015)....18, 33

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005)....17, 56, 60

*U.S. Aluminum Extruders Coal. v. United States*,
No. 24-209, Slip Op. 26-101, 2026 WL 2722700 (Ct. Int'l Trade Sept. 2, 2026) ....29

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (Fed. Cir. 1996)....16, 18, 62

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....16

*US Magnesium LLC v. United States*,
36 CIT 690 (2012) ....16

*USEC Inc. v. United States*,
34 F. App'x 725 (Fed. Cir. 2002) ....30, 31, 60

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....15

19 U.S.C. § 1677(7)(C)(ii)....7, 18

28 U.S.C. § 2639(a)(1)....15

**Legislative History**

Statement of Administrative Action to the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, vol. I (1994) ....17

## I. INTRODUCTION

Defendant U.S. International Trade Commission ("Commission") opposes the Motion for Judgment on the Agency Record filed by the American Anode Material Producers ("Plaintiff"). The Commission respectfully requests that the Court affirm the Commission's final negative material retardation determinations regarding active anode material ("AAM") from China because they are supported by substantial evidence and otherwise in accordance with law.

## II. STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determinations Under Review

Plaintiff challenges the Commission's final determinations that the establishment of an industry in the United States was not materially retarded with material injury by reason of imports of AAM from China. The Commission's Views are contained in *Active Anode Material from China*, Inv. Nos. 701-TA-752 and 731-TA-1730 (Final), USITC Pub. 5719 (Mar. 2026) (PR230).[1] Notice of the determination was published in the Federal Register on April 3, 2026. 91 Fed. Reg. 16,968 (PR229).

### B. Questions Presented and Summary of Argument

#### 1. Was the Commission's Finding that Subject Imports Did Not Have Significant Adverse Price Effects Supported by Substantial Evidence and in Accordance with Law?

Yes. The Commission's finding that subject imports from China did not have significant adverse price effects is supported by substantial evidence and in accordance with law. Plaintiff's

[1] Public record citations are indicated by "PR," referring to list number 1 on the index of the administrative record, and confidential record citations are indicated by "CR," referring to list number 2 on the index of the administrative record. Accordingly, citations to the Commission's public views and publication are to record document PR230 ("USITC Pub. 5719"), and citations to the confidential Commission Views (hereinafter, "Views") are to record document CR268.

arguments concerning underselling, price depression, and price suppression impermissibly ask the Court to reweigh evidence the Commission expressly considered and reasonably found less probative. The Commission explained that the pricing data was not probative because these data compared domestic prices for predominantly trial and test shipments with subject import prices for commercial shipments, involving sales at different levels of trade and commercial channels. It also explained why domestic price trends did not provide a meaningful basis for assessing whether domestic prices were depressed by reason of subject imports, given that they reflected prices for test shipments rather than commercial sales in competition with subject imports, and why the domestic industry's COGS-to-net-sales ratio did not reliably measure price suppression, given the industry's start-up costs and the predominance of trial and test shipments.

The Commission likewise considered and rejected Plaintiff's alternative theory that purchasers used subject import prices to leverage lower domestic prices in negotiating offtake agreements, which are agreements to purchase AAM from domestic producers once they commence commercial production. As the Commission explained, the agreements secured by domestic producers instead reflected prices based on the producers' estimated commercial-scale costs plus substantial negotiated profits, including double-digit profit margins, and those prices exceeded subject import prices in every quarter for which comparisons were available. Given this, the Commission reasonably concluded that subject imports had no significant price effects.

Plaintiff does not dispute that the agreements reflected actual or reasonably estimated commercial-scale costs, provided for genuine and reasonable profit margins, or yielded double-digit returns. Nor does Plaintiff challenge the quarterly comparisons showing that purchasers paid more for domestic AAM than for Chinese imports. Plaintiff identifies no evidence that Chinese prices reduced either the cost or profit component of the negotiated agreements. Its

remaining arguments mischaracterize the Commission's findings or invite the Court to reweigh evidence the Commission already considered in its role as factfinder and found insufficient to establish significant adverse price effects. The Commission's determination should therefore be sustained.

**2. Was the Commission's Determination that Subject Imports Did Not Have a Significant Adverse Impact on the Domestic Industry Supported by Substantial Evidence and in Accordance with Law?**

Yes. The Commission's determination that subject imports had no significant adverse impact on the domestic industry was supported by substantial evidence and otherwise in accordance with law. The Commission considered and rejected Plaintiff's asserted bases for material retardation, including alleged delays in domestic producers' qualification, difficulties obtaining investment and financing, and adverse financial performance. As the Commission explained, purchasers actively supported domestic producers' qualification efforts, but domestic producers continued to face significant, documented, technical deficiencies that prevented them from meeting purchasers' specifications and completing the qualification process. Notwithstanding these challenges, the two producers furthest along in qualification – Syrah and Novonix – secured approximately $2 billion in combined financing, aided by binding offtake commitments. The Commission also found that the domestic industry's financial performance reflected normal startup costs, as demonstrated by respondents' ION Economics analysis, which Plaintiff failed to rebut with a break-even analysis showing that domestic producers' performance fell below reasonable startup expectations. The Commission also expressly considered Plaintiff's contrary evidence – including its affidavits, purchaser communications, and arguments concerning Chinese prices – and explained why that evidence did not establish that subject imports materially retarded the industry's establishment. In the end, Plaintiff recycles arguments the Commission considered and rejected, asking the Court to reweigh the

evidence and substitute Plaintiff's preferred inferences for the Commission's findings in its role as factfinder. That is no basis for disturbing the Commission's determination under substantial evidence review.

## III. STATEMENT OF FACTS

In March 2026, the Commission determined that the establishment of an industry in the United States was not materially retarded by reason of imports of AAM from China. Views at 3. In its determinations, the Commission defined a single domestic like product coextensive with the scope, defined the domestic industry as all domestic producers of AAM, and found that subject imports were not negligible. *Id.* at 5-14. Plaintiff does not challenge these aspects of the Commissions' determinations.

### A. Legal Framework and Conditions of Competition

As an initial matter, the Commission explained that, although its material retardation analysis considers many of the same factors examined in a material injury investigation, those factors are not necessarily "viewed in the same light" given the unique circumstances of an industry attempting to establish itself. *Id.* at 15–16. It noted, for example, that traditional measures of industry performance, including production, shipments, capacity utilization, and market share, may be less probative when increases in those measures are expected as new producers commence operations. *Id.* The Commission also recognized that pricing data may be less relevant where limited domestic sales and small shipment quantities complicate meaningful price comparisons and the evaluation of pricing trends. *Id.* at 16.

Turning to conditions of competition, the Commission found that demand for AAM in the United States was driven principally by demand for downstream products using lithium-ion batteries, including electric vehicles and energy storage systems, and that apparent U.S. consumption increased during the POI. *Id.* at 16–18. It found that U.S. purchasers had

incentives to develop domestic sources of AAM, including to mitigate supply chain risks and take advantage of government incentives favoring domestic production. *Id.* at 17. It further found that the U.S. market was highly concentrated on the purchasing side, with a relatively small number of battery manufacturers accounting for the overwhelming majority of AAM purchases. *Id.* at 18. In particular, it noted that Tesla and GM together accounted for approximately [ [redacted] ] percent of total reported U.S. purchases during the POI. *Id.*

Addressing supply, the Commission found that subject imports from China were by far the largest source of supply to the U.S. AAM market throughout the POI while nonsubject imports were the second-largest supply source. *Id.* at 19-20. It found that the domestic industry was the smallest source of supply in the U.S. market during the POI and remained in a start-up phase, with only small quantities of trial/test shipments throughout the POI, small quantities of commercial shipments in 2022, and no commercial shipments after 2022. *Id.* at 18–19. It noted that two domestic producers – Syrah and Novonix – together accounted for virtually all U.S. production of AAM in 2024, accounting for [ [redacted] ] percent and [ [redacted] ] percent, respectively. *Id.* at 19.

The Commission found a low degree of substitutability between domestic AAM and subject imports. *Id.* at 21. It noted that questionnaire responses from purchasers and importers indicated that domestic and subject AAM were never interchangeable. *Id.* It also found that the lack of qualified domestic AAM producers and U.S. AAM purchasers' strict specifications and requirements limited substitutability. *Id.* at 22-23. It found that qualification of a new AAM supplier was a rigorous, multistage, and time-intensive process; that purchasers had indicated there was no shortcutting the qualification process; and that purchasers had invested significant time and resources in qualifying domestic suppliers. *Id.* Noting that no domestic producer had

qualified for commercial sales during the POI, the Commission found that Syrah and Novonix were by far the furthest along in the qualification process, while the remaining domestic producers were in substantially earlier stages. *Id*. at 24. By contrast, several Chinese suppliers had already been qualified by U.S. AAM purchasers. *Id*.

The Commission found that price was an important factor in purchasing decisions among qualified AAM suppliers, along with non-price factors. *Id*. at 24-25. At the same time, it found that other factors – most notably, a supplier's ability to meet customer specification – were more important to purchasers than price. *Id*. at 25. It noted that all responding U.S. purchasers identified the ability to meet customer specifications as the first-most important factor in purchasing AAM, while no purchasers identified price as the first-most important factor. *Id*. It found that non-price factors such as quality and the ability to meet customer specifications were more important than price when a supplier was not qualified or unable to meet purchasers' design specifications. *Id*.

Addressing other conditions of competition, the Commission found that offtake agreements were an important feature of the U.S. market for AAM, with only U.S. producers Syrah and Novonix having entered into such agreements with U.S. purchasers during the POI. *Id*. at 26-28. It found that offtake agreements are usually multi-year agreements and typically include a negotiated price. *Id*. at 26. Noting that offtake agreements were closely integrated with the qualification and development process, the Commission found that purchasers and producers collaborate extensively as producers work toward qualification and commercial-scale production, with purchasers providing producers with technical support and other assistance under such agreements. *Id*. Offtake agreements also helped domestic producers secure financing for their production projects by making them "bankable," as such agreements reflected

purchasers' interest in developing stable domestic sources of AAM. *Id*. at 26-27. Finally, the Commission considered trends in raw material costs for AAM and the availability of government funding and incentives supporting domestic AAM production. *Id*. at 28-29.

Plaintiff does not challenge any aspect of the Commission's analysis of conditions of competition.

**B. Volume**

The Commission found that subject imports were the dominant source of AAM in the U.S. market during the POI and that their volume was significant both in absolute terms and relative to apparent U.S. consumption. *Id*. at 31. At the same time, however, it noted that the significance of subject import volumes was not unexpected given China's dominant presence in the U.S. market throughout the POI, the domestic industry's virtually nonexistent commercial sales, and the much smaller presence of nonsubject imports during the POI. *Id*. at 31-32. Moreover, the Commission found that the significant volume of subject imports did not have significant price effects or a significant adverse impact on the domestic industry for the reasons discussed below. *Id*. at 32.

**C. Price**

The Commission analyzed the price effects of subject imports pursuant to section 771(7)(C)(ii) of the Tariff Act. *Id*. In accordance with the statute, the Commission considered the record evidence concerning the significance of subject import underselling and whether subject imports depressed prices to a significant degree or prevented price increases that otherwise would have occurred. *Id*. at 32-33. In analyzing these statutory factors, the Commission recognized that, because this was a material retardation case, the factors warranted consideration in light of the different circumstances presented when an industry is attempting to establish itself in a market that may already be dominated by other market participants. *Id*.

In its underselling analysis, the Commission found that landed duty-paid purchase costs for subject imports from China were below domestic producers' sales prices in 11 of 14 comparisons, involving [ [redacted] ] pounds. *Id*. at 34 & n.148. The Commission nevertheless found that these comparisons did not provide a meaningful measure of underselling. *Id*. at 35–36. It explained that the comparisons involved different types of data: domestic producers' sales price data and importers' purchase cost data reflecting landed duty-paid costs for subject imports. *Id*. at 34–35 & n.148; Confidential Staff Report at 5.9 (CR253). Because the domestic industry remained in a start-up phase, the Commission found, domestic prices primarily reflected prices paid by purchasers for trial and test shipments from producers seeking qualification, whereas subject import purchase costs reflected the landed duty-paid purchase costs paid by direct importers for commercial shipments. Views at 35–36. The Commission found that the domestic like product and subject imports were sold at different levels of trade – subject imports through commercial channels and domestic AMM through non-commercial channels – and were therefore not comparable. *Id*. at 36. Given these differences, the low degree of substitutability between domestic and subject AAM, and the greater importance of non-price factors such as quality and the ability to meet customer specifications when a supplier had not been qualified or was otherwise unable to meet purchasers' design specifications, the Commission concluded that the pricing and purchase cost data did not permit meaningful price comparisons and had little, if any, probative value in assessing whether subject imports had significant adverse price effects. *Id*.

