**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Honorable Jennifer Choe-Groves, Judge**

| | |
|---|---|
| AMERICAN ACTIVE ANODE MATERIAL PRODUCERS<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>LG ENERGY SOLUTION MICHIGAN, INC., PANASONIC CORPORATION OF NORTH AMERICA, PANASONIC ENERGY CORPORATION OF NORTH AMERICA, TESLA, INC., HUZHOU KAIJIN NEW ENERGY TECHNOLOGY CO., LTD., and CONTEMPORARY AMPEREX TECHNOLOGY CO., LIMITED,<br><br>Defendant-Intervenors. | Court No. 26-02905<br><br>**NON-CONFIDENTIAL VERSION**<br><br>*Confidential information has been removed on pages 14, 19 to 21, 23 to 24, 32 to 34, 36 to 38, 54 to 55, 58 to 61, and 63 to 64.* |

**DEFENDANT-INTERVENORS RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**


Matthew R. Nicely
Julia K. Eppard
Sydney L. Stringer
Sarah P. Tinaphong

**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street, N.W.
Washington, D.C. 20006
202-887-4000

Counsel for Tesla, Inc.

Daniel L. Porter
Julian Beach

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

Counsel for LG Energy Solution Michigan, Inc.

Sydney H. Mintzer
Ryan R. Migeed

**Mayer Brown, LLP**
1999 K Street, NW
Washington, DC 20006
202-263-3000

Counsel for Panasonic Corporation of North America, Panasonic Energy Corporation of North America


**November 23, 2026**

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

STATEMENT PURSUANT TO RULE 56.2(c)(1) ..........................................................1

I. ADMINISTRATIVE DETERMINATION UNDER REVIEW ..........................................1

II. STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT ..............................2

STATEMENT OF FACTS AND CONDITIONS OF COMPETITION ...................................7

STANDARD OF REVIEW ......................................................................................7

ARGUMENT ........................................................................................................8

I. PLAINTIFF HAS CONFLATED THE COMMISSION'S MATERIAL INJURY AND MATERIAL RETARDATION STANDARDS, WHICH ARE DISTINCT UNDER THE STATUTE ........................................................................................8

II. THE SUPPLIER QUALIFICATION PROCESS WAS CRITICAL TO THE COMMISSION'S ANALYSIS AND REASONABLY INFORMED THE COMMISSION'S DETERMINATIONS .....................................................................10

A. Plaintiff's Argument Relies on Several Inaccurate Claims about the AAM Qualification Process ...........................................................................12

1. The Qualification Process Is a Complex, "Multi-Year" Process ...............12

2. Prospective Domestic Producers' AAM Is Not Qualified and Therefore Not Substitutable with Qualified Subject Imports ....................16

3. U.S. Purchasers Did Not Delay Their Qualification Processes, and Technical Requirements Cannot Be Compromised ..................................17

B. The Commission Relied on Extensive Documentation of Prospective Domestic Producers' Failures in the Qualification Process and Reasonably Weighed This Evidence Against Petitioner's Unsupported Claims .......................20

III. THE COMMISSION CORRECTLY FOUND THAT SUBJECT IMPORTS HAD NO MATERIAL ADVERSE PRICE EFFECTS ...........................................................25

A. The Commission's Finding that Traditional Price Data Had Limited Probative Value Was Reasonable and Consistent with Prior Material Retardation Cases ......................................................................................26

B. The Commission's Determination that Subject Imports Did Not Have Material Adverse Price Effects on the Establishment of the Domestic Industry Is Supported by Substantial Evidence ....................................................31

IV. THE COMMISSION'S DETERMINATION THAT THERE IS NO CAUSAL RELATIONSHIP BETWEEN SUBJECT IMPORTS AND LACK OF AN ESTABLISHED DOMESTIC INDUSTRY IS SUPPORTED BY SUBSTANTIAL EVIDENCE....39

A. The Commission Properly Considered Third-Party News and Analytical Reports Submitted by Petitioner Purporting to Show Causal Relationship Between Subject Imports and Material Retardation, but Found Them Unpersuasive....40

1. The Commission Did Not Dismiss Third-Party Reports Submitted by Petitioner....41

2. Market Domination Is Assumed in Material Retardation Cases....44

3. Through Its Reference to Third-Party News and Analyst Reports, Plaintiff Raises Nonjusticiable Claims of Chinese Geopolitical Strategy....46

B. The Commission Conducted a Full Impact Analysis....48

V. THE VOLUME OF SUBJECT IMPORTS DID NOT PREVENT MARKET ENTRANTS FROM ATTRACTING INVESTMENT, SECURING OFFTAKE AGREEMENTS, OR COMPLETING QUALIFICATION....51

A. The Commission's Final Determination Accounted for Market Conditions and Reasonably Concluded that Qualification Is Progressing at the Normal Industry Pace....52

B. The Commission's Determination that the Domestic Industry's Performance Is Indicative Of Normal Start-Up Conditions Is Based on Substantial Evidence and Otherwise in Accordance with Law....55

C. The Commission's Determination that Subject Imports Have Not Hindered the Domestic Industry's Ability to Obtain Financing Is Based on Substantial Evidence and Otherwise in Accordance with Law....57

1. Affidavits and Testimony....58

2. Offtake Agreements and Government Grants....62

CONCLUSION....65

# TABLE OF AUTHORITIES

## CASES

*Almond Bros. Lumber Co. v. United States*, 36 C.I.T. 558 (2012) ... 47
*ALTX, Inc. v. United States*, Case No. 09-cv-00477, Slip Op. 01-116 (Ct. Int'l Trade Sep. 19, 2001) ... 30
*American Greenfuels Rockwood (Tennessee), LLC v. Aik Chuan Construction Pte. Ltd*., 702 F. Supp. 3d 217 (S.D.N.Y. 2023) ... 33
*AWP Indus. v. United States*, 783 F. Supp. 2d 1266 (CIT 2011) ... 31
*Coalition for Fair Trade of Hardwood Plywood v. United States*, Case No. 16-57, Slip. Op. 14-13 (Ct Int'l Trade June 8, 2016) ... 30
*Committee for Fair Coke Trade v. United States*, 28 C.I.T. 1140 (2004) ... 24, 31, 51, 52
*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ... 52
*Cucuras v. Secretary of Health & Human Servs.*, 993 F.2d 1525 (Fed. Cir. 1993) ... 58
*DAK Americas LLC v. United States,* 517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ... 35
*Durum Gida Sanyi Ve Ticaret A.S. v. United States*, 311 F. Supp. 3d 1367 (Ct. Int'l Trade 2018) ... 61
*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ... 29, 36, 38, 41
*NSK Corp. v. U.S. Int'l Trade Comm'n*, 716 F.3d 1352 (Fed. Cir. 2013) ... 41
*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ... 43, 51
*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344 (Fed. Cir. 2001) ... 61
*Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014) ... 35
*U.S. Aluminum Extruders Coal. v. United States*, Consol. Court No. 24-00209, Slip Op. 26-101, 2026 Ct. Intl. Trade LEXIS 140 (Sept. 2, 2026) ... 42
*U.S. Glass Producers Coal. v. United States*, Court No. 24-00199, Slip Op. 26-78, 2026 Ct. Intl. Trade LEXIS 110 (July 22, 2026) ... 43
*U.S. Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) ... 29
*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948) ... 58
*Usinor Sacilor v. United States*, 893 F. Supp. 1112 (Ct. Int'l Trade 1995) ... 24, 31, 51, 58

## STATUTES

19 U.S.C. § 1671d(b)(1) ... 8
19 U.S.C. § 1673d(b)(1) ... 8
19 U.S.C. § 1677(7)(B) ... 8
19 U.S.C. § 1677(7)(C)(ii) ... 26
19 U.S.C. § 1677(7)(C)(iii) ... 11

## ADMINISTRATIVE DECISIONS

*Certain Commuter Airplanes from France and Italy*, Inv. Nos. 701-TA-174 and 175 (Preliminary), USITC Pub. 1269 (July 1982) ... 57
*Laminated Woven Sacks from China*, Inv. Nos. 701-TA-450 and 731-TA-1122 (Preliminary), USITC Pub. 3942 (Aug. 2007) ... 26
*Refillable Stainless Steel Kegs from Mexico,* Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 (Oct. 2019) ... 2, 8, 26

*Tungsten Shot from China*, Inv. Nos. 701-TA-732 and 731-TA-1701 (Final), USITC Pub. 5655 (Aug. 2025) ........ 26, 28, 31

## INTRODUCTION

Defendant-Intervenors LG Energy Solution Michigan, Inc. ("LGES"), Panasonic Corp. of North America and Panasonic Energy Corp. of North America ("Panasonic"), and Tesla, Inc. ("Tesla") (collectively, "Defendant-Intervenors" or "Respondents") oppose the Motion for Judgment on the Agency Record filed by the American Active Anode Material Producers ("Plaintiff" or "Petitioner"). Defendant-Intervenors respectfully request that the Court affirm the negative final material retardation determinations of the U.S. International Trade Commission ("Commission") regarding active anode material ("AAM") from China because they are supported by substantial evidence and otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I. ADMINISTRATIVE DETERMINATION UNDER REVIEW

The administrative determination under review is the Commission's Final Determination in the investigation of *Active Anode Material from China*, finding that the establishment of a domestic industry was not materially retarded by reason of imports of AAM from China. The Commission's Views are contained in *Active Anode Material from China*, Inv. Nos. 701-TA-752 and 731-TA-1730 (Final), USITC Pub. 5719 (Mar. 2026). P.R. 230, C.R. 268.[1] Notice of the Final Determination was published in the Federal Register on April 3, 2026. *Active Anode Material from China; Determinations*, 91 Fed. Reg. 16,968 (Apr. 3, 2026). P.R. 229.

[1] Public record citations are indicated by "P.R.__," referring to list number 1 on the index of the administrative record, and confidential record citations are indicated by "C.R.__," referring to list number 2 on the index of the administrative record. Citations to the public version of the Commission's Views are to record document P.R. 230, and citations to the confidential version of the Commission's Views (hereinafter, "Final Views") are to record document C.R. 268.

## II. STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT

### A. Whether the Commission Appropriately Applied the Material Retardation Standard in this Case.

Yes. As the Commission explained in its Final Views, material retardation and material injury/threat are mutually exclusive standards. The central question for the Commission in material retardation cases is "whether the industry's performance 'reflects merely the normal start-up condition of a company entering an admittedly difficult market or, is the performance worse than what could reasonably be expected{.}" Final Views at 15-16 (quoting *Refillable Stainless Steel Kegs from Mexico,* Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 (Oct. 2019) at 27). Consistent with that distinct inquiry, the Commission correctly recognized that the traditional material injury criteria (price effects, impact, and volume) must be evaluated differently, and necessarily carry less weight, in the material retardation context.

Plaintiff's objections to the Final Determination rest on the flawed premise that the Commission failed to appropriately evaluate the traditional material injury factors in the context of this material retardation case. This flawed premise conflates two distinct statutory standards and thus provides no basis to disturb the Commission's Final Determination.

### B. Whether the Critical Supplier Qualification Process and the Prospective Domestic Producers' Inability to Produce AAM to the U.S. Purchasers' Specifications at Scale Reasonably Informed the Commission's Final Determination.

Yes. The Commission's Final Determination that the domestic industry was not materially retarded by reason of subject imports was reasonably grounded in record evidence demonstrating the unique and critical nature of the AAM supplier qualification process and the

prospective domestic producers' inability to produce AAM capable of meeting U.S. purchasers'[2] specifications for safe and effective use in downstream batteries.

First, the Commission found, based on substantial record evidence, that the qualification process is a necessarily extensive and complex "multi-year" process for *all* AAM suppliers, not only the prospective domestic producers, to ensure that every qualified supplier can produce AAM to the required quality and safety specifications at scaled quantities. AAM supplier qualification is necessarily rigorous and time-intensive, given the critical concerns of guaranteeing the safety and performance of the end-use battery products (i.e., electric vehicles). Record evidence demonstrated that the complete qualification process generally takes multiple years and varies depending on certain factors, including the supplier's existing facilities and expertise. Accordingly, the Commission reasonably concluded that the domestic industry's development was consistent with the expected qualification timeline for new AAM suppliers and was not materially retarded by subject imports.

Second, the Commission concluded, based on substantial record evidence, that prospective domestic producers were unable to produce AAM that met the U.S. purchasers' specifications for the safety and performance of the end-use battery product. Unqualified AAM from the prospective domestic producers that *could not* meet purchasers' technical specifications was not substitutable for, nor competing with, qualified subject imports that met those same specifications. The Commission thus reasonably determined that any traditional underselling and price analysis considerations provided limited probative value in its analysis and that the domestic industry was not materially retarded by reason of subject imports.

[2] "U.S. Purchasers" refers collectively to all U.S. purchasers, including Tesla, Panasonic, and LGES.

Third, the Commission relied on substantial record evidence to conclude that U.S. purchasers did not delay the qualification of the prospective domestic producers. Indeed, the record evidence revealed the opposite—U.S. purchasers had strong incentives to localize AAM supply and invested substantial time and resources to accelerate the prospective domestic producers' qualification accordingly. Substantial evidence thus substantiates the Commission's conclusion that U.S. purchasers went to great lengths to support, not hinder, the domestic industry's establishment, irrespective of subject imports.

### C. Whether the Commission's Determination that Subject Imports Had No Material Adverse Price Effects Is Supported by Substantial Evidence and in Accordance with Law.

Yes. The Commission's determination that subject imports did not have significant price effects is supported by substantial evidence and otherwise in accordance with law. As an initial matter, the Commission reasonably determined that traditional price suppression analysis had limited probative value in the context of this material retardation case. The domestic industry remained in a start-up phase during the period of investigation ("POI"), there were no commercial sales of the domestic like product during the POI, and the domestic industry's U.S. shipments during the POI were trial/test shipments. Thus, consistent with both logic and its established practice, the Commission reasonably recognized that price effects data warranted different consideration in this material retardation case than in a traditional material injury case.

In light of these considerations, the Commission appropriately determined that subject imports did not have any material adverse price effects. Substantial evidence demonstrates that the U.S. purchasers entered into offtake agreements with the domestic industry on a cost-plus basis, such that domestic producers could recover their production costs plus a reasonable profit. The record evidence also indicates that the offtake agreements had no relation to subject import pricing. Although Plaintiff contends that the Commission disregarded certain evidence

pertaining to the offtake agreement negotiations, the Final Views demonstrate that the Commission evaluated Petitioner's documentation but found it unpersuasive in light of the totality of the record evidence. To be sure, the fact that the Commission afforded certain evidence more weight than others does not render the Final Views unlawful. The Court should thus sustain the Commission's determination.