Regarding price depression, the Commission examined trends in domestic prices and subject import purchase costs but found such trends not particularly probative because the

domestic industry's U.S. shipments consisted almost entirely of trial/test shipments and the industry remained in a start-up phase. *Id.* at 35 & n.150, 36-37.

Similarly, the Commission found that the domestic industry's COGS-to-net-sales ratio was not particularly probative of price suppression because both its cost and sales components were distorted by the industry's start-up status and limited commercial sales. *Id.* The numerator (cost of goods sold) was distorted by start-up costs and did not reflect commercial-scale production. *Id.* The denominator (net sales) was likewise distorted because it consisted almost entirely of trial and test shipments, while subject imports consisted exclusively of commercial sales during the POI. *Id.* Moreover, because the domestic industry made very few commercial sales, fluctuations in the volume and mix of trial and test shipments drove changes in net sales AUVs rather than meaningful changes in commercial pricing. *Id.*

The Commission also considered and rejected Plaintiff's alternative theory that purchasers used subject import prices to leverage lower domestic prices in negotiating offtake agreements. *Id.* at 37–46. Plaintiff relied on news and analyst reports concerning China's dominance in the graphite market and business documents – including emails, meeting notes, presentations, and affidavits concerning negotiations involving Tesla, Panasonic, LG, and domestic producers. *Id.* at 37–38, 43–45 & n.158, nn.176–77. The Commission considered this evidence alongside the actual offtake agreements, hearing testimony, and other evidence concerning the negotiations. *Id.* at 37–46.

The Commission found that Syrah and Novonix, the only domestic producers with offtake agreements, negotiated prices based on estimated commercial-scale costs plus a reasonable profit, rather than subject import prices. *Id.* at 40–45. Tesla's agreement with Syrah provided for an 11.98 percent cash margin, Panasonic's agreement with Novonix provided for

operating margins of 23 to 28 percent, and LG's agreements with both producers likewise tied prices to costs plus a reasonable profit. *Id*. at 42. The Commission also found that purchasers were willing to pay a premium for domestic AAM, as reflected by negotiated offtake prices that exceeded subject imports' quarterly average unit values throughout the POI, to enable domestic producers to establish sustainable production of AMM into the future, once they were qualified. *Id*. at 39-40 & nn.163–65, 45. The Commission found further support for these findings in purchasers' incentives to secure reliable domestic supply, including concerns about reliance on Chinese imports and available tax incentives. *Id*. at 45 & n.179.

The Commission acknowledged that purchasers referred to Chinese prices during negotiations, but found that such references were unsurprising given China's dominance in the market and did not establish that subject-import prices materially affected negotiated offtake prices or that purchasers used them to leverage lower domestic prices. *Id*. at 41-42. The Commission evaluated those references alongside the offtake agreements, hearing testimony, affidavits, and other record evidence concerning the negotiations, which supported its finding that domestic prices reflected estimated commercial-scale costs plus a reasonable profit. *Id*. at 40-45 & nn.176–79. The Commission also considered evidence concerning negotiations between purchasers and [ [redacted] ] but found that their communications did not establish that purchasers used subject import prices to leverage lower domestic prices; unlike Syrah and Novonix, these producers had made substantially less progress toward qualification and lacked comparable offtake agreements. *Id*. at 24, 42–45 & nn.176–77. The Commission found the record showed "that the offtake agreements are not based on or tied to Chinese pricing. They are based on the domestic producers' cost structure plus profit." *Id.* at 45. The Commission therefore concluded that the record as a whole did not support Plaintiff's claim that

purchasers used subject import pricing to prevent producers from recouping their costs plus an adequate profit or otherwise materially retard the establishment of the industry during the POI. *Id*. at 39 & 45–46. Accordingly, the Commission found that subject imports had no significant adverse price effects.

**D. Impact**

After finding no significant adverse price effects, the Commission considered Plaintiff's arguments that subject imports materially retarded the establishment of the domestic AAM industry by delaying qualification of domestic producers and hindering their ability to attract investment. The Commission rejected both arguments and further found that the domestic industry's financial performance was consistent with the normal challenges of a capital-intensive start-up industry. *Id*. at 46–60.

*Qualification*. The Commission found that qualifying an AAM supplier was a rigorous, multistage process requiring substantial time and testing to ensure product quality, safety, and performance at commercial scale. *Id*. at 51. Because AAM affects battery performance and safety, purchasers require new AAM suppliers to undergo an extensive qualification process to validate and ensure the durability and consistent performance of their AAM and to avoid costly recalls or battery fires. *Id*. As the Commission explained, the record indicated that the qualification process could not be expedited without compromising the safety and warranty of downstream battery products. *Id*. The Commission found that no domestic producer had completed qualification for commercial sales during the POI. *Id*. at 54. Although Syrah and Novonix were the furthest along in the qualification process, both producers remained unqualified because they struggled to meet Tesla's and Panasonic's respective specifications in commercial quantities, despite substantial technical assistance from those purchasers. *Id*. at 51-54. The remaining domestic producers were at substantially earlier stages of qualification, with

limited or no trial or test shipments. *Id.* at 19 & nn.69-70, 54. Thus, the Commission found that no domestic producers were qualified to supply AAM in the U.S. market because none could meet customers' safety-critical specifications in commercial quantities. *Id.* at 51. The Commission also noted that purchasers conducted the technical qualification of domestic producers separately from their commercial negotiations with the producers over pricing in offtake agreements. *Id.* at 51 n.192.

The Commission also found that purchasers had made substantial efforts to advance domestic producers' qualification for becoming suppliers of commercial-scale AAM. It found that purchasers had strong incentives to develop domestic AAM sources to mitigate supply-chain risks and take advantage of U.S. government incentives. *Id.* Consistent with those incentives, Tesla, Panasonic, and LG submitted affidavits, business records, and other evidence documenting their substantial efforts to advance the qualification of domestic producers through testing, technical assistance, and other support. *Id.* at 51-53. As the Commission found, Syrah had progressed to the fourth and final stage of Tesla's qualification process and also had progressed through [ [redacted] ] of LG's qualification process, while Novonix had progressed to the [ [redacted] ] of Panasonic's qualification process. *Id.* at 54.

The Commission also considered and rejected Plaintiff's contention that purchasers delayed qualification because lower-priced Chinese AAM remained available, including the business documents Plaintiff submitted with its posthearing brief. *Id.* at 50-55 & n.189. The Commission found that the qualification timelines for domestic AAM producers, including Syrah and Novonix, were generally consistent with those experienced by other global battery-material suppliers for Tesla, Panasonic, and LG. *Id.* 54-55 & n.203. The Commission concluded that purchasers had not hindered domestic producers but rather helped them by supporting their

efforts. Noting that qualification was a legitimate, non-pretextual process essential to ensuring battery safety and reliability, the Commission found that Plaintiff had provided no credible evidence that qualification delays were due to subject imports or their prices instead of the normal rigors of the qualification process. *Id*. at 55.

*Investment and Financing*. The Commission also considered and rejected Plaintiff's contention that subject imports discouraged investment and hindered the domestic industry's ability to obtain financing. *Id*. at 56-60. The Commission found that domestic AAM producers had secured significant funding during the POI and that the record did not indicate that subject imports had impeded them from securing greater financing than reasonably could have been expected. *Id*. at 56. Syrah and Novonix – the two producers furthest along in qualification – had secured approximately $1 billion and $860 million in financing, respectively, or approximately $2 billion combined. *Id*. The Commission found that purchaser offtake agreements helped facilitate that financing, including through Syrah's agreement with Tesla and Novonix's agreement with Panasonic. *Id*. The Commission found that these agreements and the large-scale funding secured by Syrah and Novonix provided an adequate basis for finding that purchasers were not hindering the domestic industry's ability to obtain financing. *Id*. at 56-57. The Commission further found that a domestic producer's ability to secure investment increased as the producer progressed through qualification, indicating that the qualification progress was a more pertinent factor driving investment decisions than the availability of subject imports. *Id*. at 58.

The Commission also considered Plaintiff's contrary evidence that subject imports discouraged investment and hindered financing, including producer testimony and affidavits, but found that evidence insufficient in light of the substantial financing secured by the producers

furthest along in the qualification process and the relationship between a producer's qualification progress and access to financing. *Id.* at 56-58. The Commission therefore concluded that the record did not establish that subject imports had materially retarded the domestic industry by discouraging investment or impeding access to financing. *Id.* at 59-60.

*Start-Up Costs and Financial Performance.* The Commission also assessed the domestic industry's financial performance in light of its stage of development. The Commission found that the domestic industry's financial performance was consistent with the expected challenges facing a capital-intensive industry in the startup phase. *Id.* at 58-60. As support, the Commission found persuasive the economic analysis prepared on behalf of respondent Telsa by ION Economics, which explained that domestic AAM producers could reasonably be expected to incur substantial start-up costs as they developed the technical expertise and production capabilities necessary to manufacture AAM at commercial scale. *Id.* at 58-59. Based on this analysis, the Commission found no basis to conclude that the domestic industry's performance was worse than reasonably could be expected, because reaching break-even can take years for startup companies in the AAM industry. *Id.* The Commission also explained that a break-even point for the industry could not be calculated because [ [redacted] ], as Plaintiff acknowledged, and Plaintiff had declined to provide an analysis projecting when the industry could reasonably be expected to reach break-even. *Id.* at 49 n.187, 58 & n.212. Given that the ION Economics analysis was the only record evidence addressing the domestic industry's expected start-up performance, the Commission reasonably relied on that analysis in finding that the domestic industry's financial performance reflected normal start-up conditions and not any adverse impact by subject imports. *Id.* at 58–59.

The Commission also considered the domestic industry's stage of development, finding that no domestic producer had completed qualification for commercial sales during the POI. *Id.* at 59. The Commission found that the domestic industry's substantial start-up costs and weak financial performance were consistent with its continued efforts to establish commercial-scale production and complete purchaser qualification. *Id.* Noting the great lengths to which purchasers had gone to support the qualification efforts of nascent domestic producers, the Commission found that the record did not support Plaintiff's theory that it was somehow rational for purchasers to delay or interfere with qualification due to low priced subject imports. *Id.* at 59-60. Because the financial condition of the domestic industry was no worse than reasonably could be expected of an industry in the start-up phase, the Commission concluded that the establishment of the industry was not materially retarded by reason of subject imports. *Id.* at 60.

## IV. STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court reviews the Commissions' final antidumping and countervailing duty determinations to assess whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determinations to demonstrate otherwise. *See* 28 U.S.C. § 2639(a)(1).

Under the substantial evidence standard, reviewing courts defer to the Commission's reasoned fact-finding and analysis in injury investigations. *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Nor does the

fact that Plaintiffs can point to an alternative view of the same factual record by a dissenting Commissioner establish that the Commission's views were not supported by substantial evidence. *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise . . . displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "{T}he question is not whether the court would have reached the same decision on the same record –rather, it is whether the administrative record as a whole permits the Commission's conclusion." *PAO TMK v. United States*, No. 21-00532, Slip Op. 23-150, 2023 WL 6939242, at *2 (Ct. Int'l Trade Oct. 12, 2023). A court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020).

In injury investigations, the Commission is the trier of fact. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp.,* 96 F.3d at 1357. Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *US Magnesium LLC v. United States*, 36 CIT 690, 692 (2012). As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

Since the Commission "is presumed to have considered all of the evidence on the record," it is "not required to explicitly address every piece of evidence presented by the parties" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I at 892 (1994); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005). "When evaluating challenges to the ITC's choice of methodology," this Court "will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316 n.4 (Ct. Int'l Trade 2015).

As an overarching matter, Plaintiff's attacks upon the Commission's determinations depend upon an improper application of substantial evidence review. Throughout its opening brief, Plaintiff largely ignores the record support for the Commission's actual factual findings or cites to its preferred findings in various impermissible attempts to reweigh the evidence. At most, Plaintiff points to evidence – invariably considered and rejected by the Commission in its opinion – that could have supported a factual finding contrary to the one the agency made. In the end, it is neither "surprising nor persuasive" that Plaintiff can point to evidence "which detracts from the evidence which supports the Commission's decision" or can "hypothesize a reasonable basis for a contrary determination." *Matsushita Elec. Indus., Ltd. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).