### D. Whether the Commission's Determination that There Was No Causal Relationship Between Subject Imports and the Lack of an Established Domestic Industry Is Supported by Substantial Evidence and in Accordance with Law.

Yes. The Commission's determination that there was no causal relationship between subject imports and the lack of an established domestic industry is supported by substantial evidence and otherwise in accordance with law. Contrary to Plaintiff's assertions, the Commission's Final Views demonstrate that the Commission thoroughly examined Petitioner's proffered evidence, including its third-party reports and analyses. However, Petitioner's reports and analyses supported the uncontroverted fact that the AAM market consisted primarily of subject imports. Plaintiff's repeated emphasis on subject imports' dominance of the AAM market misses the mark. The very premise of a material retardation inquiry is that the domestic industry is not yet established and is attempting to establish itself in a market already served by other participants. The dominance of subject imports, without more, does not establish that subject imports caused the domestic industry's lack of establishment.

Further, in its baseless accusation that the Commission failed to appropriately consider its third-party news and analyst reports, Plaintiff raises nonjusticiable claims of Chinese geopolitical strategy, namely alleging "massive subsidization, oversupply, and a Chinese government policy of eliminating competition." Pl. Br. at 45. Plaintiff's claims of a broad Chinese government conspiracy plainly exceed the bounds of a Commission material retardation case, and Plaintiff

fails to cite to any statutory provision permitting the Commission to consider such allegations as part of its material retardation analysis.

Moreover, contrary to Plaintiff's allegations, the Commission conducted a full impact analysis. In this analysis, the Commission recognized that start-up industries are expected to incur losses while developing production capability, increasing output, and achieving economies of scale and pointed to the undisputed fact that "no domestic producer is yet qualified with any purchasers and as a result no domestic producer is in a position to make any commercial sale of AAM." Final Views at 59. In light of the domestic industry's inability to produce AAM to the purchasers' specifications and in the absence of any commercial sales, it is reasonable that the prospective domestic producers remained in an initial startup phase. The Commission's Final Determination that there is no causal connection between subject imports and the status of the domestic industry is thus supported by substantial evidence.

### E. Whether the Commission's Determination that the Volume of Subject Imports Did Not Prevent Market Entrants from Attracting Investments, Securing Offtake Agreements, or Completing Qualification Is Supported by Substantial Evidence and in Accordance with Law.

Yes. The Commission's determination that the volume of subject imports did not prevent the domestic industry from attracting investments, securing offtake agreements, or completing qualification is supported by substantial evidence and otherwise in accordance with law.

As an initial matter, and as explained, subject import domination of the market is already assumed in material retardation cases. As such, Plaintiff's complaints regarding subject import dominance are inapposite.

Likewise, Plaintiff's allegations that U.S. purchasers purposely delayed qualification because of the high volume of subject imports is unsupported by the record evidence. As also explained, qualification is a scientific process that relies on measurable outcomes, the domestic

industry's qualification timelines were consistent with qualification timelines for other producers (including subject import producers), the prospective domestic producers were incapable of producing AAM capable of meeting U.S. purchasers' specifications for safe and effective use in downstream batteries, and U.S. purchasers are highly incentivized to localize their supply chains and have invested substantial time and financial resources into qualification of the prospective domestic producers. Plaintiff's allegations are meritless.

Moreover, substantial evidence indicates that subject imports did not discourage investors or hinder the domestic industry's ability to obtain financing. In addition to the cost-plus offtake agreements between U.S. purchasers and certain prospective domestic producers, the domestic industry has secured billions of dollars in financing. The Commission's determination that the volume of subject imports did not prevent the prospective domestic producers from attracting investment or securing offtake agreements is therefore supported by substantial evidence. The Court should uphold the Commission's Final Views accordingly.

## STATEMENT OF FACTS AND CONDITIONS OF COMPETITION

Defendant-Intervenors agree with the statement of facts and conditions of competition presented by the Commission in its Brief and incorporate the Commission's discussion by reference. *See* Def. Br. at 4-15.

## STANDARD OF REVIEW

Defendant-Intervenors agree with the standard of review described by the Commission in its Brief and incorporate the Commission's discussion by reference. *See* Def. Br. at 15-18.

## ARGUMENT

### I. PLAINTIFF HAS CONFLATED THE COMMISSION'S MATERIAL INJURY AND MATERIAL RETARDATION STANDARDS, WHICH ARE DISTINCT UNDER THE STATUTE

As a threshold matter, Plaintiff's arguments rest on the flawed premise that the Commission was obligated to evaluate volume, price effects, and impact under the same framework applicable in a material injury investigation. That premise is incorrect. Congress established material retardation as a distinct basis for antidumping or countervailing duty relief. 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). The Commission has confirmed that "material retardation and material injury/threat thereof are mutually exclusive standards." Final Views at 11. In other words, the Commission assesses domestic industries under either standard, not both. The Commission's inquiry in a material retardation case thus necessarily differs from that applied in material injury cases.

As the Commission acknowledged in its Final Views, "because each attempt to establish a new industry is inherently unique, it makes its determination of whether the establishment of an industry is materially retarded on a case-by-case basis." *Id.* at 14. The central question for the Commission in material retardation cases is "whether the industry's performance 'reflects merely the normal start-up condition of a company entering an admittedly difficult market or, is the performance worse than what could reasonably be expected{.}'" *Id.* at 15-16 (quoting *Refillable Stainless Steel Kegs from Mexico*, USITC Pub. 4976 at 27). While the statute specifies "that the requirement to address volume, price, and impact of subject imports applies" to both material injury and material retardation cases, *see* 19 U.S.C. § 1677(7)(B), the Commission has explained that "these criteria are not 'viewed in the same light' {as in material injury cases} given the unique circumstances of a material retardation analysis." Final Views at 14-15. In its Final Views, the Commission gave examples of how these factors have been weighed differently in

prior material retardation cases, such as when "pricing data may be less relevant in evaluating material retardation because the small number of sales in this industry and the limited quantities sold by the domestic producer complicate price comparisons and the evaluation of pricing trends over time." *Id.* at 15.

Plaintiff repeatedly faults the Commission for not drawing the same inferences from record evidence as it may have drawn in a material injury investigation. Indeed, as the Commission observed in its Brief, all of Plaintiff's arguments boil down to simple disagreement with the manner in which the Commission considered and weighed record evidence without regard for the different legal standard for material retardation cases. *See* Def. Br. at 17. For example, Plaintiff challenges the Commission's price effects finding in part because the "statutorily required price effects factors such as price suppression, depression, and underselling demonstrate the negative price effects on the domestic industry," disagreeing with the Commission's conclusion that "the traditional price effects analyses {were} of limited probative value" in a material retardation case. Pl. Br. at 13, 17. However, Plaintiff itself expressly acknowledged before the Commission that the Commission applies less weight to the traditional price effects analysis in a material retardation case. Specifically, in its Prehearing Brief, Plaintiff stated that the "analysis of the price effects of subject imports should differ from that in a material injury case by placing less emphasis on underselling and price trends and more emphasis on what the established price is, who sets that price, and the role that price plays in the domestic industry's efforts to establish itself." Final Views at 35 n.151 (quoting Petitioner's Prehearing Br. at 114, P.R. 168, C.R. 201/209).

Accordingly, even if Plaintiff could identify evidence supporting a different finding under the Commission's traditional analysis in material injury cases (which it cannot), this would not

demonstrate that the Commission's material retardation finding was not supported by substantial evidence or otherwise not in accordance with law. In assessing material retardation, the Commission retains broad discretion to evaluate the relative importance of the statutory considerations in light of the question before it, i.e., whether subject imports materially impeded the establishment of the domestic industry. Here, the Commission clearly explained its reasoning for affording more weight to certain factors than others in the context of a material retardation case.

The Commission's analysis did not reflect either a departure from the statutory requirements or a dismissal of record evidence but rather demonstrated the discretion the Congress afforded the Commission in applying the distinct material retardation standard. The Commission was under no obligation to evaluate volume, price effects, and impact in the same manner as in a material injury investigation. Indeed, the Commission expressly recognized that it considered these statutory factors through the lens of whether subject imports materially impeded the establishment of a domestic industry, and it reasonably explained why certain traditional indicia of material injury, such as underselling and price trends, were of less probative value under the particular facts of this case. Because the Commission articulated a rational basis for its approach and grounded its conclusions in record evidence, the Commission's determination readily satisfies the substantial evidence standard. Plaintiff's disagreement with the Commission's conclusions does not provide a basis for this Court to overturn the Commission's determination.

## II. THE SUPPLIER QUALIFICATION PROCESS WAS CRITICAL TO THE COMMISSION'S ANALYSIS AND REASONABLY INFORMED THE COMMISSION'S DETERMINATIONS

In its glancing treatment of the Commission's determinations, Plaintiff fails to grapple with the most important condition of competition in this case: the lack of substitutability between

the domestic like product and subject imports. The statute instructs the Commission to "evaluate all relevant economic factors" affecting the industry at issue "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). As the Commission explained, conditions of demand, supply, substitutability, ability to meet customer specifications, product quality, and availability of domestic supply informed the Commission's analysis in this case as in all cases. Final Views at 16-30. In the context of this material retardation case, the most critical condition of competition in the Commission's analysis was whether the domestic industry could provide a qualified product that met customer specifications. It could not.

Prospective domestic producers could not sell their product to U.S. consumers because they could not qualify their product as safe and effective for use in downstream batteries. As the Commission found, "almost all responding U.S. importers and purchasers reported that {the domestic industry's} products are 'never' interchangeable" with subject imports. *Id.* at 21. Importers and purchasers reported that the domestic like product was "inferior to subject imports with respect {to} 11 of 17 purchasing factors for AAM." *Id.* The "domestic like product 'rarely or never' met minimum quality specifications" according to most U.S. importers and purchasers. *Id.* Accordingly, the question for the Commission was not whether the volume or price of subject imports affected the ability of prospective domestic producers to sell the domestic like product, but whether subject imports affected their ability to qualify a competing product and produce it at scale. The Commission reasonably concluded, based on overwhelming evidence, that neither the price nor the volume of subject imports prevented the domestic industry from qualifying a competing product. Thus, the Commission's considerations necessarily began—as the Court's review of the Final Determination must—with the issue of qualification. Once it is

clear that the domestic industry could not qualify its product for reasons wholly unrelated to subject imports, Plaintiff's arguments fail.

### A. Plaintiff's Argument Relies on Several Inaccurate Claims about the AAM Qualification Process

Over the POI, prospective domestic producers were progressing through rigorous qualification processes with U.S. purchasers to become qualified suppliers of AAM in the U.S. market. Throughout the POI, and even as of the date of the Final Determination, no domestic producer had yet qualified its product for safe, effective end-use. *Id.* at 24 ("no domestic producers of AAM have fully qualified their product for commercial use"). As such, there was no actual competition between unqualified domestic AAM and qualified imports of AAM, as U.S. purchasers could not purchase unqualified AAM from U.S. producers for use in commercial applications that did not meet their specifications or safety standards. *See id.* at 59.

Plaintiff makes several interrelated and inaccurate claims about the qualification process, suggesting that: (1) the qualification process was shorter than the record evidence demonstrates, Pl. Br. at 49; (2) prospective domestic producers could manufacture AAM product capable of competing with qualified subject imports even though their product was not qualified, *id.* at 20-22; and (3) U.S. purchasers intentionally "slow-walked" or delayed qualification due to access to low-priced subject imports, *see id.* at 43-44, 49-51. The Commission addressed each of these arguments in its Final Views and supported its conclusions with substantial evidence. As the Commission explained, the record demonstrated that Plaintiff is wrong on all three counts.

#### 1. The Qualification Process Is a Complex, "Multi-Year" Process

First, Plaintiff implies that qualification as a quick, uncomplicated process. As the Commission put it, the qualification process is "onerous" and "intensive." Final Views at 51. It requires meeting immutable scientific benchmarks. Plaintiff asserts that "{t}he Final Staff

Report confirms that importers/purchasers 'typically reported that the time required to certify or qualify their last three suppliers from China ranged from one to two years.'" Pl. Br. at 49 (citing Final Staff Rep., P.R. 216, C.R. 253 at 2.16). However, the Final Staff Report *also* notes that the "entire" qualification process "requires multiple years, *depending upon the AAM supplier's existing producer's facilities and expertise, continued progress, and avoiding setbacks in building-up their production capabilities*." P.R. 216, C.R. 253 at 1.15-1.16 (emphasis added). Thus, suppliers can advance more rapidly through qualification where they have existing facilities, are already producing commercial quantities for another purchaser, and/or have existing expertise from producing a similar product. It is undisputed that most prospective domestic producers were in the early stages of the qualification process and were competing against suppliers that have established products and relationships in the marketplace. Final Views at 24, 47. Therefore, the Commission reasonably concluded that "{q}ualification is a multistage process that requires suppliers to advance their production capabilities in order to provide successively larger batches of AAM," and can take multiple years "depending upon the particular AAM supplier's existing facilities and expertise, continued progress, and setbacks in building up production capabilities." *Id.* at 23-24. Indeed, the Commission found that the qualification of all prospective domestic producers was proceeding at a normal pace based on how long it had taken purchasers to qualify nonsubject producers. *See id.* at 54-55.

The Commission thus correctly found that qualification is a multistep, iterative process to ensure that a supplier can produce AAM to specified quality and safety standards—and that it can do so at scale, meaning that it can replicate that quality production at the scale necessary to fulfill supply contracts. While each purchaser's qualification process may be slightly different, qualification generally has several milestones, starting with an evaluation of physical properties

of the graphite supplied by the supplier. *See id.* at n.197. This step alone typically takes at least a year but may take longer if new equipment is needed to complete the samples. *Id.* Suppliers must then provide the purchaser with samples from equipment that is representative of the supplier's mass production capabilities. *Id.* This may involve the supplier building or using a "pilot" production line, and the purchaser will exchange rounds of feedback with the supplier aimed at optimizing the AAM for performance. *Id.* The purchaser will release to the supplier a set of "development targets," which is a reduced set of material specification targets. *Id.* During the pilot line phase, a purchaser will test the sample product by **[**

**]**. *Id.* At this stage, specifications are rigorously validated and the supplier is expected to make various adjustments on equipment and production to improve quality. *Id.* This interim phase is the longest part of the qualification process.