Similarly, Plaintiff's reliance on Commissioner Kearns' dissenting views in support of its challenge to the Commission's determinations is misplaced. *See* Plf's Opening Br. at 17, 22 (Dkt. 67) ("PlBr."). That a dissenting Commissioner, Plaintiff, or even this Court, may have

weighed the evidence differently, does not provide grounds to overrule the Commission's reasonable consideration of the same evidence. Although "individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 607); *see also U.S. Steel Grp.*, 96 F.3d at 1362 (noting "each commissioner is free to attach different weight to factual information and . . . commissioners may ultimately reach different factual conclusions on the same record"). By asking the Court to remand the Commission's determinations based on the findings of the dissenting Commissioner, Plaintiffs are "in essence, asking the Court to reweigh the evidence." *See Metallverken Nederland B.V. v. United States*, 13 CIT 1013, 1017, 728 F. Supp. 730, 734 (1989).

## V. ARGUMENT

### A. The Commission's Finding That Subject Imports Did Not Have Significant Adverse Price Effects Is Supported by Substantial Evidence and in Accordance with Law

#### 1. The Commission Reasonably Found That Subject Imports Did Not Have Significant Adverse Price Effects

The Commission found that subject imports from China did not have significant adverse price effects, and substantial evidence supports that determination. In evaluating price effects under 19 U.S.C. § 1677(7)(C)(ii), the Commission considered whether subject imports significantly undersold the domestic like product, depressed domestic prices to a significant degree, or prevented price increases that otherwise would have occurred. Views at 32–37. The Commission also recognized that in a material-retardation investigation, these factors must be evaluated in light of the circumstances facing an industry attempting to establish itself in a

market where other suppliers already compete. *Id*. at 32–33. Consistent with that framework, the Commission examined the available price comparisons, subject import purchase cost trends, purchaser responses concerning lost sales and lost revenue, domestic pricing trends, and the domestic industry's cost-of-goods-sold-to-net-sales ratio. *Id*. at 33–37 & nn.147–50. The Commission explained why this evidence did not establish significant adverse price effects under the conditions prevailing during the POI. *Id*. at 32–37. Plaintiff's disagreement with that conclusion does not establish that the Commission failed to perform the analysis required by the statute. As discussed above, the statute requires the Commission to consider whether subject imports undersold the domestic like product or otherwise depressed or suppressed domestic prices. In accordance with the statute, the Commission considered the record evidence that is normally relevant to underselling, price depression, and price suppression, and explained why this evidence was of limited probative value under the specific facts of the case. As the Federal Circuit explained in *Altx, Inc. v. United States*, 370 F.3d 1108, 1123 (Fed. Cir. 2004), the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor. *See also Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).

The Commission explained that the particular commercial circumstances of the domestic industry and the subject imports during the POI undermined the probative value of price comparisons and trends. The Commission found that domestic shipments consisted almost entirely of trial and test shipments, whereas U.S. importers' shipments of subject merchandise from China consisted exclusively of commercial shipments. Views at 36–37. The Commission also found, based on reports from market participants, that domestic and subject AAM had a low degree of substitutability and that non-price considerations – including quality and the ability to

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

meet customer specifications – were particularly important when a supplier had not yet qualified to make commercial sales, as was the case with all domestic producers. *Id.* at 36. These circumstances mattered directly to the probative value of the available pricing evidence: domestic producers' sales-price data and importers' purchase-cost data reflected products sold at different levels of trade and through different commercial channels, rather than comparable transactions on a common commercial basis as necessary for price comparisons to reflect actual price competition. *Id.* at 35–37. The Commission accordingly evaluated the traditional pricing indicators in light of the record evidence concerning how purchasers evaluated, qualified, and ultimately purchased AAM. *Id.* at 33–37. In fact, Plaintiff acknowledged the limited utility of traditional pricing analyses in a material-retardation investigation and shifted its emphasis in its posthearing brief to an alternative theory concerning the alleged use of subject import prices in negotiations over domestic offtake agreements. *Id.* at 36–37 & n.156. The Commission evaluated both the conventional pricing evidence and Plaintiff's alternative theory, and explained why neither established significant adverse price effects. *Id.* at 32–46.

In considering the conventional pricing evidence, the Commission explained why the available comparisons between subject import purchase costs and domestic sales prices did not establish significant adverse price effects. Although subject imports from China had lower purchase costs than domestic producers' sales prices in 11 of 14 comparisons, involving [ [redacted] ] pounds, the Commission found that those comparisons did not provide a meaningful measure of underselling. *Id.* at 34–36 & n.148. The domestic shipments underlying the comparisons consisted almost entirely of trial and test shipments, while the subject-import data was entirely purchase cost data reflecting landed duty-paid purchase costs. *Id.* at 35–36; Confidential Staff Report at 5.9 (CR253). Thus, the comparisons juxtaposed domestic prices for

trial and test shipments made before or during the qualification process by domestic producers not yet qualified to supply AAM on a commercial basis against purchase costs for subject imports sold on a commercial basis. The Commission further found that domestic and subject AAM had a low degree of substitutability and that non-price factors, including quality and the ability to meet customer specifications, were particularly important before a supplier qualified for commercial sales. Views at 36. In light of those findings, the Commission reasonably concluded that the sales price to purchase cost comparisons had little, if any, probative value in assessing whether subject imports significantly undersold the domestic like product. *Id*. at 35–36. That subject import purchase costs were lower than domestic sales prices in a majority of quarterly comparisons did not compel a contrary conclusion where the underlying data did not meaningfully measure price competition between domestic and subject AAM for commercial sales to the same purchasers.

The Commission likewise reasonably found that the record did not provide a meaningful basis for determining whether subject imports had depressed domestic prices. After examining domestic pricing trends and subject import purchase costs, the Commission explained that these data did not permit meaningful comparisons under the conditions of competition prevailing during the POI. Views at 35–36 & n.150. Domestic prices declined by [ [redacted] ] percent for Product 1 but increased by [ [redacted] ] percent for Product 4. *Id*. at 35 n.150. The Commission considered those movements in the context of the domestic industry's limited commercial sales, confined to small volumes in 2022, and the substantial differences between the domestic and subject import shipments reflected in the available data. *Id*. at 35–36.

In particular, domestic pricing data reflected predominantly trial and test shipments, whereas subject import data reflected direct importers' purchase costs, on a landed duty-paid

basis, for exclusively commercial sales. *Id.* at 35–36 & n.148. The Commission also considered the low degree of substitutability between domestic and subject AAM and the importance of quality and customer-specification requirements before domestic suppliers could qualify to make commercial sales. *Id.* at 36. Because the domestic industry had made very few commercial sales, fluctuations in the volume and mix of trial and test shipments drove changes in net-sales average unit values ("AUVs"), rather than meaningful changes in commercial pricing. *Id.* at 37. These findings provided a reasoned basis for the Commission's conclusion that the observed domestic price movements did not meaningfully establish whether subject imports had depressed domestic prices. The Commission was not required to infer significant price depression from changes in domestic prices without a reliable basis for attributing those changes to competition from subject imports.

The Commission also reasonably concluded that the domestic industry's cost-of-goods-sold-to-net-sales ("COGS-to-net-sales") ratio was not particularly probative of price suppression. Views at 35 & n.150, 37. As the Commission explained, the cost component of the ratio in the numerator was affected by start-up costs and therefore did not reflect commercial-scale production. *Id.* at 37. The sales component in the denominator was similarly affected by the domestic industry's start-up phase of development: domestic shipments consisted almost entirely of trial and test shipments rather than commercial sales, while subject imports consisted exclusively of commercial sales during the POI. *Id.* The domestic industry's COGS-to-net-sales ratio declined from [ [redacted] ] percent in 2022 to [ [redacted] ] percent in 2023, but then increased to [ [redacted] ] percent in 2024, for an overall increase of [ [redacted] ] percent during 2022–2024. *Id.* at 35 n.50. The ratio was also [ [redacted] ] percentage points higher in interim 2025, at

[ [redacted] ] percent, than in interim 2024, at [ [redacted] ] percent. *Id*. The Commission reasoned that these movements, however, did not provide a reliable measure of price suppression by reason of subject imports because they reflected the large start-up costs in the numerator and limited revenues from trial and test shipments in the denominator rather than competition with subject imports for commercial sales. *Id*. at 37. The Commission therefore reasonably concluded that the COGS-to-net-sales ratio did not provide a meaningful basis for determining whether subject imports had prevented domestic producers from increasing prices sufficiently to cover increasing costs. *Id*. The Commission's analysis accounted for the limitations of the underlying data rather than treating a ratio affected by start-up costs and a changing mix of noncommercial shipments as a reliable measure of price suppression.

Taken together, the Commission's findings explain why conventional pricing indicators did not establish significant adverse price effects by reason of subject imports during the POI. The quarterly price comparisons juxtaposed sales prices for domestic trial and test shipments with the purchase cost of commercial shipments of subject imports; the domestic pricing trends reflected changes in the volume and mix of trial and test shipments rather than subject import competition for commercial sales; and the COGS-to-net-sales ratio reflected large start-up costs divided by revenues from sales of trial and test shipments. Views at 35–37. None of these factors reflected the effects of subject imports on domestic prices through competition for commercial sales to the same purchasers. These deficiencies in the pricing data reflected the broader circumstances of an industry that remained in a start-up phase, in which domestic producers had made very few commercial sales and non-price factors remained paramount to purchasers seeking to qualify new domestic suppliers. Based on these considerations, the Commission reasonably found that the conventional pricing indicators had little if any probative

value for finding significant adverse price effects. *Id*. at 36, 45. The Commission's determination therefore rested on a reasoned evaluation of the available evidence, not on a failure to consider underselling, price depression, or price suppression.

The Commission also considered and reasonably rejected Plaintiff's alternative theory that purchasers used subject import prices to leverage lower domestic prices in negotiating offtake agreements. *Id*. at 38–46. Although Plaintiff advanced this theory principally in its posthearing brief, relying on more than 40 business documents, including emails, meeting notes, presentation materials, and an affidavit, the Commission examined the evidence and detailed its rejection of Plaintiff's price leverage argument. *Id*. The Commission found that the record did not establish that purchasers used subject import prices to force domestic producers to accept lower offtake prices. *Id*. That finding was supported by record evidence concerning the actual commercial negotiations and the resulting offtake agreements, which provided concrete evidence of how domestic offtake prices were determined. *Id*.

As the Commission explained, Syrah and Novonix – the only domestic producers with offtake agreements and, by far, the producers farthest along in qualification – negotiated offtake prices on a cost-plus basis, reflecting estimated commercial-scale costs plus an agreed profit margin. *Id*. at 40–45. Tesla's agreement with Syrah provided for an 11.98 percent cash margin, Panasonic's agreement with Novonix provided for operating margins of 23 to 28 percent, and LG's agreements with Syrah and Novonix likewise tied prices to the producers' costs plus a reasonable profit. *Id*. at 40–42 & nn.167–73. Significantly, Plaintiff does not challenge the accuracy or reasonableness of either component of these pricing arrangements: it does not contend that the cost components failed to reflect the domestic producers' actual estimated commercial-scale production costs, or that the negotiated profit margins were inaccurate,

inadequate, or otherwise affected by subject import price pressure. The Commission considered these contractual terms alongside hearing testimony, affidavits, and contemporaneous business documents concerning the negotiations and found that the agreements supported the conclusion that negotiated prices allowed domestic producers to recover their estimated commercial-scale costs and earn a reasonable profit. *Id.* at 40–46 & nn.167–79. Absent any challenge to the accuracy of the underlying commercial-scale production costs or the negotiated profit margins in the offtake agreements, Plaintiff has not explained how subject import prices materially affected the prices ultimately established under these agreements. The Commission thus grounded its analysis in the terms of the actual offtake agreements and the evidence concerning their negotiation, rather than inferring the effect of subject import prices from isolated references in the business communications submitted by Plaintiff.

The Commission also found that the cost-plus terms of the offtake agreements were consistent with purchasers' commercial incentives to secure reliable domestic sources of AAM. The Commission found that purchasers indicated that they did not expect domestic AAM producers to meet import prices and that purchasers were willing to pay a premium for domestic AAM, as the prices for domestic AAM in the negotiated offtake agreements exceeded subject imports' quarterly average unit values during the POI. *Id.* at 39-40 & nn.161-67. Indeed, the Commission found that the negotiated offtake prices under the Tesla-Syrah, Panasonic-Novonix, and LG-Syrah offtake agreements exceeded the average unit values of AAM imported from China by Tesla, Panasonic, and LG, respectively, in [ [redacted] ]. *Id.* at 40 n.165. Importantly, Plaintiff does not challenge these comparisons or identify evidence undermining the Commission's finding that purchasers negotiated offtake agreements in which they agreed to

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

purchase a significant portion of the domestic industry's future AAM output at a price premium relative to subject imports. The Commission also found that purchasers had independent commercial reasons for seeking to secure reliable domestic supplies of AAM, including supply chain concerns about the risks of relying on subject imports and the availability of tax incentives supporting domestic production. *Id.* at 17. These findings reinforced the Commission's conclusion, based on the actual negotiations and resulting offtake agreements, that subject import prices had not materially affected the negotiated domestic prices reflected in offtake agreements.