The record cited by the Commission indicates that the interim stage takes a minimum of one to two years, though it can range from **[** **]**. *Id.* (citing Panasonic's Posthearing Br. at 3-5, including Ex. 12, P.R. 200, C.R. 242/246 (an example of one purchaser's timelines for qualifying various global AAM suppliers)); *see also id.* at nn.198, 203 (citing Tesla's and LGES' Prehearing Briefs and Responses to Commissioners' Questions regarding timelines for qualification of AAM suppliers). Finally, after a supplier demonstrates it can produce the AAM to the specified quality standards, qualification is completed when the supplier can mass produce the product to the same quality specifications. *Id.* at n.197.

Qualification typically involves close technical collaboration between the supplier and the purchaser. *See, e.g.*, *id.* at 26; *id.* at 52-53 & n.197. For example, Panasonic has been

providing technical feedback to prospective domestic producers since January 2022. *Id.* at 52-53 & n.197 (citing Panasonic's Prehearing Br. at Ex. 6, P.R. 173, C.R. 202/212 (an example of one purchaser's experience with each of the entities it has engaged with on qualification)). Panasonic has had a similar level of technical collaboration with Syrah Technologies LLC ("Syrah") and has disclosed specifications and provided technical feedback to a number of other prospective domestic producers. *See id.* LGES and Tesla also documented intensive technical collaboration with prospective producers. For instance, Tesla has an engineering team "solely dedicated to anode qualification and deploys to suppliers' production facilities to help design and build facilities and install equipment that will enable the supplier to meet Tesla's specifications." *See id.* at n.97 (citing, e.g., Tesla's Prehearing Br. at 36-47 & App'x I-A, I-B, I-C & I-D, P.R. 175, C.R. 206/214). LGES also has an engineering team that "qualifies AAM producers through a rigorous, multi-stage collaboration process focusing on pilot testing." *Id.* (citing LGES' Prehearing Br. at 4-8 & Ex. 1, P.R. 174, C.R. 203/213).

The qualification process is "rigorous" and "time-intensive" for good reason: It is designed to control for AAM impurities that endanger the safety of consumers of the end-use battery product (*i.e.*, electric vehicle owners). *Id.* at 22. As the Commission found:

> AAM impurities are a safety concern and can cause punctures within the battery that can lead to a catastrophic thermal runaway. More specifically, free-floating metallic particles released from AAM can puncture the thin separator thereby creating a short to the electrical connection between the electrodes. The heat generated from such a rapid electrical discharge can send the battery cell into thermal runaway and even ignition, which can spread to the entire battery module or pack.

*Id.* at 22 (citing Final ITC Staff Rep. at 1.15 & n.38, P.R. 216, C.R. 253), n.93 (citing Hearing Tr. at 173 (Swamynathan), 187 (Byles), 252 (Hy), and 254 (Seals), P.R. 198, C.R. 245); *see also* Conf. Tr. at 225-27 (Weber), P.R. 224; LGES' Prehearing Br. at 10, P.R. 174, C.R. 203/213;

Panasonic's Prehearing Br. at 5, P.R. 173, C.R. 202/212; Tesla's Prehearing Br. at 13-14 & App'x 1-C (Dr. Sunny Hy Aff.), P.R. 175, C.R. 206/214. As such, the Commission reasonably concluded that "AAM is safety-critical and cannot lack qualification." Final Views at 59.

Importantly, even Plaintiff agreed that "AAM must meet the qualification requirements for battery performance and safety." *Id.* at 22 ("{Petitioner} and respondents agree that AAM must meet the qualification requirements"). Thus, its argument that qualification could be reduced to a bargaining chip in price negotiations, Pl. Br. at 49-51, is undermined by overwhelming record evidence supporting the Commission's conclusions that qualification is a "rigorous" and "time-intensive" scientific process that cannot be "shortcut." Final Views at 22; *see also* **Part II.B**.

### 2. Prospective Domestic Producers' AAM Is Not Qualified and Therefore Not Substitutable with Qualified Subject Imports

Second, Plaintiff claims that the Commission found in its Preliminary Determination that "the domestic industry has demonstrated the ability to produce AAM that is substitutable with subject merchandise." Pl. Br. at 21. However, this statement is a gross mischaracterization of the record evidence and the Commission's findings because no domestic producer produced qualified AAM at any point during the POI. Indeed, in quoting the Preliminary Determination, Plaintiff cut off the second half of the Commission's sentence, which reads: "but domestic producers have not yet been able to qualify their products for commercial use." Prelim. Views at 37, P.R. 89, C.R. 85. The Commission further explained, "{d}omestic producers are engaged in qualification processes with several purchasers, but none appear to have fully qualified a product for commercial use." *Id.* at 38. "Moreover," the Commission continued, "the fact that AAM is produced to certain standard specifications set by the customer, such as purity and energy density, indicates ***the potential*** for a high degree of interchangeability between AAM from

domestic and imported sources *if domestic producers continue to advance their ability to produce to customer specifications at commercial scale*." *Id.* at 39 (emphases added).

This reality—that no prospective domestic producer manufactured AAM capable of competing with subject imports—remained unchanged by the Commission's Final Determination, and in neither the Preliminary Determination nor the Final Determination did the Commission find that prospective domestic producers' unqualified product was substitutable with subject imports. *See* Prelim. Staff Rep. at 2.8, C.R. 79 ("there is currently a low degree of substitutability between domestically produced AAM and AAM imported from subject sources. Factors reducing substitutability include the current lack of qualified U.S. production, coupled with the typically time-intensive qualification processes that U.S. producers need to pass in order to sell their product"); Final Views at 21; *see also id.* at 24 ("no domestic producers of AAM have fully qualified their product for commercial use" and "{m}ost domestic producers of AAM are in the early stages {of} the qualification process"); *see also id.* at 58, 59. As a result, the Commission reasonably determined in its final investigation that its traditional underselling and price analysis was of limited probative value in this case. *See* **Part III**.

### 3. U.S. Purchasers Did Not Delay Their Qualification Processes, and Technical Requirements Cannot Be Compromised

Third, although Plaintiff asserts that U.S. purchasers slow-walked the qualification process because of the ready supply of foreign AAM, Pl. Br. at 43-44, 49-51, substantial evidence relied on by the Commission demonstrates that qualification proceeded at its normal pace, as discussed above, and that Plaintiff's claims of "delays" to qualification were unsupported or otherwise rebutted. As an initial matter, U.S. purchasers testified to the Commission that it was implementing a strategy to localize AAM supply chains. *See* Final Views at 17 (citing Tesla's Prehearing Br. at 24-25, P.R. 175, C.R. 206/214; Panasonic's

Prehearing Br. at 6-7, P.R. 173, C.R. 202/212). Purchasers therefore consider ensuring U.S. AAM suppliers' long-term viability a "mutual effort between the suppliers and purchasers." *Id.* at n.169 (citing Panasonic's Posthearing Br. at 8, P.R. 200, C.R. 242/246) (internal quotation marks omitted). In other words, U.S. purchasers invested this extraordinary effort in qualifying U.S. producers precisely *because of* foreign dominance in the market and U.S. purchasers' requisite interest in having reliable, local AAM supply chains. Therefore, the record evidence illustrates that delaying qualification of prospective domestic producers was not in purchasers' strategic financial interest, undermining a core theme of Plaintiff's argument.

Plaintiff claims that the Commission disregarded "contemporaneous business documents demonstrat{ing} that U.S. purchasers . . . have both delayed qualifying U.S. producers and refused to proceed with qualification due to lower priced Chinese imports." Pl. Br. at 50. However, the evidence cited by Plaintiff represented only speculative statements submitted by Petitioner in response to the Commission's requests for information, which Plaintiff passed off as "evidence" in its Brief. For instance, Petitioner submitted emails which it alleged were evidence of purchasers' delays in qualification. *See* Pl. Br. at 50 (citing Petitioner's Posthearing Br. at Exs. 1-6, P.R. 202, C.R. 240/248). But the emails merely showed prospective domestic producers asking purchasers follow-up questions in ongoing exchanges about the qualification process, indicating that delays were not the fault of purchasers but merely a reality of the iterative qualification process. *See, e.g.*, Petitioner's Posthearing Br. at Ex. 2, P.R. 202, C.R. 240/248. Petitioner also submitted a table of information summarizing each prospective domestic producer's production and qualification status with various purchasers. *See id.* at Ex. 8. But this table did not offer <u>*any*</u> evidence of purposeful delays; it simply identified where in the qualification process each prospective domestic producer was.

Elsewhere, Petitioner made spurious claims about purchasers' delays in qualification that it failed to support with any documentary evidence, despite the Commission's request. For example, Petitioner claimed that "**[** **]**." *See id.*, Answers to Commissioners' Questions at 20. But, as the Commission pointed out, Tesla rebutted this claim with credible evidence to the contrary. Final Views at n.196. Tesla **[**

**]**. Tesla explained that **[**

**]**

In other words, the record demonstrated that an extended qualification process *cost* the purchasers additional money; it did not **[** **]**, undermining Petitioner's entire theory of why purchasers would have "slow-walked" qualification due to lower-priced subject imports. Thus, the Commission reasonably concluded, based on the evidence of qualification's length and complexity described above, that qualification was not being "slowed" and indeed, technical requirements could not be compromised, because they require "rigorous validation to ensure safety, durability, and performance consistency at scale," including "extensive testing," and that prospective domestic producers remained "unable to meet customers' safety-critical specifications in commercial quantities." *Id.* at 51.

Given the extensive evidence on the record of U.S. purchasers' efforts to *help prospective domestic producers complete qualification*, the Commission reasonably and correctly concluded, based on substantial evidence, that, rather than hinder the domestic industry, U.S. purchasers

"have gone to great lengths to work with the domestic AAM industry to develop the technical know-how and production capabilities required to produce AAM to necessarily strict specifications. . . . These efforts have helped create, not retard, a domestic industry on its way to establishment." *Id.* at 59-60.

### B. The Commission Relied on Extensive Documentation of Prospective Domestic Producers' Failures in the Qualification Process and Reasonably Weighed This Evidence Against Petitioner's Unsupported Claims

The record relied upon by the Commission contained extensive documentation from purchasers **[ ]** with the prospective domestic producers, **[ ]** companies were still failing to qualify their AAM products. *See id.* at 51 (citing, e.g., Tesla's Prehearing Br. at Section II.B.2 to II.B.3, App'x I-C, P.R. 175, C.R. 206/214; Tesla's Posthearing Brief at Section IV.B, P.R. 203, C.R. 241/249; LGES' Prehearing Br. at Ex. 1, P.R. 174, C.R. 203/213; Panasonic's Prehearing Br. at 2-6, Exs. 1, 17, 24, P.R. 173, C.R. 202/212). The Commission also observed that Tesla **[ ]** indicating that Tesla has been unable to qualify Syrah's AAM "due to Syrah's own difficulties in qualifying its AAM product that meets Tesla's specifications." *Id.* at 52 & n.196 (citing, e.g., Tesla's Prehearing Br. at App'x I-D at 3, App'x I-E-43, App'x I-B at 6, App'x I-E-11, P.R. 175, C.R. 206/214). The Commission discussed underlying record documents at length, including highlighting purchasers' communications with suppliers and the technical meeting notes providing feedback to suppliers. *Id.* at 51 (citing Panasonic's Prehearing Br. at Ex. 17, P.R. 173, C.R. 202/212 (including, *inter alia*, email to supplier following factory visit; technical meeting presentation slides providing feedback on why certain samples failed Panasonic's testing; presentation providing Panasonic site visit summary and implementation schedule for process improvement action items)); *see also id.* at n.198 (describing LGES' Prehearing Br. at Ex. 1, P.R. 174, C.R.

203/213 (Sung Aff.) in which Ms. Sung details "the significant time and resources that LG has spent qualifying domestic AAM producers, including LG's . . . Material Test and Production Part Approval Process whereby LG works closely with suppliers in testing samples and providing technical advice and feedback to AAM producers.").

Thus, it was reasonable for the Commission to conclude that respondent purchasers "have invested significant time and resources into qualifying domestic AAM producers, including by testing samples and providing extensive technical support and feedback." *Id.* at 51. As the Commission observed, and as Plaintiff again fails to address in its Brief, the purchasers' investments included the following:

<u>*Tesla*</u>

- **[ ]**.
- **[ ]**
- Tesla submitted multiple letters to the Department of Energy ("DOE") in support of funding for the nascent domestic AAM industry. *Id.* at 53-54.

<u>*Panasonic*</u>

- Panasonic provided extensive technical support to both Novonix's and Syrah's production teams. *See id.* at 53. For Novonix alone, Panasonic documented **[ ]** site visits since **[ ]**, and **[ ]** technical feedback meetings in 2022, **[ ]** in 2023, **[ ]** in 2024, and **[ ]** in 2025. *See id.* at 53, n.197.
- Generally, Panasonic's qualification process included evaluations of sample products, several rounds of feedback with the supplier aimed at optimizing the AAM for performance, and onsite visits to the supplier's factories to assess anti-contamination procedures, measurement equipment, and production capacity. *See id.*

- Panasonic also submitted letters to the DOE on behalf of prospective domestic producers to help them obtain government funding. *See id.* at n.113.

_LGES_

- LGES expended over $33 million of its own resources to the development of domestic suppliers through technical assistance, funding support, laboratory testing, and other measures. *Id.* at 53. This estimate was supported by a sworn affidavit provided by LGES, describing the significant time and resources that LGES spent qualifying domestic AAM producers, including working closely with suppliers to test samples and provide technical advice and feedback to AAM producers. *Id.* at 53, n.198.

- LGES submitted multiple letters to the DOE in support of funding for the nascent domestic AAM industry. *Id.* at 53-54.

In its Final Views, the Commission explained that its evaluation of this evidence, among other evidence on the record, led it to conclude that "the domestic AAM industry has failed thus far to meet technical specifications of battery producers for reasons unrelated to low-priced subject imports." *Id.* at 54.