The Commission found that the documents and other evidence submitted by Plaintiff did not support its theory that purchasers used subject import prices to leverage lower domestic prices in offtake agreements. Specifically, the Commission considered the LG communications concerning Syrah and Novonix on which Plaintiff relies. *Id.* at 43–45 & n.177. It examined the [ [redacted] ]. *Id.* at 44 n.177. It also examined the document Plaintiff characterizes as comparing [ [redacted] ] U.S. price with a Chinese price and found instead that the document [ [redacted] ]. *Id.* Those findings were consistent with the Commission's broader examination of LG's actual offtake agreements with Syrah and Novonix, both of which tied pricing to the domestic producers' cost structures and contemplated the producers' recovery of production costs plus a reasonable profit. *Id.* at 42–45. The Commission therefore reasonably concluded that the LG communications submitted by Plaintiff did not establish that subject import prices materially affected the prices negotiated in those agreements.

The Commission also considered the additional communications concerning [ [redacted] ] on which Plaintiff relied as support for its theory. Views at 43–45 & nn.176–

77. As to [ [redacted] ], the Commission found that the LG communication identified neither a specific import price nor a demand that a domestic producer lower its price based on a comparison with import prices. *Id.* at 44 n.177. As discussed below, the additional communications on which Plaintiff relies likewise do not establish that purchasers used subject import prices to demand or obtain lower prices from domestic producers during offtake agreement negotiations.

In sum, the Commission considered both the conventional pricing indicators and Plaintiff's alternative theory concerning offtake negotiations. The Commission found that the conventional pricing data was of little or no probative value because domestic trial and test shipments did not compete with and were not comparable to commercial subject imports, and the cost-plus offtake agreements and evidence concerning their negotiation did not establish that purchasers used subject import prices to leverage lower domestic prices in the agreements. *Id.* at 32-46. The Commission's finding that subject imports had no significant adverse price effects thus reflected a reasoned evaluation of the record as a whole, including the documentary evidence Plaintiff submitted in support of its alternative theory presented in its posthearing brief. As discussed below, Plaintiff's arguments do not detract from the substantial evidence supporting the Commission's finding that the offtake agreements were not based on or tied to Chinese pricing and were instead based on the domestic producers' production cost at scale plus profit. The Court should reject Plaintiff's invitation to reweigh evidence the Commission reasonably considered in its role as factfinder.

### 2. Plaintiff's Arguments Regarding Traditional Price Effects Are Unavailing

Plaintiff's arguments that the Commission should have somehow found underselling, price depression, and price suppression do not withstand scrutiny. The Commission considered

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

the relevant quarterly comparisons of subject imports purchase costs to domestic prices, domestic pricing trends, and the domestic industry's COGS-to-net-sales ratio but reasonably found that these data did not establish significant adverse price effects in the circumstances of this nascent industry. Views at 32–37, 45-46. Indeed, Plaintiff acknowledged the limited utility of these data and analysis in the material retardation context and argued instead that purchasers used subject import prices to leverage lower domestic prices in offtake agreements. *Id*. at 36-37 n.156. Plaintiff's challenge to the Commission's price effects analysis neither identifies overlooked evidence nor detracts from the substantial evidence supporting the Commission's findings; Plaintiff merely seeks to have the Court draw different inferences from the same record. As discussed below, these arguments provide no basis for disturbing the Commission's determinations.

Plaintiff argues that the Commission disregarded or improperly discounted purchase cost data in considering the significance of underselling, but the Commission expressly considered those data and explained why the quarterly price comparisons were not probative of adverse price effects. *See* PlBr. at 20–22. Specifically, the Commission found that subject import purchase costs were below domestic producers' sales prices in 11 of 14 comparisons, involving [ [redacted] ] pounds of reported subject import sales, with price-cost differentials ranging from [ [redacted] ] percent to [ [redacted] ] percent and averaging [ [redacted] ] percent. Views at 34 n.148. The Commission thus did not overlook these data; it found that the underlying transactions did not permit a meaningful comparison of subject and domestic prices.

As the Commission explained, domestic producers' sales prices reflected predominantly trial and test shipments, whereas subject import purchase costs reflected the landed duty paid cost paid by direct importers for commercial shipments of AAM from China. *Id*. at 35–36.

Accordingly, the price comparisons shed no light on whether subject import prices were lower than domestic prices on commercial sales to the same purchasers. The Commission also found a low degree of substitutability between domestic and subject AAM based on purchaser questionnaire responses indicating that domestic and subject AAM were never comparable and that non-price factors – including quality and the ability to meet customer specifications – were more important than price for suppliers not yet qualified for commercial sales. *Id.* at 36. Given these findings, which Plaintiff does not challenge, the Commission reasonably concluded that the pricing and purchase cost data had little, if any, probative value in assessing underselling.[2] Plaintiff's argument that the Commission should have relied on the lower purchase costs of subject imports (PlBr. at 21) does not undermine the Commission's conclusion because, as the Commission explained, those costs were not meaningfully comparable to the sales prices for domestic trial and test shipments.[3]

---

[2] Plaintiff's reliance on the preliminary substitutability finding is a particularly misguided effort to have the Court reweigh the evidence. *See* PlBr. at 21-22. The Commission's final finding of low substitutability was based on uncontroverted purchaser questionnaire responses indicating that domestic and subject AAM were never comparable and that non-price factors were more important than price before domestic producers qualified for commercial sales. Views at 21-22 & 36. Plaintiff does not challenge that finding or the underlying questionnaire evidence which was unavailable in the preliminary phase.

[3] Nor does underselling alone establish significant adverse price effects. *See, e.g.*, *U.S. Aluminum Extruders Coal. v. United States*, No. 24-209, Slip Op. 26-101, at 27–28 (--- F. Supp. 3d ---, 2026 WL 2722700, at *11-12 (Ct. Int'l Trade Sept. 2, 2026); *Comm. for Fair Coke Trade v. United States*, 28 CIT 1140, 1159–60 (2004). The relevant question is whether the underselling had an adverse effect on domestic prices. Here, the Commission found that low-priced subject imports did not prevent domestic producers from negotiating offtake agreements with purchasers on a cost-plus basis, unrelated to subject import prices, at prices designed to recover estimated production costs at commercial scale plus a reasonable profit. Views at 40–44. Indeed, it found that low-priced subject imports did not prevent the domestic industry from negotiating offtake agreements at prices well above subject import prices. *Id.* at 40 & n.165. Thus, the fact that subject imports were purchased at costs lower than the sales prices of domestic trial/test shipments did not establish significant adverse price effects where those transactions did not compete at the same level of trade and the domestic producers' prices were

[*Footnote continued on next page*]

Plaintiff's price-depression arguments are equally unavailing. Plaintiff contends that the Commission disregarded domestic pricing trends, AUV evidence, increasing demand, and reports concerning Chinese market conditions. *See* PlBr. at 16–20. The Commission considered all of this evidence and found that it did not establish price depression during the POI. Domestic prices declined by [ [redacted] ] percent for Product 1 but increased by [ [redacted] ] percent for Product 4. Views at 35 & n.150. Those divergent movements did not establish a significant downward pricing effect attributable to subject imports, particularly where domestic shipments consisted almost entirely of trial and test shipments, subject import purchase costs reflected landed duty-paid purchase costs reported by direct importers, and the Commission found limited substitutability between domestic and subject AAM. *Id.* at 35–36. As the Commission explained, absent commercial sales, domestic prices trends only showed variations in trial/test shipments, exacerbated by significant variations in shipment volume. *Id.* at 37. For the same reasons discussed above, the available data did not provide a meaningful basis for determining whether subject imports had depressed domestic prices.

Nor did the Commission overlook Plaintiff's argument concerning domestic AUVs, as Plaintiff mistakenly contends (PlBr. at 16). To the contrary, it expressly cited the portions of Plaintiff's prehearing brief discussing those data in arguing that subject imports depressed domestic prices. *Id.* at 36 n.156 (citing Petitioners' Prehearing Br. at 98–115 (CR201)). Furthermore, the Commission "'is presumed to have considered all of the evidence on the record,'" and need not "'explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor*, 28 CIT at 234, 318 F. Supp. 2d at 1247 (quoting *USEC Inc. v.*

---

not based on commercial sales. The Commission therefore reasonably found that the purchase cost comparisons in these investigations had little if any probative value.

*United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Here, the Commission assessed the pricing evidence, including domestic price trends, in light of the domestic industry's stage of development and the nature of its shipments. Because domestic prices reflected predominantly trial and test shipments, rather than commercial sales competing with subject imports, those trends did not provide a meaningful basis for determining whether subject imports had depressed domestic prices. Views at 35-36. Similarly, the Commission considered domestic prices in the context of the increase in apparent U.S. consumption during the POI. *Id*. at 16-18 & 31. But increased demand did not overcome the limitations of the pricing evidence, which did not meaningfully measure competition between domestic and subject AAM for commercial sales. *Id*. at 35-37. Accordingly, Plaintiff's reliance on domestic AUV trends and increased demand provide no basis for disturbing the Commission's conclusion that the available evidence did not establish significant price depression.

Plaintiff's price suppression arguments fare no better. Plaintiff argues that the Commission should have given greater weight to the COGS-to-net-sales ratio in light of the domestic industry's deteriorating financial performance. *See* PlBr. at 14–16. As discussed above, the Commission recognized that this ratio increased by [ [redacted] ] percentage points from 2022 to 2024 and was [ [redacted] ] percentage points higher in interim 2025 than in interim 2024. Views at 35 n.150. The Commission found that the ratio was not particularly probative of price suppression. *Id*. at 37. The domestic industry's reported costs were affected by start-up costs and therefore did not reflect commercial-scale production. *Id*. Its net-sales AUVs, in turn, reflected predominantly trial and test shipments rather than commercial sales. *Id*. Because the domestic industry had made virtually no commercial sales during the POI, the ratio did not provide a reliable measure of whether subject imports had prevented domestic producers from

increasing prices sufficiently to cover increasing costs. *Id.* at 35 & 37. Plaintiff's reliance on the domestic industry's deteriorating financial performance (PlBr. at 14-15) is a particularly misguided effort to have the Court reweigh the evidence. The Commission considered that evidence and found the domestic industry's performance no worse than would be expected for an industry in a start-up phase, consistent with its finding that the industry's COGS-to-net-sales ratio was not particularly probative of price suppression because the underlying costs and sales values did not reflect commercial-scale production. Views at 37, 48-49 & n.186, 58-59.

Equally unavailing is Plaintiff's reliance on news and analyst reports concerning China's dominance of the global AAM market, including alleged dumping, subsidies, excess capacity, and the effects of Chinese pricing on non-Chinese producers. *See* PlBr. at 18–20, 38–43. The Commission expressly considered those reports, as evident from its citation to the portions of Plaintiff's prehearing brief discussing them. Views at 37-38 & n.160 (citing Petitioners' Prehearing Br. at 14-54) (CR201)). The Commission also recognized that subject imports accounted for [ [redacted] ] to [ [redacted] ] percent of the U.S. market and considered Commerce's findings concerning dumping and illegal subsidies. Views at 3, 19-20, 31, 46 n.180, & 60. But generalized evidence concerning China's global market position did not establish that subject imports caused significant price depression or suppression in the U.S. market. Nor did it cure the limitations in the traditional pricing evidence, including price comparisons and the COGS-to-net-sales ratio, that the Commission found. The Commission considered these reports but found them outweighed by other evidence showing that subject imports had neither deterred investment in the domestic industry nor prevented domestic producers from obtaining pricing that would enable them to cover their costs and turn a profit, contrary to Plaintiff's theory. *Id.* at 37-46. Plaintiff's reliance on generalized evidence concerning China's global market position is yet

another misguided effort to have the Court reweigh evidence the Commission reasonably considered.

Plaintiff's reliance on the preliminary determinations and Commissioner Kearns's dissent is similarly misplaced. *See* PlBr. at 17-18. In the preliminary phase investigations, based on a less-developed record and under the far less exacting "reasonable indication" standard, the Commission found only that it could not rule out price depression or suppression; it did not conclusively determine that subject imports had caused either price effect.[4] The Commission was entitled to reassess the evidence after the far more complete record developed in the final phase of the investigations. Nor does Commissioner Kearns's dissent establish that the Commission's negative determinations were unsupported by substantial evidence, and Plaintiff's argument to that effect is nothing more than an invitation to reweigh the evidence. *See, e.g.*, *Metallverken Nederland*, 13 CIT at 1017, 728 F. Supp. at 734 ("In asking the Court to negate a commissioner's determination based upon the findings of dissenting commissioners, plaintiffs are, in essence, asking the Court to reweigh the evidence.").[5]

---

[4] *See* Confidential Preliminary Views at 3, 47-48 (CR85) (citing *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001-04 (Fed. Cir. 1986)).