Importantly, and contrary to Plaintiff's claims, the Commission considered all the information submitted by Petitioner regarding alleged "delays" in the qualification process. *See id.* at 50-51 & n.189 (discussing delay argument and citing Petitioner's Posthearing Br. at 9-10, Ex. 1 (Answers to Commissioners' Questions) at 20, Exs. 2 & 8, P.R. 202, C.R. 240/248). Thus, Plaintiff's assertion to this Court that the Commission "essentially den{ied} the existence of contradictory evidence" has no merit. *See* Pl. Br. at 50-51. The Commission considered the evidence and concluded, "{b}ased on our review of the record," that Plaintiff had not "presented substantial evidence that purchasers have slowed qualification for U.S. producers"; to the contrary, the Commission found that qualification is a deliberative process that "involves rigorous validation to ensure safety, durability, and performance consistency" of the AAM product. Final Views at 50-51. Based on the substantial record evidence highlighted above, the

Commission reasonably concluded that "shortcutting" the qualification process was not possible. *Id.*

Just as importantly, Plaintiff's purported "evidence" pales in comparison to the itemized lists of technical meetings and reams of testing feedback on prospective domestic producers' samples that respondent purchasers provided to the Commission, as described above. For instance, the Commission specifically noted the extensive difficulties **[ ]** encountered in attempting to meet Tesla's qualification requirements and the considerable evidence **[ ]** those difficulties. *See* Final Views at 52, n.196. Among other things, Tesla provided "**[ ]**." *Id.* (citing Tesla's Prehearing Br. at App'x I-C at 6; App'x I-E-29 (**[ ]**), P.R. 175, C.R. 206/214). Tesla also provided copies of the **[ ]** in which it **[ ]**, *see id.* (citing Tesla's Prehearing Br. at App'x I-B at 6; App'x I-E-11, P.R. 175, C.R. 206/214), and the **[ ]** in which Tesla **[ ]**, *see id.* (citing Tesla's Prehearing Br. at App'x I-B at 6; App'x I-E-12, P.R. 175, C.R. 206/214). The Commission cited to similar documentation submitted by Panasonic regarding its "extensive technical support to Novonix's production team and Novonix's inability to become qualified by Panasonic due to Novonix's own difficulties in qualifying its AAM product that meets Panasonic's specifications." *Id.* at 52-53 (citing, *inter alia*, Panasonic's Prehearing Br. at

1-5 & 10-13 & Ex. 6, P.R. 173, C.R. 202/212; Panasonic's Posthearing Br. at 3-5 & Exs. 3-4, P.R. 200, C.R. 242/246).

In other words, Plaintiff's theory that subject import prices prevented domestic producers from qualifying their product is refuted by **[** **]** on the record, which revealed that domestic AAM had "**[** **]**" and failed to meet the required safety specifications for a product to be used in electric vehicles, energy storage systems, and other consumer, commercial, industrial, and military electronic products. *See id.* at 8 & n.196. It was well within the Commission's discretion, as the trier of fact, to weigh the evidence and find that U.S. purchasers' documentation of prospective domestic producers' repeated failures to produce AAM to scientific customer specifications held greater probative weight than Plaintiff's speculation that purchasers were purposely delaying qualification. *See, e.g.*, *Committee for Fair Coke Trade v. United States*, 28 C.I.T. 1140, 1161-62 (2004); *Usinor Sacilor v. United States*, 893 F. Supp. 1112, 1123 (Ct. Int'l Trade 1995) (the agency's "decision to place greater or less weight on the evidence presented to it is clearly within its discretion as the fact finder and does not undermine the reasonableness of its determination."). The overwhelming weight of the evidence demonstrates unequivocally that purchasers invested significant time and resources in their supplier qualification processes, but that prospective domestic producers still failed to produce qualified product. Given the evidence, it was entirely reasonable for the Commission to conclude that the "{Plaintiff's} case rests on theory rather than concrete evidence." Final Views at 59.

These facts render the Commission's Final Determination reasonable and based on substantial evidence, in accordance with the Commission's statutory obligation to consider conditions of competition. Defendant-Intervenors explain below in further detail that (1) the

record demonstrates that prospective domestic producers' inability to produce qualified product for sale was a more important purchasing factor than price; (2) the Commission properly considered, and reasonably found unpersuasive, Plaintiff's purported "evidence" of a causal relationship between subject imports and lack of an established domestic industry; and (3) the high volume of subject imports—*which is presumed in a material retardation case*—did not prevent market entrants from attracting investment, securing offtake agreements, or completing qualification.

## III. THE COMMISSION CORRECTLY FOUND THAT SUBJECT IMPORTS HAD NO MATERIAL ADVERSE PRICE EFFECTS

The Commission's Brief detailed how the Commission's finding that subject imports did not have significant price effects is supported by substantial evidence and in accordance with law. Def. Br. at 18-46. For the following complementary reasons, we agree that the Commission's analysis of price effects was legally sound, consistent with past practice, and supported by a wealth of substantial evidence in the record. First, the Commission reasonably determined that traditional price suppression analysis would have little probative value in a case in which a nascent domestic industry had yet to meet purchaser qualifications for AAM or make commercial sales that could compete with subject imports. Second, the Commission carefully reviewed all of the other information submitted by Plaintiff on the record, and its determination that the price of subject imports did not otherwise materially impede the establishment of a domestic industry is supported by substantial evidence.

### A. The Commission's Finding that Traditional Price Data Had Limited Probative Value Was Reasonable and Consistent with Prior Material Retardation Cases.

The Commission's price-effects analysis in a material retardation investigation differs in important respects from its analysis in a conventional material injury investigation. The statute instructs the Commission to consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
>
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

However, as explained above, the Commission has consistently observed in material retardation cases that "this evidence may warrant consideration in a different light than it would in a material injury case." Final Views at 32-33; *see also Laminated Woven Sacks from China*, Inv. Nos. 701-TA-450 and 731-TA-1122 (Preliminary), USITC Pub. 3942 (Aug. 2007) at 37-39 (noting that in examining the impact of subject imports, criteria are not viewed "in the same light" in a material retardation analysis). In particular, where an industry has not yet established itself and does not have a record of domestic commercial sales, "the analysis of the price effects of subject imports should differ from that in a material injury case by placing less emphasis on underselling and price trends and more emphasis on what the established price is, who sets that price, and the role that price plays in the domestic industry's efforts to establish itself." *Tungsten Shot from China*, Inv. Nos. 701-TA-732 and 731-TA-1701 (Final), USITC Pub. 5655 (Aug. 2025) at 32; *see also Refillable Stainless Steel Kegs from Mexico*, USITC Pub. 4976 at 27, 37-38 (recognizing that the statutory price impact criteria are not viewed in the same light in a material retardation case).

**NON-CONFIDENTIAL VERSION**

In this case, as described above, the Commission found a "low degree of substitutability between the domestic like product and subject imports," and that accordingly, "traditional underselling and price depression/suppression analyses . . . are of limited probative value" in this material retardation case. *See* Final Views at 35; Def. Br. at 19. As the Commission explains in its Brief, the Commission further determined that "the domestic industry is in a start-up phase and there were no commercial sales of the domestic like product during the POI," and that instead "{t}he domestic industry's U.S. shipments during the POI consisted almost entirely of trial/test shipments." Def. Br. at 20; *see also* Final Views at 36 (reviewing evidence from questionnaire responses from purchasers and domestic producers); *id.* at 34-35 & n.149 (acknowledging that all purchases of AAM from domestic producers during the POI "were for trial/test purposes" and not commercial purposes). Put another way, the domestic industry's products were not actually competing with subject imports.

These findings are supported by substantial evidence, including Plaintiff's own documents and sworn testimony. First, Petitioner agreed at the Commission's Hearing that prospective domestic producers "are a bunch of startups" that have yet to develop a product meeting baseline safety and performance qualifications for AAM, a process which, as the Commission described, "takes time."[3] *See* Final Views at 36 & n.156. This is consistent with prior cases in which the Commission acknowledged that start-up companies are "expected" to

---

[3] *See, e.g.*, Commission Hearing Transcript ("Tr.") at 157-158, P.R. 198, C.R. 245 (testimony of Dunn and O'Kronley); Pre-Hearing Staff Rep. at 2-18, P.R. 158, C.R. 199; Hearing Tr. at 60, P.R. 198, C.R. 245. The Final Staff Report underlines that the qualification and start-up commissioning process "takes multiple years." Final Staff Rep. at 1.15-1.16, P.R. 216, C.R. 253; *see also id.* at 2.12-2.13. Undisputed record evidence from Tesla, Panasonic, and LGES shows that the experience of the U.S. industry is consistent with other international producers, and not the product of delay from Chinese price competition. LGES' Final Comments at 2-3, P.R. 220, C.R. 263,; Panasonic's Post-Hearing Brief at 4, P.R. 200, C.R. 242/246; Tesla's Post-Hearing Brief at 12, P.R. 203, C.R. 241/249; *see also* Hearing Tr. at 187, P.R. 198, C.R. 245 (Byles); *id.* at 198 (O'Kronley) (explaining that Novonix's experience with qualification is "a normal part of the process"); *id.* at 158 (acknowledging that qualification "takes time"); *id.* at 237 (Zhang).

"incur upfront costs" and "suffer losses for a number of years" before breaking even and making a profit. *See, e.g.*, *Tungsten Shot from China*, USITC Pub. 5655. Accordingly, the Commission, relying on questionnaire data, explained that unqualified domestic product could not be considered in competition with subject imports that had met qualification requirements. Final Views at 25-26; Final Staff Rep. at 2.14, Table 2.14, P.R. 216, C.R. 253.

Second, the Commission reviewed evidence submitted by both domestic producers and purchasers showing that there were *de minimis* domestic commercial sales during the POI to compare to subject imports on the basis of price. *Cf.* Def. Br. at 21 (explaining that "underlying data did not meaningfully measure price competition between domestic and subject AAM for commercial sales to the same purchasers."). The Commission "examined several sources of information" in evaluating the probative value of price suppression analysis, including pricing data submitted by prospective domestic producers in response to questionnaires, which consisted almost entirely of "small quantities for sample orders" and test shipments. Final Views at 34 & n.147. The Commission reasonably concluded on these facts that a comparison of trends in the price of test/trial shipments to the price of subject commercial shipments would say nothing about price effects under the statute. *Id.* at 36. The Commission thus correctly observed in its Brief that "The Commission was not required to infer significant price depression from changes in domestic prices without a reliable basis for attributing those changes to competition from subject imports." Def. Br. at 22.

Plaintiff's assertion that the Commission overlooked evidence of price suppression from the small volume of trial samples does not withstand scrutiny. *See* Pl. Br. at 20-22. The Commission rooted its assessment of the probative value of traditional price suppression tools in rigorous economic analysis and expert testimony. Citing extensive economic analysis conducted

by experts at ION Economics LLC and the conclusions of its Staff Report based on the entire case record, the Commission explained:

> {B}ecause the domestic industry's U.S. shipments during the POI consisted almost entirely of trial/test shipments and the industry is in a start-up phase, such trends are not particularly probative. The COGS-to-net sales ratio of the domestic manufacturers is dramatically impacted by start-up costs and not reflective of commercial-scale production at this point. And without commercial sales beyond a very limited volume in 2022, any trends in domestic industry prices as reflected in the pricing data only show variations in trial/test shipments, further exacerbated by the significant variations in shipment volume.

Final Views at 37 & n.157. Plaintiff quibbles with the Commission's conclusion, arguing that its test/trial shipments could not even cover production costs given the low prices of subject imports. However, the Commission and Staff Report explained that the cost of producing sample batches of AAM is meaningless when compared to costs of production at scale. *See id.* at 40 & n.166. Based on this record, the Commission reasonably concluded that "traditional pricing and purchase cost data as well as the information regarding lost sales do not allow for meaningful comparisons and have little if any probative value for finding significant adverse price effects." *Id.* at 35 & n.150; *see generally* Def. Br. at 22-23 (describing the Commission's assessment of COGS-to-net-sales data).

Courts are especially deferential to the agency's conclusions on the probative value of economic evidence. *See U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) (affirming the ITC's broad discretion to evaluate the probative value and weight to assign to economic indicators of injury, and that courts should not second-guess how the agency weighs economic evidence); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358-59 (Fed. Cir. 2006) ("When the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder—here the majority of the

Presidentially-appointed, Senate-confirmed Commissioners—to decide which side's evidence to believe"). Indeed, this court regularly sustains the Commission's findings on substitutability and the probative value of pricing data on the specific facts of a case. In *ALTX, Inc. v. United States*, the Commission found that competition between subject imports and domestic like product was "attenuated" based on similar factual findings as the Commission made here, including the inability of domestic producers to satisfy certain purchaser requirements and the range of subject imports that had no commercially available domestic like product. Case No. 09-cv-00477, Slip Op. 01-116 (Ct. Int'l Trade Sep. 19, 2001). The court upheld the Commission's finding of attenuated competition, while remanding on unrelated grounds. *Id.* at 14. And in *Coalition for Fair Trade of Hardwood Plywood*, the court upheld a negative injury determination based on the Commission's finding of limited substitutability between the domestic like product and subject imports. The court specifically found that, as here, the Commission properly relied upon responses to its questionnaires in differentiating the product mix of subject imports versus domestic plywood. *Coalition for Fair Trade of Hardwood Plywood v. United States*, Case No. 16-57, Slip. Op. 14-13, at 16 (Ct Int'l Trade June 8, 2016).

Plaintiff suggests that the volume of media reports and similar exhibits they produced allegedly pointing to price suppression should have overcome the evidence reviewed by the Commission, including from the Commission's own questionnaires. Pl. Br. at 37-43. But this amounts at most to a complaint with the *weight* the Commission assigned different pieces of evidence in the record. The Commission considered the voluminous public reporting Plaintiff placed on the record concerning issues such as Chinese excess capacity and pricing practices, but reasonably found that this evidence did not establish significant adverse price effects. The agency's "decision to place greater or less weight on the evidence presented to it is clearly within

its discretion as the fact finder and does not undermine the reasonableness of its determination." *Committee for Fair Coke Trade*, 28 C.I.T. at 1161-62; *see also Usinor Sacilor*, 893 F. Supp. at 1123 ("This Court lacks authority to interfere with {the agency's} discretion as trier of fact to interpret reasonably evidence collected in {an} investigation.") (citations omitted).