[5] That the dissenting Commissioner, this Court, or Plaintiffs, may have weighed the evidence differently, does not provide grounds to overrule the Commission's determination. Indeed, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Siemens Energy*, 806 F.3d at 1372 (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*, 383 U.S. at 619-20). Plaintiffs' recitation of the dissent's findings and failure to challenge or even acknowledge the Commission's findings demonstrate their failure to appreciate the standard of review applicable to this appeal. *See Maverick Tube Corp. v. United States*, No. 14-229, 2016 WL 703575, at *7 (Ct. Int'l Trade Feb. 22, 2016) ("In the final analysis, the question is solely whether the agency's determination is supported by

[*Footnote continued on next page*]

Plaintiff's contention that subject import prices were below the domestic industry's production costs is yet another misguided effort to have the Court reweigh evidence the Commission considered and rejected. *See* PlBr. at 22–25. The Commission addressed Plaintiff's cost comparisons, including domestic producers' unit COGS and raw material costs and subject-import AUVs. Views at 40 n.166. As the Commission explained, given the domestic industry's start-up status and lack of commercial sales, its limited commercial sales and trial and test shipments were not expected to cover production costs. *Id.* Moreover, domestic offtake agreements were negotiated on a cost-plus basis using estimated commercial-scale costs, ensuring that qualified producers recover their costs plus a predetermined profit margin. *Id.* Because reported per-unit variable costs exceeded reported per-unit net-sales values in every period, the Commission also could not calculate a meaningful break-even point. *Id.* Rather than challenge any of these findings, Plaintiff again attempts to reweigh the evidence by invoking increasing demand and asserting that declining prices amid increasing demand is "illogical." PlBr. at 23-24. But the Commission considered demand trends and found that domestic pricing data reflected trial and test shipments, not commercial sales competing with subject imports that might have been influenced by demand trends, and therefore did not establish price depression. *See, e.g.*, Views at 18 & 35–37. Plaintiff's effort to substitute its preferred inferences for the Commission's assessment of the evidence in its role as factfinder is yet another impermissible attempt to have the Court reweigh the evidence.

In sum, Plaintiff's arguments amount to an impermissible effort to reweigh the evidence, including traditional pricing evidence that the Commission found to have little or no probative

substantial evidence on the record and is in accordance with law."), *aff'd*, 857 F.3d 1353 (Fed. Cir. 2017).

value in assessing whether subject imports had adverse price effects. Nor can generalized evidence concerning China's dominance of the global AAM market or subject imports' presence in the U.S. market fill the evidentiary gap in the record. The Commission expressly considered these reports and news articles concerning China's market position and found them outweighed by other evidence, including evidence concerning offset agreement negotiations and the offset agreements themselves, showing that subject imports had no significant price effects in the U.S. market. Views at 32-38. Plaintiff's disagreement with the Commission's assessment provides no basis for reweighing the evidence. Indeed, after acknowledging the limited utility of traditional pricing evidence in the material retardation context, Plaintiff effectively abandoned its argument that these data established adverse price effects and instead focused its posthearing brief exclusively on the alternative theory that purchasers leveraged subject imports to negotiate lower domestic prices in offtake agreements. Views at 36-39 & nn.156, 160-162. The Commission considered and reasonably rejected that theory as well, notwithstanding Plaintiff's unpersuasive arguments to the contrary discussed below.

### 3. Plaintiff's Other Price Effects Arguments Are Unavailing

Plaintiff's claim that the Commission ignored evidence that purchasers used low-priced subject imports to force domestic producers to lower their prices simply asks the Court to reweigh evidence that the Commission considered in rejecting the same argument below. *See* PlBr. at 25–36. Plaintiff did not raise this argument in its prehearing brief, which would have enabled the Commission to explore the theory at the hearing and Defendant-Intervenors to rebut the argument in their posthearing brief. Instead, Plaintiff raised the argument for the first time in its posthearing brief, submitting more than 40 contemporaneous business documents – including emails, meeting notes, presentation materials, and an affidavit – after a Commissioner noted the absence of any evidence that purchasers had used subject import prices to demand lower

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

domestic prices. Views at 38-39 & nn.161-62. The Commission nevertheless considered the documents and addressed Plaintiff's arguments over several pages of the Views, including the evidence concerning Syrah and Novonix and the separate evidence concerning [ [redacted] ]. *Id.* at 44-45 & nn.176–77. As discussed above, the Commission found that the record did not establish that purchasers used subject import prices to leverage down domestic prices in offtake agreements. *Id.* Plaintiff's assertion that the Commission overlooked this evidence is belied by the Commission's lengthy discussion of it.

Two key findings reinforce the Commission's rejection of Plaintiff's theory, neither of which Plaintiff meaningfully challenges. First, the Commission found that purchasers were willing to pay a premium for domestic AAM: the negotiated offtake prices for Syrah and Novonix exceeded the quarterly average unit values of subject imports throughout the respective periods in which the purchasers reported Chinese imports. Views at 39-40 & n.165. Indeed, the Commission found that Tesla's negotiated price with Syrah exceeded Chinese import unit values in [ [redacted] ]. *Id.* Plaintiff does not challenge these comparisons or explain how purchasers could have used subject import prices to drive down domestic prices when the record showed that the domestic prices they agreed upon were substantially higher than subject import prices.

Second, and even more significantly, the Commission found that the prices in the offtake agreements negotiated by purchasers were based on a cost-plus formula, calculated to cover the domestic producers' production costs at scale plus a profit after the producer was qualified.

Views at 40-45. Plaintiff does not dispute the actual cost and profit components of the domestic producers' cost-plus offtake agreements. The Commission found that Tesla's agreement with Syrah provided for a 11.98 percent cash margin once Syrah qualified to supply Tesla, that Panasonic's agreement with Novonix provided for operating margins of 23 to 28 percent, and that LG's agreements with Syrah and Novonix tied prices to the producers' cost structures and allowed them to recover production costs plus a reasonable profit. Views at 42 & nn.171-73. Plaintiff does not contend that the cost components of these offtake agreements failed to reflect the producers' actual or reasonably estimated commercial-scale production costs, that the specified profit margins were inaccurate or otherwise unreasonable, or that either component was reduced because of subject import price pressure. These unchallenged contractual terms provide particularly strong evidence supporting the Commission's finding that purchasers negotiated the domestic prices in offtake agreements using a cost-plus methodology that ensured that domestic producers could operate profitably once qualified, rather than using subject import prices to extract price concessions.

Against this substantial record evidence, Plaintiff mistakenly contends that the Commission improperly discounted the documents because they were submitted after the hearing. *See* PlBr. at 32. The Commission explained that the late submission deprived the Commission and respondents of an opportunity to address the evidence at the hearing and deprived respondents of an opportunity to respond in their posthearing briefs. Views at 39 n.162. But the Commission did not exclude the evidence or decline to consider it; it addressed the documents' substance in detail. *Id*. at 43–45 & nn.176–77.

Plaintiff's arguments concerning Syrah and Novonix likewise overlook the Commission's central findings regarding the actual negotiations and resulting offtake

agreements. *See* PlBr. at 28–31. The Commission considered the documents concerning LG's negotiations with Novonix and Syrah, including the pricing comparisons Plaintiff cites, but reasonably found that they did not establish that LG used Chinese prices to leverage down the prices negotiated with either producer. Views at 44 n.177. As the Commission explained, the 2023 cost comparison involving Novonix did not indicate that LG expected Novonix to lower its price, even assuming the unnamed supplier was Chinese. *Id*. More importantly, the Commission examined the resulting offtake agreements and found that LG tied pricing to each producer's cost structure and contemplated recovery of production costs plus a reasonable profit. *Id*. at 42 & n.173. Thus, the agreements themselves supported the Commission's finding that the negotiated prices reflected the producers' costs and a reasonable profit rather than pressure from subject import prices. Plaintiff's reliance on isolated documents concerning the negotiations does not undermine that finding or establish that subject import prices significantly affected the negotiated offtake prices.

The hearing testimony that Plaintiff references likewise does not establish that purchasers used subject import prices to force domestic producers to lower their prices. *See* PlBr. at 28–30. Plaintiff relies on testimony concerning cost comparisons, but neither counsel's characterization nor testimony from a single witness concerning unspecified comparisons establishes that purchasers used subject import prices to demand lower offtake prices. That purchasers requested cost breakdowns and emphasized price in negotiations does not establish that they used Chinese prices to drive down negotiated domestic prices. Nor does the testimony that negotiations stalled over target prices identify subject import prices as the cause. Critically, the relevant question is not whether purchasers discussed or compared competing prices during negotiations, but whether those prices actually determined or constrained the prices ultimately negotiated in the offtake

agreements. The Commission examined that question and found that the agreements were based on domestic producers' estimated costs at commercial scale plus a negotiated profit margin, rather than subject import prices. *See* Views at 40-46. Representatives of Tesla, Panasonic, and LG explained that purchasers examined suppliers' costs to assess their profitability and long-term viability, and Panasonic's witnesses described supplier profitability as a mutual effort between purchasers and suppliers to ensure the long-term viability of domestic AAM supply. Views at 42 & n.170, 44-45. The testimony also established that Panasonic's and LG's offtake agreements provided for the parties to share fluctuations in raw-material costs, either sharing the savings or splitting the additional cost, corroborating that negotiated prices reflected estimated commercial-scale costs plus a reasonable profit, not subject import prices. *Id.* Importantly, Plaintiff does not challenge the accuracy or reasonableness of the cost components used in the agreements or the negotiated profit margins, or contend that either component was reduced because of subject import price pressure. Neither the LG emails nor Plaintiff's reliance on testimony that negotiations included cost comparisons establishes that purchasers used subject import prices to leverage down domestic prices in negotiating offtake agreements. Evidence that purchasers examined competing prices or negotiated over suppliers' production cost estimates does not establish that Chinese prices displaced the cost-plus methodology reflected in the resulting agreements. Plaintiff's contrary argument merely asks the Court to reweigh the evidence and does not detract from the substantial evidence supporting the Commission's finding of no significant adverse price effects.

Nor does Plaintiff's supposed appeal to "common sense" undermine the Commission's finding. *See* PlBr. at 30–31. Plaintiff contends that a purchaser's comparison of prices necessarily reflects an intent to negotiate better terms and that it would be irrational to share a

competitor's lower price without expecting a response. *Id.* Contrary to this argument, however, the Commission recognized that Chinese import prices were sometimes referenced in negotiations, unsurprisingly given China's dominance in the market, but found that the record as a whole did not establish that those prices materially affected offtake agreement prices negotiated on a cost-plus basis. Views at 41-42. Rather than finding that purchasers never considered competing prices, as Plaintiff mistakenly suggests, the Commission found that the record did not establish that those comparisons resulted in materially lower offtake prices. *Id.* at 43-45 & nn.176-77. The possibility that purchasers considered or referenced Chinese prices while negotiating offtake agreements does not establish that the resulted domestic prices were lower than they would have been otherwise, as Plaintiff alleges, particularly in light of the resulting cost-plus agreements and the corroborating testimony and affidavits from representatives of Tesla, Panasonic, and LG indicating that prices were based on production cost at scale plus a reasonable profit. Plaintiff's appeal to 'common sense' does not detract from the substantial evidence supporting the Commission's findings.

Equally unavailing are Plaintiff's arguments concerning negotiations between purchasers and nascent domestic producers [ [redacted] ]. *See* PlBr. at 28–31. As to [ [redacted] ], the Commission considered the [ [redacted] ] a domestic producer lower its price based on a comparison with import prices. Views at 44 n.177. As the Commission found, [ [redacted] ]. *Id.* Nor does [ [redacted] ]

reluctance to commit to a higher-priced U.S. supplier establish that it used Chinese prices to negotiate a lower price from [ [redacted] ]. Plaintiff's reliance on the [ [redacted] ] and [ [redacted] ] emails fares no better. Plaintiff raised these arguments and submitted the underlying documents in its posthearing brief, which the Commission cited in addressing the record evidence. *Id.* at 38-39 nn.160-61 (citing Petitioner's Posthearing Br., at 4-9 & Answers to Commissioners' Questions at 1-16 (CR240/CR248)). The [ [redacted] ] without establishing that the target was based on subject import prices. The [ [redacted] ] likewise does not identify Chinese suppliers or establish that [ [redacted] ]. And the Commission's discussion of the [ [redacted] ]documents underscores the fatal flaw in Plaintiff's theory: even the document making the most explicit reference to Chinese AAM prices concerned negotiations between [ [redacted] ] and [ [redacted] ]. Views at 44 n.177. Moreover, the Commission explained that [ [redacted] ] had made significantly less progress in the qualification process than Syrah and Novonix with no comparable offtake agreements. *Id.* at 19 & nn.69-70, 24, 27-28, 54 & n.200. These communications did not establish that purchasers used subject import prices to leverage down domestic prices in negotiating offtake agreements, much less that the Commission's finding to the contrary is unsupported by substantial evidence.