Moreover, the Commission's reliance on responses and data that it collected via questionnaires is fully consistent with its general practice and recognized by courts as an appropriate basis for substantial evidence. *AWP Indus. v. United States*, 783 F. Supp. 2d 1266 (CIT 2011) (holding that it is reasonable for an agency to rely on importers' questionnaire responses when the agency requires responding importers to swear to their accuracy). Thus, the Commission's decision to place less weight on traditional price analysis based upon its review of the entire record was reasonable. *See* Def. Br. at 20-21, 64-65.

### B. The Commission's Determination that Subject Imports Did Not Have Material Adverse Price Effects on the Establishment of the Domestic Industry Is Supported by Substantial Evidence

Consistent with its practice in material retardation cases, given the limited probative value of traditional underselling and price suppression analysis, the Commission analyzed "other information in the record that addresses the extent to which the price of subject imports has materially retarded the domestic industry{}." Final Views at 35; *see Tungsten Shot*, USITC Pub. 5655 at 32 (recognizing that the "analysis of the price effects of subject imports should differ from that in a material injury case by placing less emphasis on underselling and price trends and more emphasis on what the established price is, who sets that price, and the role that price plays in the domestic industry's efforts to establish itself."). The Commission specifically focused on Plaintiff's contention that "subject import pricing is deterring investment in U.S. graphite production," including that domestic purchasers "used low-priced subject imports to leverage

**NON-CONFIDENTIAL VERSION**

down domestic prices during offtake agreement negotiations with the domestic industry." Final Views at 36-37.

The Commission squarely addressed, and rejected, Plaintiff's argument based on an examination of "the facts of these investigations." The Commission's rejection of Plaintiff's theory was both comprehensive and reasonable. *See* Def. Br. at 23. The Commission anchored its conclusion in at least two related findings:

- "First, AAM purchasers … have entered into offtake agreements committing to buy significant portions of the domestic industry's output at prices higher than those of imports." Final Views at 39.

- "Second, as Respondents have shown with substantial evidence, U.S. AAM purchasers including Tesla, LG, and Panasonic use a "cost plus" methodology in negotiating offtake agreements with domestic producers." *Id.*

Below we specifically address record evidence (cited and discussed in the Final Views) that supports the Commission's findings and why Plaintiff's purported conflicting evidence does not undermine the Commission's well-considered conclusion.

Plaintiff does not credibly dispute that AAM purchasers entered into offtake agreements committing them to purchase domestically produced AAM at prices higher than Chinese imports, nor could they. *See* Pl. Br. at 25-29. The Commission expressly cited the pre-hearing and post-hearing briefs and the exhibits collected therein, including the **[**

**]**. As the Commission recited in extensive detail:

**[**

]

Final Views at 40, n.165. In other words, the price floors set in agreements between AAM domestic producers and purchasers were indisputably higher than the corresponding price of subject imports and were not tied to the price of subject imports at all.[4] As detailed by the Commission in its Brief, the Commission's reliance on "cost plus" agreements was extensively supported in the record. *See generally* Def. Br. 27-34.

This irrefutable fact supports the Commission's price effects analysis, and its conclusion that prices of subject imports did not ultimately affect the market price domestic producers could obtain, regardless of what transpired in interim commercial negotiations. However, as examined below, the Commission also carefully reviewed the evidence identified by Plaintiff in the Final Views, further reinforcing the Commission's finding that "the offtake agreements are not based on or tied to Chinese pricing." Final Views at 45.

In an attempt to undermine the weight the Commission gave to the price terms in the offtake agreements, Plaintiff points to documents that, on their view, show that Chinese prices dictated the prospective U.S. sale prices set in those agreements, thus undercutting the domestic

---

[4] Plaintiff contends that the Commission should have assigned less weight to the offtake agreements entered into among **[ ]** and prospective domestic producers because they "have been either **[ ]**." Pl. Br. at 31-32. This claim ignores the very nature of an offtake agreement or similar structure. Under a traditional offtake agreement, a buyer (the "off-taker") agrees to buy all or a substantial portion of a resource producer's *future output* (for example, graphite) from the seller's project. Offtake arrangements are often entered into before project construction in order to secure a revenue stream to support the seller's project financing and reduce the seller's risk of being unable to secure a market for the future output, and are conditioned on the seller being able to produce a viable product. *See, e.g.*, *American Greenfuels Rockwood (Tennessee), LLC v. Aik Chuan Construction Pte. Ltd.*, 702 F. Supp. 3d 217, 225 (S.D.N.Y. 2023) ("As part of its traditional business activities, Kolmar had entered into a contract with Global Energy to buy all of Global Energy's production of renewable diesel at the Rockwood Plant in the event that the site became commercially operational. This is referred to as an offtake agreement."). The fact that offtake agreements entered into several years ago are not yet **[ ]** is entirely expected for a nascent industry that has yet to establish commercial production. Nor is it surprising that the agreements would contain conditions surrounding qualification. Plaintiff's attempt to argue that an inability to meet qualification is the product of subject import pricing lacks any evidentiary support in the record and has been conclusively addressed and rebutted by the Commission. *See* **Part V**.

industry. Pl. Br. at 28-31. Specifically, Plaintiff argues that the Commission ignored or misinterpreted certain email correspondence of negotiations between purchasers and domestic producers where "U.S. purchasers used comparisons to Chinese prices to lower U.S. producers' prices." Pl. Br. at 25-26. These arguments are both legally and factually meritless, and the Commission addressed every single piece of evidence raised by Plaintiff at pages 28-30 of the Final Views.

The Commission properly found that AAM purchasers entered into agreements "tied to the domestic producers' cost structure" that allow domestic producers "to recover their production costs plus a reasonable profit" based on substantial evidence. Final Views at 42; *see also id.* at 43-44 ("{W}e find persuasive the evidence submitted by respondents indicating that Tesla, LG, and Panasonic pursued offtake agreements with domestic producers that ensured pricing was based on producers' estimated costs plus a profit to enable domestic producers to establish sustainable production of AMM into the future, once domestic producers were qualified."); *id.* at 45 ("**[** **]** are based on the domestic producers' cost structure plus profit."). This record evidence includes (1) the extensive hearing testimony cited by the Commission (*e.g.*, *id.* at 42 n.170) explaining how and why purchasers entered into "cost plus" offtake agreements with domestic producers; (2) the **[** **]** themselves, which clearly articulate a "cost-plus methodology" (*e.g.*, *id.* at 42 n.171); and (3) contemporaneous business documentation demonstrating that the parties "negotiated prices in offtake agreements . . . by evaluating suppliers' costs to determine a reasonable profit," *see id.* at 42 & nn.172-73.

The Commission is entitled to rely on hearing testimony and contemporaneous business documents in drawing inferences concerning price effects of subject imports— even when

conflicting evidence exists on the record. *See DAK Americas LLC v. United States,* 517 F. Supp. 3d 1349, 1369 (Ct. Int'l Trade 2021) (affirming negative injury determination with Commission reliance on hearing testimony and purchaser questionnaire responses and narratives, noting that "the Commission's reliance on hearing testimony that may have been contradicted elsewhere in the record was also explained and based on substantial evidence"); *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315, 1337 (Ct. Int'l Trade 2014) (affirming that Commission's determination of price effects based upon hearing testimony of two industry witnesses and Staff Report).

Plaintiff argues that the Commission "essentially turned a blind eye" to evidence that prices of subject imports impeded negotiations of fair offtake agreements, Pl. Br. at 26, but this is belied by the Commission's careful evaluation of Plaintiff's documentation. *See* Final Views at 28-30. In the Final Views, the Commission collected and discussed at length documentary evidence and witness testimony from Petitioner, Tesla, Panasonic, LGES, and others establishing that AAM purchasers did in fact enter into agreements with domestic producers based on an "costs plus profit margin" pricing methodology. Final Views at 41-44; *see also* Def. Br. at 35-40. The Commission's conclusion that the parties entered into arms-length agreements to match the prospective domestic producers' costs plus a reasonable profit is thus supported by substantial evidence on the record, and this Court should not disturb the agency's careful weighing of the evidence.

Plaintiff's argument that the Commission "disregard{ed}" evidence relating to negotiations between purchasers and the domestic producers also fails. Pl. Br. at 8-9, 25-26. The Commission *did* expressly consider Petitioner's testimony and documents, but "d{id} not find Petitioner's allegations to be credible based upon the totality of the evidence in the record."

Final Views at 43 n.176. Plaintiff grasps at a handful of email exchanges—most of which were introduced only in Petitioner's post-hearing brief—during commercial discussions that they claim the Commission either failed to review or misunderstood. However, a careful review of these exhibits and Plaintiff's claims against the Final Views illustrates that the Commission specifically addresses these documents, and this Court should not second-guess the weight or significance the Commission assigned to each of them.

For example, Plaintiff repeatedly cites an **[** **]**. *See* Pl. Br. at 8-9, 29-30, 34-35. In **[** **]** Plaintiff submits that the chart itself is "confusing" and susceptible to multiple interpretations. Pl. Br. at 30; *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent {the Commission's} determination from being supported by substantial evidence.").

As the Commission explained in its Brief, in its Final Views, the Commission correctly observed that Petitioner had misrepresented the document in its post-hearing brief as a comparison between Syrah's actual U.S. cost structure and price and Chinese prices. *See* Def. Br. at 42-43; Final Views at 44 n.177. As LGES explained in its Final Comments, which were cited in the Final Views: "In **[** **]** case, Petitioners' counsel appears to misread the document they cite. **[** **]**" *See id.* **[**

]

Plaintiff also claims that the Commission disregarded documents showing [ ] used Chinese import prices to drive down the price of [ ] and [ ] offtake agreements. Pl. Br. at 27-28. The Commission addressed this claim and these documents directly in the Final Views, concluding that Petitioner's "allegations" were not "credible based upon the totality of the evidence in the record."[5] Final Views at 43. Ultimately, reviewing affidavits submitted by [ ], [ ], and [ ], the Commission reasonably concluded that Petitioner had failed to make its case: the evidence reflected that the domestic producer not only received an offtake agreement "with a fixed price" capable of covering the producers' costs plus a profit margin, but that the producer also [ ] off the back of that agreement. *Id.* at n.176.

In another example, Plaintiff challenges the weight given in the Final Views to a [ ] document with a side-by-side comparison of [ ] cost structures, asserting that this document proved purchasers "[ ]." Pl. Br. at 28-29.[6] For one,

---

[5] Final Views at 43 & n.176.

[6] Plaintiff also wrongly claims that the existence of this document somehow "impeaches" the sworn testimony of the Intervenors' witnesses. LGES already rebutted this contention in its Final Comments, which were cited in the Commission's Views: Counsel for LGES and Mr. Sears explained clearly that market prices did arise in commercial negotiations—they just never played any role in the qualification process and did not dictate the terms of any offtake or collaboration agreements. Moreover, the Commission expressly acknowledged that Chinese prices featured in negotiations. Final Views at 43 (finding that evidence cited by Plaintiff does not establish "that purchasers have used subject import prices to deprive U.S. producers from recouping production costs plus an

there was no error in the Commission’s analysis: it accurately described the document as “depict{ing} a **[ ]**.” *Id.* at 30. Secondly, Plaintiff is conflating Chinese AAM *prices* with the cost of *producing* AAM. Conversely, the Commission reasonably understood the email exchange as part of how purchasers like **[ ]** explored a domestic producer’s cost structure to build a “cost plus” agreement, and not as a comparison of Chinese AAM prices and domestic prices. The Commission heard sworn testimony from multiple witnesses explaining how AAM purchasers requested information on prospective domestic producers’ cost structures, not to dictate prices for AAM, but to understand their manufacturing process, how they budget for different costs in AAM production, and their plans to reach profitability.[7]

Based on substantial evidence supporting this reasoning, including the exchanges between **[ ]** regarding cost structure, the Commission reasonably concluded that “the communications do not indicate that **[ ]** to lower its prices because of the comparison.” Final Views at 44, n.177. Plaintiff may wish that the Commission had weighed the evidence differently or drawn a different inference, but that wish does not translate into a lack of substantial evidence on this Court’s review. *See Nippon Steel*, 458 F.3d at 1356-59 (“The false premise of the plaintiffs’ argument is that the CIT may substitute its judgment for that of the Commission on the question of the weight to be assigned a

---

adequate profit margin.”). It just didn’t draw the exact inference Plaintiff wishes it had from that evidence, against the weight of other evidence in the record.

[7] *See* Hearing Tr. at 211, P.R. 198, C.R. 245 (purchasers “ask for cost breakdown {because} we especially look for the supplier actually, to understand what it takes to manufacture this part, and have they budgeted all these different costs correctly, and make sure based on those costs they can actually make a profit on top based on the price that they want to sell us.”); *id.* at 212 (“{T}he reason we ask for that information is because we want to know about the sustainability, and the potential long-term health of these companies. We want them to be around, and if we’re going to get into business, we want them to last. And so, {the comparison cost breakdown} gives a very strong indication of that.”).

particular piece of evidence.”). The Commission thus reasonably concluded that “the isolated references to a Chinese AAM cost or price in the documents submitted by Petitioner do not counterbalance the substantial evidence on the record which establishes the fact that offtake agreements are based on a “cost plus” methodology designed to ensure an adequate profit margin for the AAM supplier.” Final Views at n.177.

## IV. THE COMMISSION’S DETERMINATION THAT THERE IS NO CAUSAL RELATIONSHIP BETWEEN SUBJECT IMPORTS AND LACK OF AN ESTABLISHED DOMESTIC INDUSTRY IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff begins the causation section of its Brief by stating that “{t}he Commission may be the only agency in the United States Government to find that Chinese critical mineral imports are having no negative effects in America.” Pl. Br. at 37. This statement, of course, mischaracterizes and oversimplifies the Commission’s findings, a flaw that threads through the entirety of its causation argument. The Commission was not tasked with assessing the impact of Chinese critical mineral imports in America. Instead, the Commission was tasked with examining whether subject imports of AAM prevented the establishment of the domestic AAM industry in the United States or whether other factors explained the domestic industry’s performance. The Commission clearly did so in this case, relying on substantial evidence to conclude that, although the domestic AAM industry remained in a start-up phase during the period of investigation, the record did not demonstrate that subject imports prevented the establishment of the domestic industry.