Plaintiff identifies no factual error in the Commission's discussion of this evidence. *See* PlBr. at 33-36. Plaintiff first challenges the Commission's finding that the [ [redacted] ] document did not concern discussions with a U.S. purchaser. *Id.* at 33-34. The record supports

the Commission's finding, given that [ [redacted] ]. Views at 44 n.177; [ [redacted] ]. Plaintiff identifies no record evidence establishing that the cited discussions were with a U.S. purchaser of AAM. In any event, having made far less progress in the qualification process than Syrah and Novonix, [ [redacted] ] had no commercial sales, trial or test shipments, or offtake agreement. Views at 19 & n.69, 24, 27, 54 & n.200. The [ [redacted] ] document thus does not conflict with the Commission's finding that subject import prices did not materially affect offtake prices, based on the actual negotiations and resulting offtake agreements with Syrah and Novonix.

Plaintiff next contends that the Commission's characterization of a spreadsheet from LG's offtake negotiations with Syrah, which it placed on the record, was factually incorrect. *See* PlBr. at 34–35. Although Plaintiff characterizes the Commission's interpretation as erroneous, it acknowledges that the document is "confusing." *Id.* at 35. In fact, the Commission considered the document, [ [redacted] ]. Views at 44 n.177 (citing Petitioner's Posthearing Br., Exh. 6 at Tab A (CR240/CR248)). The Commission's interpretation did not rest merely on the spreadsheet's column heading, as Plaintiff mistakenly suggests. The Commission also noted that the document's inclusion of tariff and ocean-freight costs was consistent with a comparison of foreign suppliers. *Id.* Indeed, the underlying email correspondence further reflected [ [redacted]

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

[redacted]]. *See* Petitioner's Posthearing Br., Exh. 6 at Tab A (CR240/CR248). Plaintiff's assertion that [ [redacted] ] manufactured AAM exclusively in the United States does not establish that the spreadsheet compared [ [redacted] ]. Nor does the [ [redacted] ]. Moreover, the Commission's finding did not rest on this document alone. [ [redacted] ]. Views at 42 n.170 (citing Hearing. Tr. at 211-12, 215-16, 218 (Zhang) (PR198); *Id.* at 42 n.173 (citing LG's Final Comments at 8-9 (CR263); LG's Posthearing Br. at 10-12 (CR244/CR247)). Accordingly, Plaintiff's disagreement with the Commission's interpretation of an admittedly confusing document provides no basis to disturb the Commission's finding that subject import prices did not significantly affect the prices negotiated in Syrah's offtake agreement. Plaintiff's argument amounts to nothing more than an invitation to reweigh the evidence.

Finally, Plaintiff claims that the Commission disregarded meeting notes from Northvolt's offtake negotiations with Novonix. *See* PlBr. at 35–36. It did not. The Commission expressly considered the notes and found that references to European AAM demand, IRA compliance, and Swedish and Chinese AAM prices did not establish that Northvolt used subject import prices to

pressure Novonix to price below its costs plus a reasonable rate of return. Views at 44 n.176. The Commission's observation that Northvolt did not participate in the investigations, and therefore provided no context for the meeting notes, did not mean that the Commission disregarded the notes, as Plaintiff mistakenly implies. *Id*. None of Plaintiff's arguments concerning specific pieces of evidence establishes a factual error that undermines the Commission's assessment of the evidence. The Court should reject Plaintiff's invitation to reweigh this evidence.

Nor does the domestic industry's financial performance establish that subject imports had adverse price effects, as Plaintiff alleges. *See* PlBr. at 36–37. As the Commission explained, the industry's financial losses reflected that it was in a start-up phase, when producers had trial and test sales but virtually no commercial sales, and did not result from the offset prices negotiated for future commercial-scale production. The Commission recognized the domestic industry's poor financial performance and found it unsurprising given the industry's start-up status. Views at 48, 58-59. By contrast, the offtake agreements, corroborated by testimony and other record evidence, showed that negotiated prices were based on estimated commercial-scale costs plus a reasonable profit. In mistakenly arguing that the domestic industry's current losses somehow reflect the impact of subject imports on offtake prices, Plaintiff overlooks that the industry's losses resulted entirely from start-up costs coupled with the absence of commercial sales. Indeed, the industry's commercial sales under the terms of the offset agreements will not commence until Syrah and Novonix have qualified to supply AAM to purchasers.

Finally, China's market dominance does not establish that subject import prices caused the specific adverse price effects Plaintiff alleges. *See* PlBr. at 26–27. As discussed above, the Commission expressly considered Plaintiff's reports concerning China's dominance of the global

AAM market, the substantial market share of subject imports in the United States, and evidence concerning dumping and subsidies. Views at 3, 19-20, 31, 37-38 & n.158 (citing Petitioner's Prehearing Br. at 14-54 (CR201)), 46 n.180, & 60. The Commission acknowledged that Chinese prices were sometimes referenced in negotiations, unsurprisingly given China's market dominance, but found that substantial evidence did not establish that those prices materially affected offtake agreement prices negotiated on a cost-plus basis. *Id*. at 40-46 & nn.170-79. The actual agreements, which tied negotiated prices to estimated commercial-scale costs plus a reasonable profit, together with corroborating hearing testimony and affidavits from representatives of LG, Tesla, and Panasonic, further support that finding. *Id*. Plaintiff's reliance on China's market dominance thus asks the Court to reweigh evidence the Commission expressly considered and reasonably found insufficient to establish significant adverse price effects.

In sum, the Commission considered Plaintiff's documentary evidence, the specific communications on which Plaintiff relies, the resulting offtake agreements, and the testimony and affidavits explaining how purchasers negotiated prices with domestic producers. That record evidence supports the Commission's finding that purchasers did not use subject import prices to leverage down domestic prices and that subject import prices did not materially affect cost-plus offtake agreement prices. Critically, Plaintiff does not challenge the Commission's finding that the offset agreements would cover the domestic producers' anticipated production costs at commercial scale while providing them with a reasonable profit, or cite evidence that either the cost of profit components of the agreements were reduced or otherwise distorted by subject import price pressure. Plaintiff identifies no overlooked evidence or factual error that undermines those findings; instead, it relies on isolated documents generated during negotiations

without challenging the contractual pricing terms that governed the resulting agreements and asks the Court to reweigh evidence the Commission considered and found insufficient to establish significant adverse price effects. Plaintiff's disagreement with the Commission's assessment of the record evidence provides no basis to conclude that its determination is unsupported by substantial evidence.

### B. The Commission's Finding That Subject Imports Did Not Materially Retard the Establishment of the Domestic Industry Is Supported by Substantial Evidence and in Accordance with Law

The Commission reasonably found that subject imports did not materially retard the establishment of the domestic industry. Views at 46–60. In reaching that determination, the Commission considered the record evidence concerning the industry's qualification of domestic producers, ability to obtain investment and financing, and performance and financial condition, and evaluated that evidence in light of the circumstances of an industry in the process of establishment. *Id*. Plaintiff's arguments do not demonstrate that the Commission failed to consider the relevant evidence; rather, they challenge the Commission's weighing of that evidence and the inferences the Commission drew from the record. As discussed below, the Commission's findings concerning the domestic industry's qualification progress, ability to secure investment, and performance during its startup phase are supported by substantial evidence. In inviting the Court to reweigh this evidence, Plaintiff provides the Court with no basis for disturbing the Commission's negative material-retardation determination.

#### 1. The Commission Reasonably Found that Subject Imports Did Not Delay the Qualification of Domestic Producers

The Commission expressly found that Plaintiff had failed to "present{} substantial evidence that purchasers have slowed qualification for U.S. producers because of their continuing access to subject imports." Views at 50-51. Notwithstanding Plaintiff's challenge to

that finding (PlBr. at 43-44 & 48–52), the record amply supports it. Although purchasers had devoted substantial resources to assisting domestic producers with qualification, the Commission explained, domestic producers had yet to qualify because they remained unable to meet purchasers' safety-critical specifications in commercial quantities, with even the most advanced domestic producers continuing to encounter technical difficulties. Views at 50–55. The Commission also found that domestic producer qualification timelines were consistent with purchasers' experience qualifying other global battery-material suppliers. *Id*. at 54-55. The Commission also expressly considered Plaintiff's allegations that Tesla and Panasonic delayed qualifying Syrah and Novonix because lower-priced Chinese AAM remained available, but found that the record as a whole did not support the allegations. *Id*. at 50–52, 55 & n.189, 204–05. The record did not show that purchasers had delayed the process because of subject imports. Rather, the Commission found that qualification remained incomplete because domestic producers had not demonstrated that they could consistently meet purchasers' technical requirements in commercial quantities. *Id*. at 50–55. As discussed below, Plaintiff's qualification-delay arguments impermissibly ask the Court to reweigh the evidence and should be rejected.

Contrary to Plaintiff's argument that purchasers delayed the qualification of domestic producers (*see* PlBr. at 48-52), the Commission found that purchasers had strong incentives to establish domestic AAM supply and were actively working to qualify domestic producers. The Commission found that purchasers sought domestic supply to mitigate supply-chain risks and take advantage of U.S. government incentives. Views at 51. Consistent with those incentives, purchasers devoted substantial resources to qualification, including sample testing, technical assistance, continuing feedback, and assistance with funding and facility development. *Id*. at 51–

PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED

54. Tesla assigned one Supplier Industrial Engineer full-time and two additional engineers half-time to Syrah's qualification and devoted more than 3,000 hours of engineering support during the then-current qualification stage alone. *Id.* at 52 n.196. Panasonic provided Novonix with testing, feedback, and factory-level assistance, while LG estimated that it had spent more than $33 million of its own resources to develop domestic suppliers. *Id.* at 52–53. As further support, the Commission relied on letters that Tesla and LG submitted to the U.S. Department of Energy ("DOE") supporting the domestic industry's applications for federal funding and describing their ongoing product development and qualification efforts. *Id.* at 53-54 & n.199.

The Commission also found that the domestic producers' qualification remained incomplete because they had not yet met purchasers' technical requirements. No domestic producer had completed qualification for commercial use, and most remained in the early stages, with limited or no trial or test shipments. *Id.* at 54. Syrah and Novonix had progressed furthest, but neither had completed qualification. *Id.* As the Commission found, both Syrah and Novonix continued to face concrete technical deficiencies. *Id.* at 52–53. In particular, Tesla's test results showed that [ [redacted] ]. *Id.* at 52 & n.196. LG and Panasonic likewise provided evidence of their qualification efforts and the technical obstacles that remained, including Novonix's continuing inability to meet Panasonic's specifications notwithstanding Panasonic's extensive assistance to Novonix. *Id.* at 53 & n.197.

The Commission also found that domestic qualification timelines were consistent with purchasers' experience qualifying other global suppliers. Views at 54–55 & n.203. Although Plaintiff emphasizes the one-to-two-year qualification period reported for Chinese suppliers, *see*

PlBr. at 49, the Commission expressly considered that evidence and found it outweighed by purchaser-specific evidence demonstrating that the qualification of new global suppliers routinely takes considerably longer. Views at 24, 54–55 & n.99, 203. As the submissions from respondents cited by the Commission indicated, Panasonic reported that qualification of its global suppliers ranged from 15 to 93 months, while LG described a six-year process to qualify a new graphite supplier for mass production. Views at 55 n.203 (citing Panasonic Posthearing Br. at 4 (CR242); LG Posthearing Br. at 6–8 (CR244/CR247)). Tesla cited purchaser testimony and business records confirming that domestic producer qualification timelines were consistent with purchasers' prior experience with the qualification of foreign suppliers and that the producers' inability to progress through the qualification process faster resulted from technical deficiencies. *Id.* (citing Tesla Posthearing Br., Answers to Commissioners' Questions at 62–63 (CR241)). Plaintiff also overlooks that the Chinese suppliers that qualified in one to two years were already established commercial-scale producers, whereas no domestic producer had been qualified to produce AAM on a commercial scale. Views at 54. Furthermore, as Panasonic explained, qualification involves multiple stages of technical and safety testing, with even its interim qualification phase taking one to two years or considerably longer. *Id.* at 53 & n.197. Plaintiff's argument that nascent domestic producers should have been able to qualify in one to two years, like experienced Chinese producers, is unpersuasive and merely an invitation for the Court to reweigh evidence the Commission reasonably considered in its role as factfinder.