Plaintiff has not demonstrated that the Commission ignored relevant evidence or failed to explain its reasoning. Instead, the Commission’s Final Views demonstrate that it thoroughly examined Petitioner’s proffered evidence and theories of causation and reasonably determined that they did not show that subject imports materially retarded the establishment of a domestic

AAM industry. In particular, the Commission considered the third-party reports and analyses submitted by Petitioner but found they did not outweigh other record evidence, reasonably concluded that qualification was not tied to subject import pricing, and conducted a full impact analysis to conclude that the domestic industry's condition reflected normal startup challenges.

### A. The Commission Properly Considered Third-Party News and Analytical Reports Submitted by Petitioner Purporting to Show Causal Relationship Between Subject Imports and Material Retardation, but Found Them Unpersuasive

Plaintiff's primary allegation of error with respect to causation is that the Commission failed "to consider Plaintiff's material evidence and argument regarding the conditions of competition specific to the U.S. AAM market created by the domination of Chinese imports." *Id.* at 38. Plaintiff states that the Commission "fail{ed} to engage" with "over one thousand pages of objective evidence demonstrating China's dominance over the U.S. AAM market and resulting impacts." *Id.* However, the Commission's Final Views disprove Plaintiff's claim that the Commission "failed to provide a reasoned analysis" of, "disingenuously diminish{ed}," or "waive{d} {sic} their hand at" this evidence. *See id.* at 40-42. Instead, the Commission considered the third-party news and analytical reports placed on the record by Petitioner and concluded that this evidence did not outweigh other substantial record evidence gathered from purchasers that subject imports did not cause the condition of the domestic industry.

At bottom, Plaintiff's argument boils down to a disagreement with *how* the Commission considered its third-party news and analytical reports, not *whether* the Commission considered this evidence. As explained below, the Commission did not dismiss these third-party reports but instead explained why it afforded them less weight than other record evidence, particularly because they largely supported the uncontroverted fact that the AAM market consisted primarily

of subject imports and included nonjusticiable claims of Chinese government geopolitical strategy.

#### 1. The Commission Did Not Dismiss Third-Party Reports Submitted by Petitioner

As the Federal Circuit has explained, "{u}nder the substantial evidence standard, when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission." *NSK Corp. v. U.S. Int'l Trade Comm'n*, 716 F.3d 1352, 1366 (Fed. Cir. 2013) (quoting *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006)). For example, in *NSK*, the Federal Circuit found that the Commission's findings were supported by substantial evidence despite a record with facts detracting from the Commission's conclusions. The Federal Circuit found that "{t}hese facts . . . {did} not detract from the Commission's findings to such an extent that we can say the Commission's determinations were not supported by substantial evidence," because "the Commission set out a sound factual basis for its conclusion." *Id.* at 1368. The Federal Circuit further observed that the Commission had "specifically addressed and rejected Appellees' theories regarding the impact of non-subject imports, noting that significant portions of the record cast doubt on the interpretation of the facts that Appellees espouse." *Id.* at 1369. Additionally, the Federal Circuit emphasized that "it is the role of the expert factfinder—here the majority of the Presidentially-appointed, Senate-approved Commissioners—to decide which side's evidence to believe." *Id.* at 1368-69 (*quoting Nippon Steel*, 458 F.3d at 1359).

In *U.S. Aluminum Extruders Coalition v. United States*, the CIT rejected claims that the Commission had "ignored" contradictory evidence on the record when the Commission had clearly considered the evidence but found it insufficient to change its conclusion. *See U.S. Aluminum Extruders Coal. v. United States*, Consol. Court No. 24-00209, Slip Op. 26-101, 2026

Ct. Intl. Trade LEXIS 140, at *21 (Sept. 2, 2026). The CIT found that "the Commission did not reject the producers' reports out of hand; rather it evaluated those reports against purchaser-specific evidence and other data collected during the investigations to reach its conclusions." *Id.* at *20. The CIT concluded that the Commission "reasonably decided to assign greater weight" to "more particularized responses" from purchasers "regarding purchase decisions and pricing" and stated that it would not "reweigh this evidence merely because plaintiffs would draw a different conclusion." *Id.* at *20-21.

Here, the Commission considered the extensive third-party information placed on the record by Petitioner but ultimately concluded that "Petitioner's theory and those of the news and analyst reports are not borne out by the facts on the record of these investigations." Final Views at 37-38. The Commission acknowledged "the sheer volume of news and analyst reports" submitted by Petitioner but concluded that the "news and analyst reports" do not outweigh actual evidence on the record of how contracts and price are negotiated in the U.S. AAM industry, explaining that "{t}he Commission's determinations . . . are fact-based inquiries supported by the collection of detailed industry and market data submitted by market participants typically through lengthy questionnaire responses." *Id.* at 38, n.159. The Commission further explained that it had "considered news and analyst reports cited by Petitioner" but "{did} not find they outweigh{ed} substantial record evidence supporting the Commission's finding that subject imports have not materially retarded the establishment of a domestic industry." *Id.* Specifically, contrary to the news and analytical reports placed on the record by Petitioner, the Commission concluded that:

> U.S. producers {had} indeed secured considerable financing toward the establishment of a domestic {AAM} industry including through significant support by {AAM} purchasers and that pricing for U.S. produced graphite is not set based on subject import prices but instead is set based on producer's estimated costs at

> scale plus a determined profit margin so as to enable the long term viability of a domestic graphite industry. *Id.* at 38.

Plaintiff objects to the Commission's statement that "Petitioner's theory of the case would have the Commission use such reporting to supplant information provided by market participants on actual price negotiations between domestic producers and purchasers," *Id.* at 38 n.159, claiming that this statement was "objectively a clear mischaracterization of Plaintiff's evidence." Pl. Br. at 40. However, this was not a "characterization" of Petitioner's evidence but rather an explanation that the Commission found this evidence was outweighed by other evidence on the record.

Plaintiff seemingly faults the Commission for not including citations to each and every one of the news and analytical reports (totaling over one thousand pages) in its Final Views. However, the Commission need not address every piece of evidence or adopt a party's preferred view of the record but instead must provide an explanation sufficient to permit judicial review. *See, e.g.*, *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005). As the CIT has found, under the substantial evidence standard, "the Commission is presumed to have considered all record evidence, and the absence of a document-by-document analysis does not suggest that the Commission failed to consider material evidence." *U.S. Glass Producers Coal. v. United States*, Court No. 24-00199, Slip Op. 26-78, 2026 Ct. Intl. Trade LEXIS 110, at *21 (July 22, 2026). Instead, the central question is whether "{t}he Commission's discussion reflects that it thoroughly understood the {petitioner's} theory and weighted that theory against contrary evidence in the record." *Id.* at *21-22. Here, the Commission clearly did so, explaining that Petitioner submitted the news and analyst reports to advance the theory "that subject import pricing is deterring investment in U.S. graphite production and preventing U.S. producers from obtaining pricing that would enable them to cover their costs and turn a profit," but it ultimately

concluded that this "theory and those of the news and analyst reports are not borne out by the facts on the record of these investigations." Final Views at 37-38.

Plaintiff also states that the Commission "attempt{ed} to disingenuously diminish the evidence provided by Petitioner to 'news and reports.'" Pl. Br. at 41. Plaintiff later incorrectly claims that the Commission made an "objectively false characterization of Plaintiff's evidence" as "news reports." *Id.* at 42. However, the Commission never characterized this evidence as "news reports." Instead, it stated that Petitioner had submitted "news and analyst reports about graphite production and pricing and its role as a dominant supplier of graphite in the U.S. market." Final Views at 37 (emphasis added). The Commission explained that Petitioner had submitted these "news and analyst reports" to support its theory "that subject import pricing is deterring investment in U.S. graphite production and preventing U.S. producers from obtaining pricing that would enable them to cover their costs and turn a profit." *Id.* These statements are consistent with Plaintiff's own description of the reports and publications that it submitted. *See* Pl. Br. at 41-43. In other words, despite its claims that the Commission somehow mischaracterized the record, it is Plaintiff who has blatantly mischaracterized the Commission's own findings by falsely claiming that the Commission dismissed the evidence as "news reports." *See id.* at 42. In any event, what matters is the Commission's consideration of that evidence along with other evidence that legitimately led to a different conclusion from what Plaintiff prefers.

**2. Market Domination Is Assumed in Material Retardation Cases**

Throughout its arguments regarding the Commission's causation analysis, Plaintiff repeats the refrain that Chinese imports "dominated" the U.S. AAM market during the period of investigation and points to its third-party news and analyst reports discussing this dominance.

Plaintiff essentially argues that this alleged "domination" is *prima facie* evidence that subject imports prevented the establishment of a domestic industry, stating that "{t}he Commission failed to meaningfully grapple with the role of Chinese domination in the market, specifically the evidence that massive volumes of low-priced imports were used to deter new market entrants." Pl. Br. at 45-46. However, as the Commission recognized in its Final Views, import dominance is already assumed in material retardation cases. *See* Final Views at 32 ("{I}n a material retardation case, an industry is attempting to establish itself in the face of a market that is often already dominated by other market participants.").

Plaintiff's arguments improperly conflate market presence with causation. If the mere fact that imports supplied most of the market were sufficient to establish material retardation, the causation inquiry would become irrelevant, as any market without an established domestic industry would necessarily be supplied almost exclusively by imports. Accordingly, having already recognized that Chinese AAM imports occupied most of the market, the Commission reasonably assigned limited weight to evidence that merely reiterated that undisputed fact.

Instead, the Commission focused on whether the record demonstrated a causal link between admittedly dominant subject imports and the industry's failure to establish itself. To make this assessment, the Commission reasonably focused on the particular evidence collected from purchasers actively participating in the market rather than outside articles that did not address the question at the core of its analysis. *See id.* at 38, n.159. Plaintiff's repeated references to Chinese AAM "domination" and the articles and reports explaining this "domination" therefore largely amount to a restatement of a background condition inherent in material retardation investigations rather than evidence compelling a different causation determination.

Indeed, the Commission pointed to extensive record evidence demonstrating that despite this "dominance," U.S. producers had secured "considerable financing," including through the support of purchasers like LGES, Panasonic, and Tesla, and that this financing was designed to "enable the long term viability of a domestic graphite industry." *Id.* at 38. The Commission also pointed to evidence placed on the record by purchasers (and discussed in detail in **Part III.B**) that Chinese AAM did not dictate pricing for U.S. producers but that purchasers uniformly set prices based on a U.S. producer's estimated costs at scale plus a pre-determined profit margin. *Id.* The Commission also cited record evidence showing that Chinese dominance in the AAM industry in fact *contributed* to purchasers' desire to establish a strong U.S. supply chain, observing that "respondents also have demonstrated{} it is in their respective interests to source AAM domestically in order to mitigate supply chain risk and because of U.S. government incentives." *Id.* at 51. In making this conclusion, the Commission cited specific record evidence submitted by Tesla, Panasonic, and LGES about the efforts that purchasers have undertaken to develop this supply chain. *Id.* at 51-52.

### 3. Through Its Reference to Third-Party News and Analyst Reports, Plaintiff Raises Nonjusticiable Claims of Chinese Geopolitical Strategy

Faced with the Commission's well-supported finding that Chinese dominance in the U.S. AAM industry did not prevent the establishment of the U.S. AAM industry, Plaintiff resorts to nonjusticiable claims of the Chinese government's geopolitical strategy. Specifically, Plaintiff alleges "massive subsidization, oversupply, and a Chinese government policy of eliminating competition." Pl. Br. at 45. However, Plaintiff's reliance on overly broad claims of a Chinese government conspiracy are far beyond the bounds of a material retardation case before the Commission and properly belong in a different forum. *See Almond Bros. Lumber Co. v. United*

*States*, 36 C.I.T. 558, 564-71 (2012) (finding that plaintiff's claim presented a nonjusticiable political question that raised foreign policy considerations committed to the Executive Branch, failed to identify statutory provisions under which the claim could be properly considered by a court, and did not allow for judicially manageable standards to resolve the claim), *aff'd*, 721 F.3d 1320 (Fed. Cir. 2013).

Plaintiff does not cite any statutory provisions that would allow the Commission to consider "a Chinese government policy of eliminating competition," Pl. Br. at 45, whether a market is "under monopolistic {} control by a communist government," *id.* at 52, or whether a foreign industry "is not profit-oriented but instead is driven by geopolitical objectives," *id.* at 53. The Commission's task was to determine whether subject imports materially retarded the establishment of a domestic industry within the meaning of the statute, based on the record evidence and the statutory factors prescribed by Congress. It was not required to adjudicate whether the "communist" Chinese government has a policy, based on "geopolitical objectives," to "eliminat{e} competition" through "monopolistic {} control" of a market. Those allegations present precisely the type of broad policy and foreign-relations questions that lack judicially manageable standards and fall outside the Commission's statutory mandate. *See Almond Bros.*, 36 C.I.T. at 568-71.

Plaintiff places significant weight on its third-party news and analyst reports because it claims that these reports demonstrate that "China's artificially low pricing of AAM directly correlated to delays in the U.S. industry's qualification." Pl. Br. at 44. However, contrary to Plaintiff's assertions, the Commission found that extensive record evidence supported a conclusion that the qualification process was unrelated to Chinese AAM prices, as explained in detail above. Moreover, in its Final Views, the Commission observed that record evidence

indicated that "supplier qualification by technical experts is conducted separately from commercial negotiations over pricing in offtake agreements." Final Views at 51, n.192 (citing LGES' Posthearing Br. at 3-6, P.R. 201, C.R. 244/247; Tesla's Posthearing Br., Answers to Commissioners' Questions at 63, P.R. 203, C.R. 241; Hearing Tr. at 177-78, 194, P.R. 198, C.R. 245). In short, the extensive evidence in support of the Commission's conclusion about the lack of causal nexus between the industry's retarded establishment and subject imports confirms that the Commission's Final Determination was supported by substantial evidence and in accordance with law.

**B. The Commission Conducted a Full Impact Analysis**

Plaintiff also accuses the Commission of failing to conduct a full impact analysis, claiming that the Commission "{m}erely stat{ed} that the 'domestic AAM producers are startups, and their financial condition is no worse than expected given their phase of development.'" Pl. Br. at 46. Moreover, Plaintiff states that "{u}nlike what one would expect from a startup, the domestic industry's performance worsened as Chinese entities kept lowering prices during a period of increasing demand, and the Commission viewed this as just a normal startup environment," stating that this indicated a "lack of meaningful analysis." *Id.* Once again, Plaintiff has fundamentally mischaracterized the Commission's Final Views.