Plaintiff's argument that subject imports caused Tesla to slow Syrah's qualification progress likewise fails. *See* PlBr. at 43-44, 51. The Commission found that Syrah remained unqualified because it repeatedly failed to meet Tesla's technical specifications – not because Tesla withheld approval to preserve access to lower-priced Chinese AAM. Views at 52 & n.196.

The evidence was concrete: [ [redacted] ]. *Id.* Tesla accordingly issued a [ [redacted] ]. *Id.* Nor does comparing [ [redacted] ] establish that Tesla delayed technical approval because of lower-priced Chinese imports, as Plaintiff unpersuasively argues. *See* PlBr. at 51. As the Commission explained, Plaintiff's argument is inconsistent with Tesla's substantial efforts to advance Syrah's qualification, assigning one Supplier Industrial Engineer full-time and two additional engineers half-time to Syrah, and devoting more than 3,000 engineering hours to qualification during Material Phase C alone – orders of magnitude more than it typically devoted to qualifying other battery-material suppliers. Views at 52 n.196. The Commission also found that purchasers entered into cost-plus offtake agreements with Syrah and Novonix at prices above subject import prices before either had completed qualification. Views at 39-45. Based on this and other evidence, the Commission reasonably found that subject imports had not delayed the qualification of domestic producers. Plaintiff's contrary argument merely asks the Court to reweigh the evidence.

Similarly unavailing is Plaintiff's argument that purchasers slowed the qualification of Epsilon and Anovion due to subject imports. *See* PlBr. at 43-44, 50–51. Neither producer was as far along in the qualification process as Syrah and Novonix: Epsilon had no production during the period of investigation, Anovion reported only limited commercial sales in 2022 and none thereafter, and neither had entered into an offtake agreement. Views at 54 & n.200. Nor does

PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED

Plaintiff identify evidence that either producer could meet purchasers' technical specifications or that subject imports prevented either from doing so. The [ [redacted] ] and Anovion's testimony concerning pricing difficulties in commercial negotiations establish, at most, that subject import prices arose in commercial discussions – not that purchasers withheld technical approval because of those prices. Plaintiff's reliance on [ [redacted] ], likewise does not establish that subject imports caused any delay in technical qualification. *See* PlBr. at 43-44 (citing CR201/CR209). Thus, as the Commission found, the record did not show that purchasers delayed qualification because of their access to subject imports. Plaintiff offers no basis to disturb the Commission's reasonable assessment.

Plaintiff also argues, unpersuasively, that the Commission's finding that supplier qualification and commercial negotiations are conducted separately was unsupported by substantial evidence because pricing and qualification can proceed simultaneously and involve the same personnel. *See* PlBr. at 49–50. Plaintiff's argument is based on a mischaracterization of the Commission's finding. The Commission did not find that technical qualification and pricing discussions could never overlap. Rather, it found that purchasers conduct the technical qualification of domestic producers separately from commercial negotiations over pricing in offtake agreements. Views at 51 n.192. Substantial record evidence supports that finding. As the record evidence cited by the Commission indicates, LG explained that its technical teams independently manage qualification testing and communicate results and technical feedback, while a separate commercial team handles sales and purchase orders, with neither team influencing the other's responsibilities or decisions. Views at 51 n.192 (citing LG Posthearing

PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED

Br. at 3-6 (CR244/CR247); Hearing Tr. at 194 (Seals) (PR198)). The record evidence for Tesla cited by the Commission likewise indicates that its Supplier Industrialization Engineering team independently evaluates suppliers' production processes, provides technical feedback, and determines whether their materials satisfy Tesla's specifications, with price expressly not a precondition for qualification. Views at 51 n.192 (citing Tesla Posthearing Br., Answers to Commissioners' Questions at 63 (CR241); Hearing Tr. at 177–78 (Qian) (PR198)). Thus, the Commission's finding was supported by ample evidence that technical qualification is governed by independent technical evaluations, not commercial pricing considerations.

The Commission also considered Plaintiff's contemporaneous business documents and reasonably found them outweighed by other evidence that purchasers had not slowed the qualification of domestic producers due to their access to subject imports, contrary to Plaintiff's argument that the documents somehow required a different result. *See* PlBr. at 43-44 & 49–50; Views at 50 n.189. As the Commission explained, purchasers invested substantial time and money in assisting domestic producers during the qualification process, consistent with their strong economic incentives to secure domestic supplies of AAM, and the producer's limited progress reflected their inability to produce AAM at scale to purchaser specifications rather than any action taken by purchasers to protract the qualification process. *See* Views at 50-55. Even accepting *arguendo* that the documents reflect discussions of Chinese prices, price concessions, and commercial negotiations, they do not establish that purchasers delayed technical testing or withheld technical approval because of subject imports. At most, they show that purchasers discussed Chinese prices, sought price concessions, or allowed pricing disputes to affect commercial negotiations. They do not establish that purchasers delayed technical testing or withheld technical approval because of subject imports. For example, the [ [redacted]

[redacted] ] (PlBr. at 50) stating that [ [redacted] ]. Furthermore, other documents submitted by Petitioner involving [ [redacted] ]. Views at 45 n.177. Nor do Plaintiff's other cited communications establish that lower-priced Chinese AAM caused purchasers to delay technical qualification, as the Commission thoroughly explained. *Id*. at 55 n.204. Plaintiff thus improperly conflates evidence that price mattered in commercial negotiations with evidence that subject imports delayed technical qualification. Plaintiff offers no basis to disturb the Commission's finding that purchasers had not slowed qualification because of their continuing access to subject imports.

In sum, the Commission reasonably found that Plaintiff had not established that subject imports caused purchasers to delay qualification of domestic AAM producers. The record provided substantial evidence that purchasers actively supported domestic producers while those producers continued to encounter technical difficulties in meeting safety-critical specifications. The Commission considered Plaintiff's evidence concerning Chinese prices, qualification timelines, and contemporaneous business communications, but found that it did not establish import-caused qualification delays. The Court should decline Plaintiff's invitation to reweigh this evidence.

### 2. The Commission Reasonably Found That Subject Imports Did Not Discourage Investors or Hinder the Domestic Industry's Ability to Obtain Financing

The Commission found that subject imports had not impeded domestic producers from securing greater levels of financing than might have reasonably been expected during the POI. Specifically, the Commission found that the record as a whole, including Plaintiff's affidavits, did not support Plaintiff's argument that low-priced subject imports discouraged investors and hindered domestic producers' ability to obtain financing, causing investment delays that, in turn, impeded qualification and the establishment of the domestic industry. *See* Views at 56-58 & nn.206-11; *see also* PlBr. at 43-45. Rather, as the Commission explained, the record showed that domestic AAM producers had secured significant funding during the POI and that subject imports had not impeded them from obtaining greater financing than reasonably could have been expected. *Id*. The Commission further found that financing increased as producers progressed through qualification, making progress toward qualification the more pertinent factor driving investment decisions. *Id*. at 58 & n.211. These findings are also supported by the substantial financing secured by the two domestic producers furthest along in qualification, Syrah and Novonix, and the offtake agreements secured from purchasers that helped them obtain the financing. *Id*. at 26-28, 56-58

The Commission found that Syrah and Novonix had secured approximately $1 billion and $860 million in funding, respectively, or approximately $2 billion combined. *Id*. at 56-57 & nn.207–10. Syrah secured a $102 million Department of Energy loan after entering into an offtake agreement committing Tesla to purchase 80 percent of its capacity; DOE also entered into a three-way agreement with Syrah and Tesla to oversee Syrah's progress. *Id*. at 56 & nn.207–08. Similarly, after Novonix entered into a binding offtake agreement with Panasonic in

February 2024, it obtained a DOE loan commitment exceeding $700 million to construct a new AAM production facility in Tennessee. *Id.* at 56 & nn.207–09. The Commission thus had concrete evidence that offtake agreements with purchasers and progress toward qualification enabled Syrah and Novonix, the two producers furthest along in qualification, to secure approximately $2 billion in combined financing, notwithstanding the availability of subject imports. Accordingly, substantial evidence supported the Commission's finding that subject imports did not impede domestic producers' ability to obtain financing.

Plaintiff's reliance on the [ [redacted] ] affidavit (*see* PlBr. at 55-56) does not establish that the Commission failed to consider material evidence or that its determination lacks substantial evidence. The Commission specifically addressed that affidavit and found it unpersuasive for several reasons. First, [ [redacted] ] assertions regarding [ [redacted] ], but Plaintiff provided neither the underlying presentations nor documentation of those discussions. Views at 57 n.210. Second, the attachment referenced in the affidavit was [ [redacted] ], indicating that it was prepared on behalf of Novonix during the trade remedy proceedings. *Id.* Third, the Commission found [ [redacted] ]. *Id.* Based on these specific evidentiary deficiencies and contrary record evidence, the Commission reasonably attached little weight to the affidavit. Rather than curing these deficiencies, Plaintiff's arguments simply ask the Court to reach a different conclusion about the affidavit's probative value.

PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED

Although Plaintiff also references the [ [redacted] ], *see* PlBr. at 55, it offers no explanation of how the Commission's consideration of those affidavits and decision to attach little weight to them was deficient. The Commission found that [ [redacted] ]. Views at 57 n.210. Given that these affidavits concerned only Anovion, which had not achieved the qualification milestones of Syrah and Novonix, the Commission found that they did not establish that Chinese pricing prevented Anovion from obtaining financing or the domestic industry from securing reasonable investment. *Id.* at 57 n.210. In this regard, [ [redacted] ] experience reflected the expected correlation between progress toward qualification and the ability to obtain financing. *Id.* at 58 & n.211. In light of those findings and the approximately $2 billion in financing secured by Syrah and Novonix, the Commission reasonably found that subject imports did not hinder the domestic industry's ability to obtain financing.

The Commission was not required to discuss each piece of evidence individually where it addressed Plaintiff's central argument and explained the evidentiary basis for its determination. *See, e.g.*, *Timken*, 421 F.3d at 1354. In any event, the additional evidence Plaintiff cites does not detract from the substantial evidence supporting the Commission's finding. *See* PlBr. at 56–57. Syrah's testimony that investors considered prevailing market prices, which were influenced by subject imports, and that those prices compared unfavorably with domestic producers' estimated costs, does not establish that subject imports prevented Syrah from obtaining financing or materially hindered its ability to attract investment. Similarly, Novonix's statement that

artificially-depressed Chinese prices and market uncertainty made investors more reluctant to provide capital does not establish that subject imports prevented it from obtaining financing. Although Plaintiff contends that the Commission ignored questionnaire evidence concerning investment constraints,[6] the Commission expressly considered Plaintiff's broader argument and the supporting affidavits and questionnaire responses, Views at 56–58 & nn.206–11, but found this evidence outweighed by other evidence that Syrah and Novonix secured approximately $1 billion and $860 million in financing, respectively, during the POI. *Id*. at 56 & nn.207–09. The Commission found that this approximately $2 billion in combined financing, secured by the two domestic producers furthest along in qualification, demonstrated that subject imports had not prevented domestic producers from obtaining financing at levels that were reasonably to be expected. Plaintiff's assertion that the Commission attached insufficient weight to generalized

---

[6] Plaintiff claims that the Commission overlooked Tables 3.6, 6.12, and 6.13 of the Confidential Staff Report (CR253), PlBr. at 44-45, but the Commission is presumed to have considered all record evidence and was not required to discuss each individual questionnaire response. In any event, these tables do not undermine the Commission's finding that subject imports did not prevent domestic producers from securing investment. Table 6.12 merely counts producers reporting various actual or anticipated investment and growth effects; it does not establish that subject imports prevented any producer from obtaining financing, particularly when other record evidence showed otherwise. Table 6.13 largely consists of producers' narrative assertions that low Chinese prices reduced expected returns, increased perceived investment risk, or affected planned expansions. Those assertions identify concerns about investment conditions, not evidence that producers were unable to secure financing at levels reasonably expected given their stage of development. Indeed, the table reports that no producer identified rejection of bank loans as an effect of subject imports. Staff Report at 6.23–6.24. Table 3.6 likewise reports producers' asserted capacity constraints, including pricing-related limitations, but does not establish that subject imports prevented the industry from obtaining financing or that any resulting constraints exceeded those reasonably expected during the startup phase. Most importantly, the Commission weighed Plaintiff's evidence against the approximately $2 billion in financing actually secured by Syrah and Novonix, the two producers furthest along in qualification. Views at 56-58 & nn.206–11. The tables therefore do not demonstrate that the Commission overlooked material evidence or undermine its ultimate finding.

statements about investment concerns is merely an invitation to reweigh this affirmative financing evidence, which provides no basis to disturb the Commission's determination.