The Commission did not "{m}erely stat{e}" that domestic AAM producers were in a normal startup condition. Instead, across 15 pages in its Final Views, the Commission embarked on a fulsome analysis of the record evidence to evaluate whether the domestic industry's performance reflected "normal start-up conditions" or instead demonstrated material retardation attributable to subject imports. *See* Final Views at 46-60. The Commission's analysis was neither cursory nor speculative. The Commission explained why poor performance indicia were "not unexpected given that the domestic industry remains in a startup phase and has largely

achieved only test production (as opposed to commercial-scale production), inflating the domestic industry's costs because of extremely low production volumes." *Id.* at 49.

Despite Plaintiff's unsupported claims that one would not expect a startup domestic industry's performance to decline, Pl. Br. at 46, the Commission recognized that start-up industries are expected to incur losses while developing production capability, increasing output, and achieving economies of scale, *see* Final Views at 58-60. The Commission also pointed to the undisputed fact that "no domestic producer is yet qualified with any purchasers and as a result no domestic producer is in a position to make any commercial sale of AAM." *Id.* at 59. Accordingly, in the absence of any commercial sales, it is reasonable that an industry in a startup stage "would not be performing better than it is." *Id.*

The Commission further cited an "extensive analysis from an economic consulting firm" submitted by Tesla that the Commission found "to be persuasive," which "demonstrat{ed} that U.S. AAM producers are expected to incur start-up costs particularly given the capital intensive nature of the industry as they gain technical expertise to supply AAM at scale." *Id.* at 58 (citing Tesla's Prehearing Br. at App'x II, P.R. 175, C.R. 206/214). Specifically, the Commission relied on an economic analysis conducted by ION Economics, which was a 344-page report applying findings on the generally expected condition of start-ups in related industries to the condition of prospective domestic producers, including a review of academic literature discussing industries directly related to AAM, an analysis of prospective domestic producers' economic conditions based on their own questionnaire response data, and a comparison of the experience of the AAM-related start-ups with the experience of prospective domestic producers. *See* Tesla's Prehearing Br. at App'x II, P.R. 175, C.R. 206/214. As that economic analysis found, prospective domestic producers were expected to incur start-up costs as they gained technical expertise to

supply AAM at scale that are subject to strict specifications, as is typical in battery-related industries. *See* Final Views at 58.

Given the anticipated length and technical requirements of the ramp-up to full commercial production, there was no reasonable expectation that prospective domestic producers could be profitable without fully qualifying their material and without commercial-scale production. *See id.* at 58-59 (citing generally Tesla's Prehearing Br. at App'x II, P.R. 175, C.R. 206/214). Based on empirical evidence and questionnaire data, ION Economics demonstrated that prospective domestic producers were, in fact, in a normal start-up phase, particularly for an industry with the rigorous qualification processes, strict specification requirements, and significant technological expertise that AAM production requires. Thus, this analysis demonstrated that there was "no indication that the domestic industry's performance is worse than what could reasonably be expected since reaching break-even can take years for start-up companies in this particular industry." *See id*.

Moreover, contrary to Plaintiff's arguments, the Commission did not simply treat the domestic industry's startup status as dispositive but rather examined Petitioner's specific theories that subject imports materially retarded the industry by (1) suppressing prices, (2) delaying qualification of domestic suppliers, and (3) discouraging financing and investment. *See id.* at 50-58. The Commission rejected each theory based on substantial record evidence, as explained in detail in **Parts II, III.B,** and **V.C**.

The Commission's causation and impact determination thus did not reflect "a lack of meaningful analysis," as claimed by Plaintiff. Pl. Br. at 46. Instead, the Commission identified the governing standard, examined the relevant performance indicia, addressed contrary evidence, evaluated Petitioner's specific allegations, and explained in detail why the industry's condition

was consistent with an emerging industry that remained in the qualification and test-production stages. Plaintiff has not reasonably shown that the Commission provided "a conclusion without analysis" when it found that the domestic industry was operating in a normal startup condition and cannot plausibly contend that the Commission failed to explain its reasoning. *See id.* at 45.

Again, Plaintiff has conflated its disagreement with the Commission's evaluation of the evidence with a failure of reasoned decision making. However, the Court's role is not to reweigh the evidence or substitute its own interpretation of the record. Where, as here, the Commission carefully evaluated the relevant indicia, addressed Petitioner's causation theories, and explained in detail why the industry's performance was consistent with normal startup conditions, the Court must sustain the agency's determination even if Plaintiff can identify evidence that might support a different conclusion. *See Nucor*, 414 F.3d at 1339 ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

## V. THE VOLUME OF SUBJECT IMPORTS DID NOT PREVENT MARKET ENTRANTS FROM ATTRACTING INVESTMENT, SECURING OFFTAKE AGREEMENTS, OR COMPLETING QUALIFICATION

Contrary to Plaintiff's arguments, the Commission meaningfully addressed Plaintiff's purported "evidence," considered it against the weight of the substantial evidence on the record, and reasonably concluded that the domestic industry's inability to qualify its product was wholly unrelated to the volume of subject imports in the market. It is well within the Commission's discretion, as the trier of fact, to weigh and determine which evidence is more persuasive or has more probative value for resolving the issues the agency is statutorily obligated to address. *See, e.g.*, *Committee for Fair Coke Trade v. United States*, 28 C.I.T. 1140, 1161-62 (2004); *Usinor Sacilor v. United States*, 893 F. Supp. 1112, 1123 (Ct. Int'l Trade 1995). The overwhelming weight of the evidence unequivocally demonstrates that prospective domestic producers'

inability to qualify their product, not subject imports, is hindering their ability to compete in the market.

### A. The Commission's Final Determination Accounted for Market Conditions and Reasonably Concluded that Qualification Is Progressing at the Normal Industry Pace

Plaintiff begins its discussion of the Commission's volume analysis with two unsupported claims. First, Plaintiff claims that the Commission failed to "consider the size of the domestic industry and the market in which it is competing." Pl. Br. at 48 (citing Final Views at 47). However, as explained in **Part IV.A.2** above, foreign dominance of the market is already *presumed* in a material retardation case. *See* Final Views at 32 ("in a material retardation case, an industry is attempting to establish itself in the face of a market that is often already dominated by other market participants"). The Commission already concluded that "subject imports were the dominant source of AAM in the U.S. market during the POI," and that finding is not contested. *Id.* at 31. Moreover, the Commission's determination was based in part on an extensive economic analysis which evaluated prospective domestic producers' performance in light of factors affecting *this particular industry and similar startup industries*. *See* Final Views at 37, 58-59, nn.157, 213 (citing Tesla's Prehearing Br. at App'x II, P.R. 175, C.R. 206/214) (finding "no indication that the domestic industry's performance is worse than what could reasonably be expected since reaching break-even can take years for start-up companies <u>*in this particular industry*</u>.") (emphasis added). The volume of subject imports did not affect this trajectory. Plaintiff's argument amounts to a complaint that the Commission found other evidence more persuasive than its own, which is within the Commission's discretion. *See* *Committee for Fair Coke Trade*, 28 C.I.T. at 1161-62; *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (the possibility of drawing two inconsistent conclusions from the evidence does

not prevent an administrative agency's finding from being supported by substantial evidence) (citations omitted).

Second, Plaintiff claims that its inability to qualify AAM is due to purchasers purposely delaying qualification because of the availability of high volumes of subject imports. *See* Pl. Br. at 48-52. As explained in **Part II**, substantial record evidence demonstrates that (1) qualification is a scientific process that relies on measurable outcomes; (2) prospective domestic producers' qualification timelines are consistent with U.S. purchasers' qualification timelines for other producers[8]; (3) the qualification process has included extensive technical coordination and feedback from U.S. purchasers; (4) prospective domestic producers continue to fail in meeting their customers' qualification specifications; and (5) U.S. purchasers have a documented supply chain localization strategy and have invested significant time and resources in qualification, facts which motivate them to qualify U.S. producers quickly, undermining Plaintiff's claims that "it would be economically rational for purchasers . . . to delay or interfere with qualification."[9] Pl. Br. at 50. Therefore, qualification is not being "delayed" by purchasers but by *prospective domestic producers' own inability to meet those scientific benchmarks*.

Plaintiff also broadly asserts that it "submitted argument and evidence that purchasers delayed qualifying the domestic industry because of their unfettered access to low-priced subject imports," Pl. Br. at 49, but cites no record evidence to support this claim. Rather, Plaintiff goes on to cite "contemporaneous business documents" regarding price negotiations to *infer* that

---

[8] The Commission rightly noted that substantial evidence in the record supported Defendant-Intervenors' contention that "the qualification timelines for domestic producers (including Syrah and Novonix) are well within the range of normal for their other global suppliers for other battery products." Final Views at 55 (citing Panasonic's Posthearing Br. at 4, P.R. 200, C.R. 242/246, LGES' Posthearing Br. at 6-8, P.R. 201, C.R. 244/247, Tesla's Posthearing Br., Answers to Commissioners' Questions at 62-63, P.R. 203, C.R. 241/249, and Kaijin's Posthearing Br. at 2-8, P.R. 199, C.R. 239).

[9] As noted above, it is not in U.S. purchasers' interest to delay qualification. Each of them has a stated economic goal of moving supply chains to the United States. Final Views at 17.

purchasers have delayed qualifying U.S. producers "due to lower priced Chinese imports." *Id.* at 50. To the extent Plaintiff argues that price negotiations are "intertwined" with the qualification process, *see id.*, the Commission expressly found the opposite based on substantial record evidence, observing that "supplier qualification by technical experts is conducted separately from commercial negotiations over pricing in offtake agreements." Final Views at 51, n.192 (citing LGES' Posthearing Br. at 3-6, P.R. 201, C.R. 244/247; Tesla's Posthearing Br., Answers to Commissioners' Questions at 63, P.R. 203, C.R. 241/249; Hearing Tr. at 177-78, 194, P.R. 198, C.R. 245).

Finally, Plaintiff argues that its claim of qualification delays was supported by testimony and documentary evidence. Plaintiff argues that testimony from a representative at Anovion supports its claim of an "interconnection" between delays in qualification and the availability of "lower priced Chinese imports." *See* Pl. Br. at 50-51. Plaintiff also states that it provided "concrete evidence" that **[ ]**. *Id.* at 51 (citing Petitioner's Posthearing Br. at Ex. 1, Question II, P.R. 202, C.R. 240/248).

However, the Commission reasonably concluded that other record evidence rebuts these claims. Regarding Anovion, any one-off delays that may have occurred in sample testing had nothing to do with the volume of subject imports. For instance, the Commission noted that one email exchange on the record indicated that **[ ]**. Final Views at 55, n.204 (citing Tesla's Posthearing Br. at App'x IV-D & Att. 1, P.R. 203, C.R. 241/249). Additionally, **[ ]**. *Id.* Accordingly, the Commission

determined that Petitioner's alleged evidence of delays in qualification, citing statements by Anovion, was severely undermined by other evidence on the record, as described in **Parts II.A** and **V**.

Plaintiff's claim that "concrete evidence" shows **[** **]**, Pl. Br. at 51, is also rebutted by extensive record evidence, as explained in **Parts II.A.3**, **II.B**, and **V.A**. The only "concrete evidence" Plaintiff cites for this proposition is the **[** **]**. *See* Pl. Br. at 51. In other words, Plaintiff's "evidence" for its argument is Petitioner's own inference drawn from the **[** **]** that it could be **[** **]**. Pl. Br. at 51 (citing Petitioner's Posthearing Br. at Ex. 1, P.R. 202, C.R. 240/248). But, as the Commission found, based on the substantial time and resources Tesla invested in qualification, an extended qualification process **[** **]**. Final Views at n.196. Thus, it was well within the Commission's discretion, and entirely reasonable, to find that the documentation provided by purchasers outweighed Petitioner's one-off testimonial statements, contradictory emails, and self-serving inferences that were ultimately rebutted.

### B. The Commission's Determination that the Domestic Industry's Performance Is Indicative Of Normal Start-Up Conditions Is Based on Substantial Evidence and Otherwise in Accordance with Law

In its section challenging the Commission's volume findings, Plaintiff recycles many of the same arguments in its section challenging the Commission's causation finding. Specifically, Plaintiff again argues, when it comes to Chinese dominance of the global AAM market, that the Commission failed to address evidence Plaintiff placed on the record regarding Chinese dominance in the market. *See* Pl. Br. at 52-55. However, Plaintiff once again ignores the contrary evidence the Commission considered, and its argument amounts to a dispute with how

the Commission weighed the record evidence. *See* **Part IV.A**. Plaintiff's fatal flaw is that Petitioner failed to develop a record about the conditions of competition in the United States specific to the U.S. AAM industry and instead relied on unsubstantiated hearing testimony and non-specific reports regarding the policies of the Chinese government. Pl. Br. at 52-54. For Plaintiff to say that the Commission failed to take into account Petitioner's evidence is false—the Commission did consider it and found Petitioner's evidence to be weak, irrelevant, and/or ultimately overcome by Respondents' substantial record evidence based on business records maintained in the ordinary course of business.

Plaintiff also again takes issue with the Commission's conclusion that prospective domestic producers "are startups, and their financial condition is no worse than expected given their phase of development." Pl. Br. at 52. Plaintiff asserts that the AAM industry is not "an industry with normal startup conditions," but a "near monopolistic market." *Id.* Plaintiff again relies on hearing testimony and academic reports that it argues "detract from the Commission's determination," *id.* at 53-54. For example, Plaintiff cites hearing testimony in which one of its witnesses asserted that "State-supported Chinese producers have a near monopoly of the AAM industry." *Id.* at 53. Plaintiff also cites a consultancy's report on "*The China Hazard*" to allege that "China purposely overproduces anode material, creating more supply than global demand." *Id.* However, as explained in **Part IV.B**, the Commission conducted a full impact analysis explaining its reasoning for concluding that the U.S. AAM industry was in a normal startup condition.