Plaintiff's argument that Syrah's and Novonix's offtake agreements had limited significance because only two domestic producers secured them reflects mere disagreement with the weight the Commission assigned those agreements and other evidence indicating that a producer's ability to secure an offtake agreement was related to its progress in becoming qualified. *See* PlBr. at 57–60. The Commission expressly recognized that Syrah and Novonix were the only producers that had progressed far enough through qualification to secure offtake agreements.[7] Views at 27–28, 58 & n.211.

Nor did the Commission find that the agreements had already produced commercial-scale operation, as Plaintiff mistakenly argues. *See* PlBr. at 57-58. The Commission acknowledged that the agreements would not generate commercial profits until the producers completed qualification and commenced commercial production and sales at scale. See, e.g., Views at 426-28, 44-45, and 56-59. The Commission also found that offtake agreements were not contingent on a producer completing qualification or commencing commercial production. *Id.* at 26-28. Rather, it found that these purchaser commitments to purchase a substantial share of Syrah's and Novonix's production once they were qualified and producing AMM commercially demonstrated prospective demand for domestic AAM while enabling the two producers furthest along in qualification to obtain substantial financing. *Id.* at 56-57 & nn.207-10. The record supports that finding. Tesla committed to purchase 80 percent of Syrah's capacity, after which

[7] Plaintiff also points to Novonix's agreements with Power Co. and Stellantis (PlBr. at 58), but the Commission expressly considered both, including Stellantis's termination of its agreement in November 2025. Views at 27 & n.118-19. Plaintiff offers no explanation of how the Commission's consideration of those agreements was deficient.

Syrah secured a $102 million DOE loan. *Id.* at 56 & nn.208–09. Similarly, following its binding offtake agreement with Panasonic, Novonix obtained a DOE loan commitment exceeding $700 million for a new AAM production facility in Tennessee. *Id.* That the offtake agreements had not yet generated commercial profits or reached their full prospective value does not diminish their demonstrated role in Syrah's and Novonix's ability to secure financing.

Plaintiff likewise argues that the financing obtained was inadequate because establishing a fully operational AAM facility requires approximately $1 billion in capital, government grants are not substitutes for private investment, and some announced funding had not been fully disbursed or made available. *See* PlBr. at 58–60. That argument mischaracterizes the Commission's determination. The Commission did not find that the domestic industry had obtained all the capital ultimately necessary to establish commercial-scale production. It found that subject imports had not prevented domestic producers from obtaining greater financing than reasonably could have been expected at their stage of development. Views at 56-58. The approximately $2 billion in combined financing secured by Syrah and Novonix, the two producers furthest along in qualification, provided substantial evidence supporting that finding. *Id.* Indeed, Plaintiff's own estimate that approximately $1 billion is required to establish a fully operational facility underscores the significance of the financing those two producers had secured.

Plaintiff's arguments concerning particular government grants provide no basis to disturb the Commission's determination. Plaintiff points to canceled or reduced awards, matching requirements, delays in disbursement, and greater government support for Chinese producers. *See* PlBr. at 58–60. But the Commission recognized the government funding awarded to domestic producers, including Anovion, Novonix, and SKI, and expressly considered Plaintiff's

broader argument that domestic producers needed additional investment to overcome the effects of low-priced subject imports. Views at 28-29 & 56. Indeed, the Commission cited Plaintiff's posthearing brief advancing that very argument. *Id*. at 56 n.206 (citing Petitioner's Posthearing Br. at 10–14 (CR240/CR248)). Plaintiff's additional citations to record evidence supporting the same contention do not establish that the Commission overlooked a material argument or was required to discuss every evidentiary detail. *See Timken*, 421 F.3d at 1354; *USEC*, 34 F. App'x at 730–31; *Altx*, 370 F.3d at 1121. More fundamentally, the Commission did not rely on government grants as a substitute for private investment or find that every announced award was immediately available for expenditure. Its finding rested on the substantial financing Syrah and Novonix actually secured, including DOE loans, and the purchaser commitments through offtake agreements that helped them obtain that financing. Views at 56-57 & nn.207–10. Indeed, Plaintiff's own evidence that domestic producers needed bankable purchaser contracts to attract financing reinforces the Commission's finding that the binding Tesla and Panasonic offtake agreements helped Syrah and Novonix secure substantial funding.

Nor does Plaintiff's assertion that approximately $1 billion is required to establish a fully operational facility establish that producers needed to secure that entire amount during the POI. *See* PlBr. at 59. The two producers furthest along in qualification, Syrah and Novonix, had already secured approximately $2 billion in combined financing – twice Plaintiff's asserted facility-cost estimate. Views at 56-57 & nn.207–10. Indeed, the Commission found that Novonix's loan of more than $700 million from the DOE was to construct a new AAM production facility in Tennessee. *Id.* at 56. Plaintiff's focus on limitations affecting individual grants does not overcome that affirmative evidence or demonstrate any deficiency in the Commission's analysis; it merely invites the Court to reweigh the evidence.

Plaintiff's contention that the Commission applied a double standard in evaluating the parties' affidavits is equally unavailing. *See* PlBr. at 60-63. The Commission did not impose a categorical requirement that affidavits be accompanied by supporting documentation or exclude evidence prepared during the investigation. Rather, the Commission evaluated each affidavit based on its particular content, evidentiary foundation, and consistency with the record. As discussed above, the Commission explained that [ [redacted] ] affidavit was unpersuasive because his assertions regarding [ [redacted] ]. Views at 57 n.210. The [ [redacted] ], was an additional consideration bearing on its weight, not a categorical basis for disregarding evidence prepared during the investigation. *Id.* Plaintiff's comparison to Tesla's affidavit is misplaced. The Commission did not credit Tesla's affidavit simply because it was submitted by a respondent while discounting [ [redacted] ] because it was submitted by a petitioner. Rather, Tesla's affidavit addressed purchaser pricing practices and was consistent with other record evidence concerning purchasers' use of cost-plus analyses in price negotiations, including the offset agreements themselves. *Id.* at 43 n.176. [ [redacted] ]. *Id.* at 57 n.210. The Commission's treatment of each affidavit thus reflected the other evidence on the record either corroborating or contradicting each affidavit, not the identity of the party submitting it. The Commission was not required to

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

assign equal weight to affidavits with materially different evidentiary foundations. Nor did the Commission disregard Plaintiff's other affidavits wholesale; as discussed above, it expressly considered the [ [redacted] ] and explained why they did not establish that Chinese pricing prevented Anovion from obtaining financing or the domestic industry from securing a reasonable level of investment. *Id.* at 57-58 & n.210. The Commission, as the factfinder, is responsible for evaluating the credibility of the evidence and assigning it appropriate weight, and the Court should defer to those determinations where, as here, the Commission provides an adequate basis for its assessment. *See AWP Indus., Inc. v. United States*, 35 CIT 774, 796, 783 F. Supp. 2d 1266, 1286-87 (2011) (citing *Nippon Steel*, 458 F.3d at 1359; *U.S. Steel Group*, 96 F.3d at 1357). Plaintiff's disagreement with the Commission's reasoned assessment of the evidence provides no basis for remand.

In sum, the Commission found that subject imports had not prevented domestic producers from obtaining financing at levels reasonably expected during the POI. The record showed that Syrah and Novonix, the two producers furthest along in qualification, secured approximately $2 billion in combined financing, aided by their offtake agreements with purchasers, and that financing increased as producers progressed through qualification. Views at 56-58 & nn.206–11. The Commission also expressly considered Plaintiff's contrary evidence, including its affidavits, and explained why that evidence was outweighed by the preceding evidence indicating that subject imports had not impeded investment. *Id.* Plaintiff's disagreement with the Commission's assessment of the evidence amounts to another invitation for the Court to reweigh the evidence and substitute a different inference for the one the Commission reasonably drew in its role as factfinder. The Court should sustain the Commission's determination.

### 3. The Commission Reasonably Found that the Domestic Industry's Startup Costs Reflected Normal Startup Conditions

The Commission found that the domestic industry's financial performance reflected the expected costs of a capital-intensive startup industry and the absence of commercial sales, not material retardation by subject imports. Views at 58-59. Noting that calculation of a break-even point was not possible, the Commission explained that Plaintiff had declined to provide a break-even analysis projecting when the industry could reasonably be expected to move beyond startup conditions or demonstrating that its performance during the period of investigation fell below reasonable expectations. *Id*. at 58 & n.212. By contrast, the Commission found persuasive Tesla's extensive analysis prepared by ION Economics demonstrating that domestic AAM producers could reasonably be expected to incur substantial startup costs as they developed the technical expertise and production capabilities necessary to manufacture AAM at commercial scale. *Id*. at 59 & n.213. The Commission also reasonably attributed the domestic industry's absence of commercial shipments to the fact that no domestic producer had yet been qualified by any purchaser. *Id.* at 59. The resulting financial performance therefore reflected the costs of a capital-intensive startup industry still developing its product for qualification and commercial production, leaving the industry's total costs spread over low volumes of test production and thereby inflating unit costs, rather than evidence that subject imports had materially retarded the industry's establishment. Thus, the Commission evaluated the available economic evidence and reasonably rejected Plaintiff's argument that the industry's performance resulted from subject import competition.

Plaintiff's argument that the Commission's analysis conflicts with China's dominance of the global AAM market is misplaced. *See* PlBr. at 37–43, 48, 52–54. As discussed in the price-effects section above, the Commission expressly considered Plaintiff's extensive reports and

studies concerning Chinese market dominance, government support, excess capacity, and pricing practices, as well as the substantial U.S. market share of subject imports and evidence concerning dumping and subsidies. Views at 3, 19-20, 31, 37-38 & n.158 (citing Petitioner's Prehearing Br. at 14-54 (CR201)), 46 n.180, 60. The Commission found that this evidence did not establish significant adverse price effects or any material retardation of the domestic industry's establishment when other, more specific evidence showed that subject imports had no material effect on domestic producer offtake prices, qualification, or investment. *Id*. at 32-60. Plaintiff identifies no additional evidence or argument that the Commission overlooked in its impact analysis but merely repeats arguments the Commission considered and rejected.

In particular, Plaintiff argues unpersuasively that the Commission's finding that the domestic industry's performance reflects normal start-up conditions somehow conflicts with evidence of Chinese government subsidies, lower electricity costs, and deliberate oversupply. *See* PlBr. at 45-46 & 53–54. The Commission considered Plaintiff's evidence but reasonably explained that the industry's startup costs did not exceed reasonable expectations for a capital-intensive industry developing the technical capabilities required for commercial-scale production. Views at 58-59. As support for that finding, the Commission relied on the economic analysis prepared by ION Economics showing that the domestic industry's start-up costs were reasonably expected as producers worked towards commercial-scale production. Views at 58-59 & n.213. The Commission also relied on Plaintiff's inability to provide any economic analysis predicting when the industry would become profitable or showing that the industry's performance during the POI was less than might reasonably be expected. *Id*. at 58-59 & nn.212–13. Although Plaintiff would have preferred the Commission to attach greater weight to its general evidence concerning the competitiveness of the Chinese industry, the Commission

reasonably found that evidence outweighed by the more specific record evidence, including the ION economic report and evidence that subject imports had no material effect on offtake prices, qualification, or investment, showing that the industry's performance reflected normal start-up conditions rather than subject import competition.

Ultimately, Plaintiff identifies no defect in the Commission's economic analysis, no competing analysis demonstrating that domestic producers' performance fell below reasonable startup expectations, and no evidence establishing that subject imports materially retarded the industry's establishment. The Commission considered the industry's deteriorating financial condition, evaluated it against the industry's actual stage of development, and relied on affirmative economic evidence in finding that its performance was consistent with normal startup conditions. Plaintiff's insistence that the Commission should have drawn different inferences from the evidence is an invitation for the Court to reweigh the evidence, not a basis for remand. The Court should therefore sustain the Commission's determination.

## VI. CONCLUSION

For all the foregoing reasons, the Court should affirm the Commission's final negative determination for AAM from China.

Respectfully submitted,

Margaret D. Macdonald
General Counsel

Karl S. von Schriltz
Assistant General Counsel for Litigation

*/s/ David A.J. Goldfine*
David A.J. Goldfine
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708.5452
david.goldfine@usitc.gov

*Attorneys for Defendant*
*U.S. International Trade Commission*

Dated: November 13, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached **DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 19,372 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).

Dated: November 13, 2026

*/s/ David A.J. Goldfine*
David A.J. Goldfine
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2520
david.goldfine@usitc.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of November 2026, I provided true and correct electronic copies of the foregoing **DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** to all counsel of record by filing it using the Court's CM/ECF system.

*/s/ David A.J. Goldfine*

David A.J. Goldfine
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC 20436
Tel: (202) 708-5452
Fax: (202) 205-3111
david.goldfine@usitc.gov