Plaintiff's argument is ultimately circular—it alleges that China's dominance of the market impedes U.S. industry's ability to compete, thereby perpetuating China's dominance. Plaintiff ignores reality—the defining characteristic of a successful AAM producer is whether it

can produce qualified AAM. Given overwhelming evidence that "no domestic producer is yet qualified with any purchasers," the Commission concluded that it is a "reasonable expectation that an industry at this stage of startup with no commercial sales would not be performing materially better than it is." Final Views at 59. The Commission's conclusion is entirely reasonable based on the record evidence and entirely consistent with its previous findings in similar cases. *See, e.g.*, *Certain Commuter Airplanes from France and Italy*, Inv. Nos. 701-TA-174 and 175 (Preliminary), USITC Pub. 1269 (July 1982) at 10 (finding that purchasers' ability to evaluate the performance of the product offered by the Domestic Industry is "essential" and that a seller who fails to detail the product's specifications "cannot be said to be in head-to-head competition for the sale.").

### C. The Commission's Determination that Subject Imports Have Not Hindered the Domestic Industry's Ability to Obtain Financing Is Based on Substantial Evidence and Otherwise in Accordance with Law

On prospective domestic producers' efforts to obtain financing, Plaintiff again takes issue with the Commission's conclusions without taking into account the contrary evidence on which the Commission relied, rendering its argument a dispute over how the Commission weighed the record evidence. First, Plaintiff argues that the Commission "failed to address" arguments and evidence submitted by Petitioner, including affidavits and testimony averring that prospective domestic producers' "efforts to obtain financing were hindered by low-priced subject imports" and that Chinese dominance in the market has been "a direct cause for hesitation on the part of investors." Pl. Br. at 55-56 (citing Petitioner's Posthearing Br. at Exs. 7, 9, 10, P.R. 202, C.R. 240/248). Second, Plaintiff argues that the offtake agreements and government grants prospective domestic producers have secured are insufficient sources of financing, and that the Commission "fail{ed} to grapple with" this contradictory evidence. *Id.* at 57-59.

### 1. Affidavits and Testimony

Plaintiff argues that the Commission unreasonably gave less weight to its affidavits and testimony because they lacked "supporting documentation," and cited "no legal authority" for such a determination. Pl. Br. at 60. Plaintiff further argues that the Commission "cite{d} no legal authority supporting its ability to disregard {} evidence . . . prepared during the course of the investigation." *Id.* at 61. These alleged failures to cite to legal authority are misplaced. The question before the Commission was which party's case was more persuasive, and courts have long observed that substantiated statements are simply more persuasive than unsubstantiated ones. *See, e.g.*, *Cucuras v. Secretary of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("oral testimony in conflict with contemporaneous documentary evidence deserves little weight") (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948)). The Commission's determination "to place greater or less weight on the evidence . . . is clearly within its discretion as the fact finder." *Usinor Sacilor*, 893 F. Supp. at 1123. It was entirely reasonable for the Commission to find that Plaintiff's witness statements—which were uncorroborated and made in the course of litigation—were less persuasive and held less probative value than other documentation on the record.

Plaintiff ignores the Commission's consideration of this evidence in its Final Views and further ignores the reasons the Commission found this evidence unpersuasive. Plaintiff focuses on **[** **]** affidavit alleging that **[**

**]**.

Pl. Br. at 55-56. But the Commission noted several contradictory facts which undermined the statements *in this very affidavit*. First, Petitioner never provided any supporting documentation

containing this financial analysis. Final Views at n.210. Second, the affidavit **[** **]** outside the POI and "approximately eleven months after the petitions were filed in these investigations thereby indicating that the document was prepared . . . during the course of these trade remedy proceedings." *Id.* Third, despite claims in the affidavit, NOVONIX "had publicly touted {the} price level" agreed to in its offtake agreement, asserting that it allowed the company to "generat{e} an acceptable level of profitability for investors." *Id.* Thus, it was entirely reasonable for the Commission to accord this affidavit little weight.

The Commission considered each of the other affidavits cited by Plaintiff and found similar reasons to accord them little weight. Petitioner's Exhibit 9 is a declaration of a **[** **]**. While the affidavit goes on to raise concerns over **[** **]**, the Commission reasonably discounted its probative value. *Id.* As the record demonstrates, Anovion failed to **[** **]**. *Id.*; *see also* **Part V.A**.

As for the remaining affidavit and additional testimony Plaintiff cited, Plaintiff simply ignores the fact that some prospective domestic producers are better investment propositions than others. As the Commission noted, two prospective domestic producers have secured significant financing. *See* Final Views at n.210 ("{T}he two domestic producers that are by far the farthest along in terms of qualification (Syrah and Novonix) have secured approximately $2 billion in financing, collectively."). The success of one prospective domestic producer over another goes back to the issue of qualification. While those that are the farthest along in the qualification process have had success in attracting financing, the Commission noted that "Anovian {sic} has not had the same success in meeting qualification milestones." *Id.* Against this evidence,

affidavits regarding its challenges in obtaining financing "do not demonstrate that Chinese pricing prevented Anovian {*sic*} from being a suitable candidate for investment." *Id.* In light of "extensive" economic analysis demonstrating that prospective domestic producers' financial position reflected normal startup conditions—and that prospective domestic producers' were failing to qualify their products despite significant time and technical investment by purchasers—it was entirely reasonable for the Commission to assign less weight to Petitioner's affidavits and testimony than the documentary evidence on the record. *See* Final Views at 58-59, n.213 (citing Tesla's Prehearing Br. at App'x II, P.R. 175, C.R. 206/214); *see also* **Part V**.

By contrast, purchasers did not rely solely on witness statements but on hundreds of pages of documentary evidence substantiating, for example, that: (1) purchasers had submitted letters to support funding prospective domestic producers, Final Views at 53-54 (citing **[** **]** and LGES); (2) most prospective domestic producers are still in the early stages of qualification and have failed to meet technical specifications of battery producers, *id.* at 51 (citing Panasonic's technical meeting presentation slides providing feedback on why certain samples failed Panasonic's testing); *id.* at 52, n.196 (citing Tesla's test results placed on the record); and (3) qualification timelines for prospective domestic producers are well within the range of normal for other global suppliers, *id.* at 54-55; *see also* **Parts II.A** and **V**. Plaintiff suggests that the Commission applied a double standard, "favorably cit{ing} an affidavit from Tesla, which did not include supporting documentation" in support of the Commission's conclusion that purchasers applied a cost-plus analysis in pricing negotiations. Pl. Br. at 60 (citing Final Views at n.176). However, Plaintiff fails to acknowledge that the affidavit in question was supported by other record evidence, including evidence that the price negotiated in the Tesla-Syrah offtake agreement was sufficient to cover its costs and that **[**

**NON-CONFIDENTIAL VERSION**

]. Final Views at n.176.

Whereas [ ], establishing a clear timeline of events, email correspondence from prospective domestic producers "merely [

]." Final Views at n.176.

Plaintiff's reliance on evidence that was dated after the petitions were filed was also unpersuasive. Pl. Br. at 61. Post-hoc statements and documents prepared for litigation are less probative and given less weight than contemporaneous documentation. *See, e.g.*, *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001) (finding in patent appeal that documentary or physical evidence "made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated" and that "post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate."); *Durum Gida Sanyi Ve Ticaret A.S. v. United States*, 311 F. Supp. 3d 1367, 1372 (Ct. Int'l Trade 2018) (finding agency "reasonably explained {its} concerns regarding the credibility and contemporaneity" of party's declaration). Thus, it was entirely reasonable for the Commission to accord this evidence less weight. Final Views at n.210.

Plaintiff's argument that "most of the evidence {in} a trade remedy investigation is prepared for the purpose of that investigation" is disingenuous. Pl. Br. at 61. Plaintiff asserts that "the Commission issues blank questionnaires to be completed by interested parties during trade remedy investigations." *Id.* But parties' questionnaire responses are *retrospective*. The Commission requests data reflecting production and sales of merchandise *that has already occurred*, and parties provide that data accordingly. The data in questionnaire responses are not

prepared during the course of the investigation in the way that an email sent during an ongoing investigation can be drafted so as to be favorable to the party sending it. Indeed, manipulating production and sales data provided to the Commission would be fraudulent. Plaintiff's argument that affidavits executed, or emails sent, during the course of an investigation are equivalent to questionnaire responses submitted during the investigation is absurd. Plaintiff presents no support for its evidentiary claims. Accordingly, the Court should uphold the Commission's determination as factfinder to accord other evidence greater weight.

**2. Offtake Agreements and Government Grants**

Plaintiff suggests that the offtake agreements prospective domestic producers have secured have not been sufficient sources of financing and that the Commission ignored evidence to this effect. Pl. Br. at 57-58. But again, it is Plaintiff that disregards evidence that directly supports the Commission's conclusion, rendering its argument a dispute over how the Commission weighed the record evidence. In disregarding this evidence, Plaintiff also downplays the substantial investment these offtake agreements represent—thousands of hours of technical assistance, amounting to an enormous transfer of intellectual capital and technical expertise, helping prospective domestic producers stand up production.

Plaintiff argues that "the Commission improperly relies on the fact that two domestic producers (in effect a minority of the domestic industry) have reached offtake agreements to support its conclusion that reaching an offtake agreement is equivalent to providing the domestic industry with sufficient tools to become established." Pl. Br. at 57-58. However, the record showed that Syrah and Novonix have offtake agreements with purchasers and have obtained about $1 billion and $860 million in funding, respectively. Final Views at 56. Offtake agreements with purchasers also come with significant resources. The Commission found that

U.S. purchasers "have invested significant time and resources" in their supplier qualification processes and have provided prospective domestic producers with "extensive technical support" to assist them in completing the qualification process. *See* Final Views at 23 & n.97 (citing, e.g., Tesla's Prehearing Br. at 36-47 & App. I-C, P.R. 175, C.R. 206/214 (Dr. Sunny Hy Aff.); LGES' Prehearing Br. at 4-8 & Ex. 1, P.R. 174, C.R. 203/213; Panasonic's Prehearing Br. at 2-4 & Exs. 1 & 24, P.R. 173, C.R. 202/212 (Bryan Byles Aff.)). Prospective domestic producers have received this financing in spite of foreign dominance in the AAM market. As the Commission acknowledged, purchasers "have prioritized sourcing AAM domestically to mitigate supply chain risk." Final Views at 17. Thus, the Commission reasonably rejected Petitioner's argument that purchasers are working at odds with the goal of establishing the domestic industry and securing its long-term success based on record evidence.

Strangely, Plaintiff assails the offtake agreements prospective domestic producers *have* secured after claiming that subject imports have prevented them from securing the very offtake agreements it now maligns. *Compare* Pl. Br. at 57, *with id.* at 55-56. Either such agreements are significant positive investments that generate further investment in prospective domestic producers—and prospective domestic producers tout them as profitable, *see* Final Views at n.210 (citing NOVONIX press release)—or they are not. Plaintiff cannot have it both ways, treating both the absence and existence of offtake agreements as equal evidence of material retardation.

Plaintiff also leaves out the actual documented reasons for delays in prospective domestic producers' qualification, which are preventing them from **[**

**]**. *See* Pl. Br. at 57. Purchasers provided extensive feedback documenting prospective domestic producers' repeated failures to produce AAM to scientific customer specifications. Final Views at 52-53 & n.197. Far from "improperly rel{ying}" on offtake

agreements as evidence of purchasers' support in helping the domestic industry become established, the Commission made clear in its determination that "U.S. battery cell producers have gone to great lengths to work with the domestic AAM industry to develop the technical know-how and production capabilities required to produce AAM," but that no prospective domestic producer is qualified due to its own "inability to meet purchaser specifications." Final Views at 58-60.

As for government grants, Plaintiff asserts that the Commission's determination that prospective domestic producers have received significant government funding did not "consider contradictory evidence" and that they "remain{} significantly under-capitalized and under-invested." Pl. Br. at 58-59. As an initial matter, it is not clear what Plaintiff means by "contradictory evidence." It does not dispute, for instance, that Syrah received a $102 million loan from the DOE or that NOVONIX obtained a loan of more than $700 million from the DOE to construct a new AAM facility in Tennessee. *See* Final Views at 56. Rather, Plaintiff merely argues that these investments are not enough to establish the domestic industry. But Plaintiff is presenting a false choice. First, investments alone will not establish the domestic industry. As detailed above, prospective domestic producers need to qualify their product in order to establish a product capable of competing with subject imports. *See* **Parts II.A.2** and **V**. Second, Plaintiff has already asserted elsewhere that existing investments **[ ]**. *See* Pl. Br. at 57. Indeed, purchasers submitted letters to support government funding of prospective domestic producers. *See* Final Views at 53-54. Plaintiff's argument continually moves the goalposts because it fails to confront the reality that there was no domestically produced AAM capable of competing with subject imports throughout the POI. *See* Final Views at 24 ("no domestic producers of AAM have fully qualified their product for commercial use" and "{m}ost

domestic producers of AAM are in the early stages {of} the qualification process"); *see also* Final Views at 58, 59.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that this Court affirm the Commission's final negative injury determination for AAM from China.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Julia K. Eppard
Sydney L. Stringer
Sarah P. Tinaphong

**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street, N.W.
Washington, D.C. 20006
202-887-4000

Counsel for Tesla, Inc.

/s/ Daniel L. Porter
Daniel L. Porter
Julian Beach

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

Counsel for LG Energy Solution Michigan, Inc.

/s/ Sydney H. Mintzer
Sydney H. Mintzer
Ryan R. Migeed

**Mayer Brown, LLP**
1999 K Street, NW
Washington, DC 20006
202-263-3000

Counsel for Panasonic Corporation of North America, Panasonic Energy Corporation of North America

**November 23, 2026**

## CERTIFICATE OF COMPLIANCE

Pursuant to this Court's Order dated July 10, 2026 (ECF No. 61), setting the word limitation of Defendant-Intervenors' Response Brief to 20,000 words, counsel for Defendant-Intervenors certify that this Response Brief contains 19,781 words according to the word count feature of the Microsoft Word processing program and therefore complies with the word count limitation.

/s/ Matthew R. Nicely
Matthew R. Nicely
Julia K. Eppard
Sydney L. Stringer
Sarah P. Tinaphong

**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street, N.W.
Washington, D.C. 20006
202-887-4000

Counsel for Tesla, Inc.

/s/ Daniel L. Porter
Daniel L. Porter
Julian Beach

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

Counsel for LG Energy Solution Michigan, Inc.

/s/ Sydney H. Mintzer
Sydney H. Mintzer
Ryan R. Migeed

**Mayer Brown, LLP**
1999 K Street, NW
Washington, DC 20006
202-263-3000

Counsel for Panasonic Corporation of North America, Panasonic Energy Corporation of North America

**November 23, 2026**